# Exhibit F

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

TIMOTHY KING, et al.,

       Plaintiffs,

v.

GRETCHEN WHITMER, et al.,             Civil Case No. 20-13134
                                     Honorable Linda V. Parker

       Defendants.,

and

CITY OF DETROIT,
DEMOCRATIC NATIONAL COMMITTEE,
MICHIGAN DEMOCRATIC PARTY,
and ROBERT DAVIS,

       Intervenor-Defendants.
_____/

## OPINION AND ORDER

     This lawsuit represents a historic and profound abuse of the judicial process.

It is one thing to take on the charge of vindicating rights associated with an

allegedly fraudulent election.  It is another to take on the charge of deceiving a

federal court and the American people into believing that rights were infringed,

without regard to whether any laws or rights were in fact violated.  This is what

happened here.

Individuals may have a right (within certain bounds) to disseminate allegations of fraud unsupported by law or fact in the public sphere.  But attorneys cannot exploit their privilege and access to the judicial process to do the same.  And when an attorney has done so, sanctions are in order.

Here's why.  America's civil litigation system affords individuals the privilege to file a lawsuit to allege a violation of law.  Individuals, however, must litigate within the established parameters for filing a claim.  Such parameters are set forth in statutes, rules of civil procedure, local court rules, and professional rules of responsibility and ethics.  Every attorney who files a claim on behalf of a client is charged with the obligation to know these statutes and rules, as well as the law allegedly violated.

Specifically, attorneys have an obligation to the judiciary, their profession, and the public (i) to conduct some degree of due diligence before presenting allegations as truth; (ii) to advance only tenable claims; and (iii) to proceed with a lawsuit in good faith and based on a proper purpose.  Attorneys also have an obligation to dismiss a lawsuit when it becomes clear that the requested relief is unavailable.

This matter comes before the Court upon allegations that Plaintiffs' counsel did none of these things.  To be clear, for the purpose of the pending sanctions motions, the Court is neither being asked to decide nor has it decided whether there

2

was fraud in the 2020 presidential election in the State of Michigan.[1]  Rather, the question before the Court is whether Plaintiffs' attorneys engaged in litigation practices that are abusive and, in turn, sanctionable.  The short answer is yes.

The attorneys who filed the instant lawsuit abused the well-established rules applicable to the litigation process by proffering claims not backed by law; proffering claims not backed by evidence (but instead, speculation, conjecture, and unwarranted suspicion); proffering factual allegations and claims without engaging in the required prefiling inquiry; and dragging out these proceedings even after they acknowledged that it was too late to attain the relief sought.

*And this case was never about fraud—it was about undermining the People's faith in our democracy and debasing the judicial process to do so.*

While there are many arenas—including print, television, and social media—where protestations, conjecture, and speculation may be advanced, such expressions are neither permitted nor welcomed in a court of law.  And while we as a country pride ourselves on the freedoms embodied within the First

---

[1] In fact, resolution of that issue was never appropriately before the Court for the reasons stated in the Court's December 7, 2020 ruling.  (*See* ECF No. 62.)

Amendment, it is well-established that an attorney's freedom of speech is circumscribed upon "entering" the courtroom.[2]

Indeed, attorneys take an oath to uphold and honor our legal system. The sanctity of both the courtroom and the litigation process are preserved only when attorneys adhere to this oath and follow the rules, and only when courts impose sanctions when attorneys do not. And despite the haze of confusion, commotion, and chaos counsel intentionally attempted to create by filing this lawsuit, one thing is perfectly clear: Plaintiffs' attorneys have scorned their oath, flouted the rules, and attempted to undermine the integrity of the judiciary along the way.[3] As such,

---

[2] *See Mezibov v. Allen*, 411 F.3d 712, 717, 720-21 (6th Cir. 2005) (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071 (1991)) ("[The Supreme Court] has noted . . . that '[i]t is unquestionable that in the courtroom itself . . . whatever right to 'free speech' an attorney has is extremely circumscribed. . . . [I]n filing motions and advocating for his client in court, [an attorney is] not engaged in free expression; he [is] simply doing his job. In that narrow capacity, he voluntarily accept[s] almost unconditional restraints on his personal speech rights . . . . For these reasons, . . . in the context of the courtroom proceedings, an attorney retains no personal First Amendment rights . . . .").

[3] Plaintiffs' counsel and their counsel have suggested that this Court's handling of these proceedings and any resultant decision can be expected based on the President who appointed the undersigned. This is part of a continuing narrative fostered by Plaintiffs' counsel to undermine the institutions that uphold our democracy. It represents the same bad faith that is at the base of this litigation. To be clear, all federal judges, regardless of which President appoints them, take oaths affirming that they will "faithfully and impartially discharge" their duties, 28 U.S.C. § 453, and uphold and protect the Constitution of the United States, 5 U.S.C. § 3331.

4

the Court is duty-bound to grant the motions for sanctions filed by Defendants and

Intervenor-Defendants and is imposing sanctions pursuant to Rule 11 of the

Federal Rules of Civil Procedure, 28 U.S.C. § 1927, and its own inherent authority.

## I.    Procedural History

On November 3, 2020, a record 5.5 million Michigan residents voted in the

presidential election, resulting in then-Former Vice-President Joseph R. Biden, Jr.

securing over 150,000 more votes than then-President Donald J. Trump.[4]  By the

following evening, President Biden had been declared the winner in the State.[5]

Even though Michigan law establishes an extensive procedure for challenging

elections, *see* Mich. Comp. Laws §§ 168.831-.832, .879, Plaintiffs did not avail

themselves of those procedures, as they conceded at the July 12, 2021 motion

hearing before this Court (ECF No. 157 at Pg ID 5332-33).

Instead, at 11:48 p.m. on November 25, 2020—the eve of the Thanksgiving

holiday—Plaintiffs (registered Michigan voters and nominees of the Republican

Party to be presidential electors on behalf of the State) filed the current lawsuit

against Michigan Governor Gretchen Whitmer, Michigan Secretary of State

---

[4] Moving forward, the Court refers to the current and former presidents as
President Biden and Former President Trump, respectively.

[5] *See* Sam Gringlas, *Biden Wins Michigan, Per The AP, Putting Him 6 Electoral
Votes From Presidency*, NPR (Nov. 4, 2020, 6:00 PM), https://perma.cc/S5NL-
F9UB; Todd Spangler, *Joe Biden Wins Michigan in Critical Battleground Election
Victory*, Detroit Free Press (Nov. 4, 2020, 6:00 PM), https://perma.cc/3N9J-A5KL.

Jocelyn Benson, and the Michigan Board of State Canvassers.  The following

lawyers electronically signed the pleading: Sidney Powell, Scott Hagerstrom, and

Gregory J. Rohl.  (ECF No. 1 at Pg ID 75.)  The Complaint listed the following

attorneys as "Of Counsel": Emily P. Newman, Julia Z. Haller, L. Lin Wood, and

Howard Kleinhendler.  (*Id.*)

On November 29, a Sunday, Plaintiffs filed, *inter alia*, an Amended

Complaint (ECF No. 6) and an "Emergency Motion for Declaratory, Emergency,

and Permanent Injunctive Relief and Memorandum in Support Thereof" ("Motion

for Injunctive Relief") (ECF No. 7).  The same attorneys who electronically signed

or were listed as "Of Counsel" on the initial complaint signed or were listed on the

amended pleading.  (ECF No. 6 at Pg ID 957.)  The amended pleading also listed

Brandon Johnson as additional "Of Counsel."  (*Id.*)

In their Amended Complaint, Plaintiffs alleged three claims pursuant to 42

U.S.C. § 1983: violations of (Count I) the Elections and Electors Clauses; (Count

II) the Fourteenth Amendment Equal Protection Clause; and (Count III) the

Fourteenth Amendment Due Process Clause.  (ECF No. 6.)  Under Count IV,

Plaintiffs asserted violations of the Michigan Election Code.  (*Id*.)  Underlying

Plaintiffs' claims were their contentions that Defendants (i) "failed to administer

the November 3, 2020 election in compliance with the manner prescribed by the

Michigan Legislature in the Michigan Election Code, [Mich. Comp. Laws]

6

§§ 168.730-738" and (ii) "committed a scheme and artifice to fraudulently and illegally manipulate the vote count to make certain the election of Joe Biden as President of the United States."  (*See* ECF No. 7 at Pg ID 1840 (citing "Compl., Section 1").)  Plaintiffs asserted that their claims were supported by "the affidavits of dozens of eyewitnesses and the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses."  (ECF No. 6 at Pg ID 873.)  Plaintiffs attached hundreds of pages as exhibits to their pleadings, some of which included affidavits from individuals and reports from purported experts.  (*See* ECF Nos. 6-1 to 6-30.)  Most of these affidavits had been submitted by different lawyers in prior Michigan lawsuits challenging the 2020 presidential election.  These other lawsuits include *Costantino v. City of Detroit*, No. 20-014780-AW (Wayne Cnty. Cir. Ct. filed Nov. 8, 2020) and *Donald J. Trump for President, Inc. v. Benson*, No. 1:20-cv-01083 (W.D. Mich. filed Nov. 11, 2020).  Plaintiffs cited to these materials in support of the factual allegations in their Amended Complaint and Motion for Injunctive Relief.

Plaintiffs asked the Court to, *inter alia*, decertify the election results and order Defendants "to transmit certified election results that state that President Donald Trump is the winner of the election . . . ."  (ECF No. 6 at Pg ID 955; ECF No. 7 at Pg ID 1847.)  Plaintiffs maintained that this Court had to issue this relief by December 8, 2020, because, on that date, the results of the election would be

7

considered conclusive.  (*See* ECF No. 6 at Pg ID 890; ECF No. 7 at Pg ID 1846-47.)

By December 1, motions to intervene had been filed by the City of Detroit ("City") (ECF No. 5), Detroit resident and Michigan voter Robert Davis (ECF No. 12), and the Democratic National Committee and Michigan Democratic Party ("DNC/MDP") (ECF No. 14).  As of that date, however, Plaintiffs had not yet served Defendants with the pleadings or the Motion for Injunctive Relief.  Thus, on December 1, the Court entered a text-only order to hasten Plaintiffs' actions to bring Defendants into the case and enable the Court to address Plaintiffs' pending motions.  Plaintiffs served Defendants on December 1 (ECF No. 21), and the Court thereafter granted the motions to intervene (ECF No. 28) and entered an expedited briefing schedule with respect to Plaintiffs' Motion for Injunctive Relief (ECF No. 24).

On December 7, the Court issued an opinion and order denying Plaintiffs' motion and thereby declining to grant Plaintiffs the relief they wanted, which the Court noted was "stunning in its scope and breathtaking in its reach" as it sought to "disenfranchise the votes of the more than 5.5 million Michigan citizens who . . . participat[ed] in the 2020 General Election."  (ECF No. 62 at Pg ID 3296.)  The Court concluded that Plaintiffs' lawsuit was subject to dismissal based on any one of several legal theories: (i) their claims were barred by Eleventh Amendment

8

immunity; (ii) their claims were barred under the doctrine of laches; (iii) they

lacked standing; (iv) their claims were moot; and (v) abstention was appropriate

under the doctrine set forth in *Colorado River Water Conservation District v.*

*United States*, 424 U.S. 800 (1976). (*Id.* at Pg ID 3301-24.) But the Court also

concluded that Plaintiffs were not likely to succeed on the merits of their claims.

(*Id.* at Pg ID 3324-28.)

     As to Plaintiffs' claim that Defendants violated the Elections and Electors

Clauses by deviating from the requirements of the Michigan Election Code, the

Court pointed out that Plaintiffs failed to "explain how or why such violations of

state election procedures automatically amount to violations of the clauses" (*id*. at

Pg ID 3324), and case law did not support Plaintiffs' attempt to expand the

Constitution that far (*id.* at Pg ID 3325). Thus, the Court found, Plaintiffs'

Elections and Electors Clauses claim was "in fact [a] state law claim[] disguised as

[a] federal claim." (*Id.* at Pg. ID 3324.) With respect to Plaintiffs' attempt to

establish an equal protection claim based on the theory that Defendants engaged in

tactics to, among other things, switch votes for Former President Trump to votes

for President Biden, the Court found the allegations to be based on nothing more

than belief, conjecture, and speculation rather than fact. (*Id*. at Pg ID 3326-28.)

As to the due process claim, the Court noted that Plaintiffs abandoned it. (*Id.* at Pg

ID 3317 n.5.)

9

The day after the Court issued its decision, attorney Stefanie Lynn Junttila entered her appearance in this matter (ECF No. 63) and filed a Notice of Appeal to the "Federal Circuit" on behalf of Plaintiffs (ECF No. 64).  The notice was updated on December 10 to reflect the proper appellate court (namely, the Sixth Circuit Court of Appeals).  On December 11, 2020, Sidney Powell, Stefanie Lynn Junttila, and Howard Kleinhendler filed a petition for writ of certiorari in the United States Supreme Court.  (*See* ECF No. 68.)  In the petition, when urging immediate Supreme Court review, Plaintiffs wrote: "Once the electoral votes are cast [on December 14, 2020] subsequent relief would be pointless."  (ECF No. 105-2 at Pg ID 4401.)

On December 15, 2020, the City served a letter ("Safe Harbor Letter") and motion ("Safe Harbor Motion") on Plaintiffs' attorneys, threatening sanctions pursuant to Rule 11 of the Federal Rules of Civil Procedure.  (ECF No. 161-3; *see also* ECF No. 95 at Pg ID 4118-19 (acknowledging service of the motion).)  Specifically, counsel for the City sent the Safe Harbor Letter and Safe Harbor Motion via electronic mail and first-class mail to Sidney Powell, Gregory Rohl, Stefanie Lynn Junttila, Scott Hagerstrom, L. Lin Wood, and Howard Kleinhendler.  (ECF No. 161-3 at Pg ID 6058-67.)

In the meantime, the Supreme Court did not rule on Plaintiffs' petition for

writ of certiorari by December 14.[6]  On December 22, Davis filed a motion seeking

sanctions against Plaintiffs and their counsel pursuant to the Court's inherent

authority and 28 U.S.C. § 1927.  (ECF No. 69.)  On the same day, motions to

dismiss were filed by Defendants (ECF No. 70), the DNC/MDP (ECF No. 72), and

the City (ECF No. 73).  The City's motion to dismiss included four paragraphs

discussing why Plaintiffs and Plaintiffs' counsel should be sanctioned pursuant to

§ 1927.[7]  (*Id.* at Pg ID 3576-78.)  And all three motions to dismiss reflected that

concurrence had been sought, but not obtained, from Plaintiffs' counsel.  (*See* ECF

No. 70 at Pg ID 69; ECF No. 72 at Pg ID 3434; ECF No. 73 at Pg ID 3545.)

Plaintiffs' response to Davis' sanctions motion was due on January 5, 2021, and

their responses to the motions to dismiss were due on January 12.  *See* E.D. Mich.

LR 7.1(e).

On January 3, Plaintiffs filed a motion seeking an extension of time (until

January 19) to respond to Davis' sanctions motion, citing counsel's current

assignments and the need for more time to prepare a response.  (ECF No. 74 at Pg

ID 3598.)  The Court granted Plaintiffs' request.  (ECF No. 76.)  On January 12,

---

[6] The Supreme Court eventually denied the petition on February 22, 2021.  (*See* ECF No. 114 and accompanying docket entry text.)

[7] The City further explained in this motion that it "intends to file a Motion for Rule 11 sanctions (after the safe harbor expires)."  (ECF No. 73 at Pg ID 3558 n.17.)

11

Plaintiffs sought an extension of time (also until January 19) to respond to the pending motions to dismiss, again citing the need for more time to research the claims advanced in the motions.  (ECF No. 82.)  The Court granted this request, as well.

On January 14, Plaintiffs filed what was docketed as a response to all three pending motions to dismiss, but the single response brief addressed only the § 1927 sanctions requested in the City's motion to dismiss.  (ECF No. 85.)  On the same day, Plaintiffs filed notices voluntarily dismissing this case as to Defendants (ECF Nos. 86, 88, 90), the City (ECF No. 87), and the DNC/MDP (ECF Nos. 89, 91).  Plaintiffs moved to voluntarily dismiss Davis a few days later.  (ECF No. 92.)  On January 26, 2021, the parties stipulated to the dismissal of the matter on appeal.  (*See* ECF No. 101.)

In the meantime, on January 5, the City filed a Rule 11 "Motion for Sanctions, for Disciplinary Action, for Disbarment Referral and for Referral to State Bar Disciplinary Bodies."  (ECF No. 78.)  On January 28, Governor Whitmer and Secretary of State Benson (hereafter "the State Defendants") filed a "Motion for Sanctions Under 28 U.S.C. § 1927."  (ECF No. 105.)  All sanctions motions— including Davis'—were fully briefed thereafter.

On June 8, the Court scheduled a motions hearing for July 6 and, on June 17 ordered "[e]ach attorney whose name appears on any of Plaintiffs' pleadings or

12

briefs" to "be present."  (ECF No. 123.)  On June 28, Plaintiffs sought to adjourn the hearing due to Junttila's planned vacation (ECF No. 126), a request the opposing parties (except Davis) did not contest (ECF No. 126 at Pg ID 5201).  The Court granted the request and eventually the hearing was scheduled for July 12. (ECF No. 147.)  Prior to the hearing, Plaintiffs' attorneys (except Junttila) retained counsel to represent them.[8]  (ECF Nos. 127-140, 148.)

The Court conducted an almost six-hour virtual hearing on July 12.  At the beginning of the hearing, the Court explained that each question was directed to all attorneys and, if no other attorney commented or added to the initial response to a question, the Court would find that all other attorneys agreed with the answer placed on the record.  (ECF No. 157 at Pg ID 5314.)  At the end of the hearing, the Court indicated that the attorneys could file supplemental briefs and supporting affidavits (*id.* at Pg ID 5424, 5506-07, 5513, 5515, 5517), and thereafter entered an order setting deadlines for those briefs (*see* ECF No. 150).  Supplemental briefs were subsequently filed (ECF Nos. 161-62, 164-65), as were responses thereto (ECF Nos. 166-171).  No attorney filed an affidavit.

---

[8] During the July 12 hearing, Donald D. Campbell and Patrick McGlinn represented Hagerstrom, Haller, Johnson, Rohl, Wood, Kleinhendler, and Powell, while Thomas M. Buchanan represented Newman.  By the time post-hearing supplemental briefs were filed, Wood and Newman had obtained new counsel. (*See* ECF No. 154, 158.)

**II.     Sanctions Motions**

The State Defendants and Intervenor-Defendants rely on 28 U.S.C. § 1927,

Federal Rule of Civil Procedure 11, and the Court's inherent authority as the

sources for sanctioning Plaintiffs and/or their counsel.  In this section, the Court

summarizes the arguments made in each sanctions motion.  In the next section, the

Court discusses the law that applies to each source of authority.

**A.     Governor Whitmer & Secretary of State Benson**

The State Defendants seek sanctions against Plaintiffs' counsel under § 1927

or, alternatively, the Court's inherent authority.

The State Defendants contend that sanctions are appropriate pursuant to

§ 1927 for two reasons.  "First, Plaintiffs' counsel unreasonably and vexatiously

multiplied the proceedings in this litigation by failing to dismiss the case when

their claims became moot, which plainly occurred upon the vote of Michigan's

electors on December 14, if not earlier."  (ECF No. 105 at Pg ID 4337.)

"[S]econd, Plaintiffs' counsel knew or should have known that their legal claims

were frivolous, but counsel pursued them nonetheless, even after the Court's

opinion concluding that Plaintiffs were unlikely to succeed on the merits of their

claims for multiple reasons," which included "the weakness of their legal claims

and the lack of factual support."  (*Id.* at Pg ID 4367.)  And, the State Defendants

argue, sanctions pursuant to the Court's inherent authority are appropriate because

14

"Plaintiffs' claims were meritless, their counsel should have known this, and their real motive in filing suit was for an improper purpose." (*Id.* at Pg ID 4369-74.)

In a supplemental brief filed in support of their motion for sanctions on April 6, 2021, the State Defendants also identify three specific allegations that they contend were not well-grounded in fact:

1. "'[T]he absentee voting counts in some counties in Michigan have likely been manipulated by a computer algorithm,' and [] at some time after the 2016 election, software was installed that programmed tabulating machines to 'shift a percentage of absentee ballot votes from Trump to Biden.'"

2. "Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election."

3. "The several spikes cast solely for Biden could easily be produced in the Dominion system by preloading batches of blank ballots in files such as Write-Ins, then casting them all for Biden using the Override Procedure (to cast Write-In ballots) that is available to the operator of the system."

(ECF No. 118-2 at Pg ID 4804-05 (citing ECF No. 6 at Pg ID 874 ¶ 5, 916-17 ¶ 124, 922 ¶ 143).)

## B.     City of Detroit

The City seeks sanctions against Plaintiffs and Plaintiffs' counsel for violating Rule 11.

The City first argues that the Complaint was filed for an improper purpose, in contravention of Rule 11(b)(1).  The City supports this assertion by pointing to (i) the hurdles that previously barred Plaintiffs' success, including Eleventh Amendment immunity, mootness, laches, standing, and the lack of merit as to the claims under the Constitution and state statutory law; (ii) the lack of seriousness and awareness of deficiency evinced by Plaintiffs' failure to serve Defendants before this Court hastened them via its December 1, 2020 text-only order; and (iii) Plaintiffs' counsel's attempt "to use this Court's process to validate their conspiracy theories," "undermin[e] our democracy," and "overturn[] the will of the people" as evinced by statements made by some of Plaintiffs' attorneys.  (ECF No. 78 at Pg ID 3636-43.)

The City also contends that Plaintiffs' claims were not well-grounded in law, in contravention of Rule 11(b)(2).  This is so, the City argues, not only because of Eleventh Amendment immunity, mootness, laches, and standing, but also because the factual allegations could not support Plaintiffs' claims or the relief they requested.  (*Id.* at Pg ID 3658-62.)

16

The City further contends that Plaintiffs' allegations were not well-grounded in fact, in contravention of Rule 11(b)(3):

1.   Plaintiffs alleged that "Republican challengers were not given 'meaningful' access to the ballot processing and tabulation at the Absent Voter Counting Board located in Hall E of the TCF Center," knowing that the assertion lacked evidentiary support because it was rejected in *Costantino*, the state court case decided before Plaintiffs filed the Complaint (*id.* at Pg ID 3644 (citing Am. Compl. at ¶¶ 13, 42, 47, 57, 59-61));

2.   Plaintiffs alleged that "Republican challengers were exclusively barred from entering the TCF Center," knowing that the assertion was rejected in *Costantino* (*id.* at Pg ID 3645 (citing Am. Compl. at ¶¶ 62-63));

3.   Plaintiffs alleged that some absentee ballots were "pre-dated," knowing that the assertion was rejected in *Costantino* (*id.* at Pg ID 3645-46 (citing Am. Compl. at ¶¶ 88, 90));

4.   Plaintiffs alleged that ballots were "counted more than once," knowing that the assertion was both rejected in *Costantino* and "conclusively disproven by the Wayne County canvass" (*id.* at Pg ID 3646-47 (citing Am. Compl. at ¶ 94));

5.   Plaintiffs alleged that a "software weakness" in Dominion machines "upended Michigan's election results," knowing that the "two instances of errors [to which Plaintiffs cite]—one in Antrim County and one in Oakland County (Rochester Hills)"—did not constitute evidentiary support for the allegation (*id.* at Pg ID 3647-49);

6.      Plaintiffs "intentional[ly] lie[d]" by filing the partially redacted declaration of "Spider"—who Plaintiffs identified as "a former US Military Intelligence expert" and "former electronic intelligence analyst with the 305th Military Intelligence"—which was signed by Joshua Merritt, who never completed the entry-level training course at the 305th Military Intelligence Battalion and is not an intelligence analyst (*id.* at Pg ID 3651-52 (citing Am. Compl. at ¶¶ 17, 161));

7.      Plaintiffs "intentional[ly] lie[d]" by filing the declaration of Russell James Ramsland, Jr., who claimed (i) that there were "reports of 6,000 votes in Antrim County that were switched from Donald Trump to Joe Biden *and were only discoverable through a hand counted manual recount*," when "there were no hand recounts in Michigan as of that date"; (ii) "statistically improbable" voter turnouts, including a turnout of 781.91% in North Muskegon, where the publicly-available official results were known, as of election night, to be approximately 78%, and a turnout of 460.51% (or, elsewhere on the same chart, 90.59%) in Zeeland Charter Township, where it was already known to be 80%"; and (iii) that "'ballots can be run through again effectively duplicating them,'" when there were "safeguards in place to prevent double counting of ballots in this way" (*id.* at Pg ID 3652-54 (emphasis in original)); and

9.      Plaintiffs "intentional[ly] lie[d]" by filing the "analysis" of William M. Briggs, who relied on "survey" results posted in a tweet by Matt Braynard and the "survey" "misrepresents Michigan election laws"; "disregards standard analytical procedures"; contains "a baffling array of inconsistent numbers"; and includes "conclusions [that are] without merit" (*id.* at Pg ID 3654-58).

18

The City maintains that monetary sanctions sufficient to deter future misconduct by counsel must include the amount counsel collected in their fundraising campaign to challenge the 2020 election, as well as the attorneys' fees Defendants incurred to defend against Plaintiffs' claims.  (*Id.* at Pg ID 3662-63.) The City also seeks an injunction barring Plaintiffs and their counsel from filing future actions in this District without obtaining approval from a judicial officer and asks the Court to refer counsel for discipline and disbarment.[9]  (*Id.* at Pg ID 3664, 3666-69.)

## C.    Davis

Davis seeks sanctions against Plaintiffs and their counsel pursuant to the Court's inherent authority and § 1927, based on many of the same legal and factual

---

[9] The City also argues that "this is the rare case where the Plaintiffs themselves deserve severe sanctions."  (ECF No. 78 at Pg ID 3664.)  "Rule 11 expressly provides the district court with discretion to impose sanctions on a party that is responsible for the rule's violation, provided that the violation is not one for unwarranted legal contentions under Rule 11(b)(2)."  *Rentz v. Dynasty Apparel Indus., Inc.*, 556 F.3d 389, 398 (6th Cir. 2009) (citing Fed. R. Civ. P. 11(c)(1), (c)(5)(A)).  Nevertheless, courts generally decline to do so, and the Sixth Circuit has reserved such sanctions for occasions where the party can be said to have caused the violation.  *Id.*  The Court is unable to reach that conclusion here, particularly given that it is Plaintiffs' counsel, not Plaintiffs, who have filed similar legally frivolous lawsuits in other battleground states.

19

deficiencies set forth by the State Defendants, the City, and this Court in its

December 7 decision.  (ECF No. 69.)

## III.  Applicable Law

### A.  Sanctions Pursuant to 28 U.S.C. § 1927

"Section 1927 provides that any attorney 'who so multiplies the proceedings

in any case unreasonably and vexatiously may be required by the court to satisfy

personally the excess of costs, expenses, and attorneys' fees reasonably incurred

because of such conduct.'"  *Ridder v. City of Springfield*, 109 F.3d 288, 298 (6th

Cir. 1997) (quoting 28 U.S.C. § 1927).  The purpose of a sanctions award under

this provision is to "deter dilatory litigation practices and to punish aggressive

tactics that far exceed zealous advocacy."  *Red Carpet Studios Div. of Source

Advantage, Ltd. v. Sater*, 465 F.3d 642, 646 (6th Cir. 2006).

Section 1927 imposes an objective standard of conduct on attorneys, and

courts need not make a finding of subjective bad faith before assessing monetary

sanctions.  *Id*. (*citing Jones v. Cont'l Corp*., 789 F.2d 1225, 1230 (6th Cir. 1986)).

A court need only determine that "an attorney reasonably should know that a claim

pursued is frivolous."  *Id*. (quoting *Jones*, 789 F.2d at 1230).  "Simple inadvertence

or negligence, however, will not support sanctions under § 1927."  *Salkil v. Mount

Sterling Twp. Police Dep't*, 458 F.3d 520, 532 (6th Cir. 2006) (citing *Ridder*, 109

F.3d at 298); *see also Red Carpet Studios*, 465 F.3d at 646 (holding that "§ 1927

20

sanctions require a showing of something less than subjective bad faith, but something more than negligence or incompetence").  Ultimately, "[t]here must be some conduct on the part of the subject attorney that trial judges, applying collective wisdom of their experience on the bench, could agree falls short of the obligations owed by a member of the bar to the court . . . ."  *Ridder*, 109 F.3d at 298 (quoting *In re Ruben*, 825 F.2d 977, 984 (6th Cir. 1987)).

### B.    Sanctions Pursuant to Rule 11(b) and (c)[10]

Rule 11(b) reads, in part:

By *presenting* to the court a pleading, written motion, or other paper—*whether by signing*, *filing, submitting, or later advocating it*—an attorney . . . certifies to the best of the person's knowledge, information, and belief *formed after an inquiry reasonable under the circumstances*:

(1) it is not being presented for any improper purpose, such as to harass, cause unnecessary delay, or needlessly increase the cost of litigation;

(2) the claims, defenses, and other legal contentions are warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law; [and]

(3) the factual contentions have evidentiary support or, if specifically so identified, will likely have evidentiary

---

[10] Although the Court mentioned the availability of imposing Rule 11 sanctions on its own initiative during the July 12 hearing, it recognizes such sanctions must be preceded by a show cause order, which was not issued here.  *See* Fed. R. Civ. P. 11(c)(3).  Moreover, for the reasons discussed *infra*, the Court need not rely on that authority to sanction Plaintiffs' counsel.

21

support after a reasonable opportunity for further
investigation or discovery . . . .[11]

Fed. R. Civ. P. 11(b) (emphasis added).  Much of the italicized language was

added to Rule 11 in 1993.  *See* Fed. R. Civ. P. 11 Advisory Committee Notes

(1993 Amendment).  Also added in 1993 was the provision in subsection (c)

allowing for the sanctioning of attorneys other than presenters who are

"responsible" for a violation of the rule.  *Id.*; Fed. R. Civ. P. 11(c)(1).  As the

Advisory Committee Notes explain: "The revision permits the court to consider

whether other attorneys in the firm, co-counsel, other law firms, or the party itself

should be held accountable for their part in causing a violation."  Fed. R. Civ. P. 11

Advisory Committee Notes (1993 Amendment).

Any sanction imposed pursuant to Rule 11 "must be limited to what suffices

to deter repetition of the conduct or comparable conduct by others similarly

---

[11] None of the allegations in the Amended Complaint contain "specific[ ]"
reference to the need for additional factual support from investigation or discovery.
And Plaintiffs plead on "information and belief" in only three of the Amended
Complaint's 233-paragraphs.  One of those paragraphs does not contain a fact
asserted upon information and belief but seems to be concluding that facts asserted
elsewhere reflect, upon information and belief, Defendants' failure to follow
proper election protocol; another of those paragraphs relate to when a co-inventor
of certain Dominion-related patents joined Dominion's predecessor; and the other
relates to Plaintiffs' allegation that Defendants failed to post certain absentee ballot
information before certain times on Election Day.  (See ECF No. 6 at Pg ID 934
¶ 166, 952 ¶¶ 221, 224.)  Plaintiffs have not availed themselves of Rule 11's
allowance for claims that "will likely have evidentiary support after a reasonable
opportunity for further investigation or discovery," except for arguably in the latter
two instances.

situated." Fed. R. Civ. P. 11(c)(4). This is because "the central purpose of Rule 11 is to deter baseless filings in district court." *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 393 (1990). Thus, "[e]ven if the careless litigant quickly dismisses the action, the harm triggering Rule 11's concerns has already occurred[,]" and "the imposition of such sanctions on abusive litigants is useful to deter such misconduct." *Id.* at 399.

Rule 11 "de-emphasizes monetary sanctions and discourages direct payouts to the opposing party." *Rentz v. Dynasty Apparel Indus., Inc*., 556 F.3d 389, 395 (6th Cir. 2009) (quoting *Ridder*, 109 F.3d at 294 (citing Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment))). "The amended rule recognizes, however, that 'under unusual circumstances deterrence may be ineffective unless the sanction not only requires the person violating the rule to make a monetary payment, but also directs that some or all of this payment be made to those injured by the violation.'" *Id.* (quoting Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment)). In addition, a variety of possible sanctions are available under Rule 11, including, but not limited to, "requiring participation in seminars or other education programs; ordering a fine payable to the court; [and] referring the

23

matter to disciplinary authorities."[12]  Fed. R. Civ. P. 11 Advisory Committee Notes

(1993 Amendment).

In the Sixth Circuit, the test for imposing Rule 11 sanctions is "whether the

individual's conduct was objectively reasonable under the circumstances."  *Nieves*

*v. City of Cleveland*, 153 F. App'x 349, 352 (6th Cir. 2005) (citing *Jackson v. Law*

*Firm of O'Hara, Ruberg, Osborne & Taylor*, 875 F.2d 1224, 1229 (6th Cir. 1989)).

To determine objective reasonableness, the court must ask "whether the position

advanced by a party was supported by a reasonable inquiry into the applicable law

and relevant facts."  *Advo Sys., Inc. v. Walters*, 110 F.R.D. 426, 430 (E.D. Mich.

1986) (citations omitted).  Whether a "reasonable inquiry" was conducted "is

judged by objective norms of what reasonable attorneys would have done."  *In re*

*Big Rapids Mall Assoc.*, 98 F.3d 926, 930 (6th Cir. 1996).  "Courts must not 'use

the wisdom of hindsight,' but must instead test what was reasonable to believe at

---

[12] Plaintiffs maintain that the City's Rule 11 motion is procedurally defective because it seeks "both Rule 11 sanctions and . . . disbarment of attorneys and their referral to state bar associations for disciplinary action."  (ECF No. 95 at Pg ID 4114-45.)  Plaintiffs note that Rule 11 motions "must be made separately from ***any*** ***other motion***[.]"  (*Id*. at Pg ID 4145 (citing Fed. R. Civ. P. 11(c)(2) (emphasis added by Plaintiffs)).)  Plaintiffs' argument is frivolous.  The separate-motion requirement is designed only "to prevent [the sanctions request] from being tacked onto or buried in motions on the merits, such as motions to dismiss or for summary judgment."  *Ridder*, 109 F.3d at 294 n.7.  The City's request for referral and disbarment are merely the sanctions sought for Plaintiffs' alleged Rule 11 violations.  As indicated above, a "variety of possible sanctions" may be imposed for a Rule 11 violation, including those requested by the City.

24

the time the pleading, motion, or other paper was submitted."  *Gibson v. Solideal*

*USA, Inc.*, 489 F. App'x 24, 29-30 (6th Cir. 2012) (quoting *Merritt v. Int'l Ass'n of*

*Machinists and Aerospace Workers*, 613 F.3d 609, 626 (6th Cir. 2020)).

This objective standard is "intended to eliminate any 'empty-head pure-

heart' justification for patently frivolous arguments."  Fed. R. Civ. P. 11 Advisory

Committee Notes (1993 Amendment); *Tahfs v. Proctor*, 316 F.3d 584, 594 (6th

Cir. 2003) ("A good faith belief in the merits of a case is insufficient to avoid

sanctions.").

### 1.    Signatures

Plaintiffs' lawyers argue that no attorney can be sanctioned whose name

appeared only in typewritten form; that no attorney besides Plaintiffs' local counsel

has appeared or signed a document filed in this matter; and that the Court lacks

jurisdiction to sanction any attorney who did not personally appear or sign a

document filed in this matter.  (ECF No. 95 at Pg ID 4116-18.)  Yet, the local

attorneys assert that, although they signed the filings, they did not prepare them

and thus should not be responsible for them.  (*See* ECF No. 157 at Pg ID 5322-24,

5359, 5523; ECF No. 111-1 at Pg ID 4597 ¶¶ 2, 4, 6, 7, 9, 15.)  As such, no

25

attorney wants to take responsibility now that sanctions are sought for filing this lawsuit.

In this age of electronic filing, it is frivolous to argue that an electronic signature on a pleading or motion is insufficient to subject the attorney to the court's jurisdiction if the attorney violates the jurisdiction's rules of professional conduct or a federal rule or statute establishing the standards of practice. As set forth earlier, Sidney Powell, Scott Hagerstrom, and Gregory Rohl electronically signed—at least—the Complaint, Amended Complaint, and Motion for Injunctive Relief. The remaining attorneys, except Junttila, were listed as "Of Counsel" on one or more of the pleadings.[13] The cases Plaintiffs cite to support their argument that non-signing attorneys cannot be sanctioned were decided before the 1993 amendments to Rule 11. (*See* ECF No. 95 at Pg ID 4116-17.)

For purposes of Rule 11, an attorney who is knowingly listed as counsel on a pleading, written motion, or other paper "expressly authorize[d] the signing, filing, submitting or later advocating of the offending paper" and "shares responsibility

---

[13] Junttila, however, did sign and docket subsequently filed motions, briefs, or other papers in which she and Plaintiffs' remaining attorneys advocated the claims asserted in their pleadings. (*See, e.g.*, ECF No. 85 at Pg ID 3896-3906); *see also* Fed. R. Civ. P. 11(b) (indicating that counsel "present[s] to the court a pleading, written motion, or other paper" by, *inter alia*, "signing," "filing," or "*later advocating* it") (emphasis added).

26

with the signer, filer, submitter, or advocate."[14] *Morris v. Wachovia Sec., Inc.*, No.

3:02cv797, 2007 WL 2126344, at *9 (E.D. Va. 2007) (emphasis removed)

(quoting Gregory P. Joseph, *Sanctions the Fed. Law of Litig. Abuse*, § 5(E)(1) at

110 (3d ed. 2000)).  "The Court need not go through 'mental gymnastics,' as pre-

1993 courts sometimes felt compelled to do, *see* Sanctions, § 5(E)(1) at 109, in

order [to] hold [the attorney] to account under Rule 11."  *Id.*

Notably, because Rule 11 only requires a signature by "at least one

attorney," Fed. R. Civ. P. 11(a), documents are frequently presented to federal

courts which list several attorneys as counsel but contain the signature of only one.

Regardless, as amended in 1993, Rule 11 allows for sanctions "on any attorney . . .

that violated the rule *or is responsible for* the violation."  Fed. R. Civ. P. 11(c)(1)

(emphasis added).  Moreover, Michigan Rule of Professional Conduct 8.5(a) reads:

"A lawyer not admitted in this jurisdiction *is also subject to the disciplinary*

*authority of this jurisdiction* if the lawyer provides or offers to provide any legal

services in this jurisdiction."  (emphasis added).

---

[14] At the July 12 hearing, Wood asserted for the first time that he was oblivious to
his inclusion as counsel for Plaintiffs in this case.  The Court will address this
assertion separately.

27

By agreeing to place their names on pleadings and/or motions, counsel are responsible for those submissions and will be held accountable.[15]

### 2.   L. Lin Wood

At the July 12 hearing, Wood maintained that the Court lacks jurisdiction to sanction him because he played no role in drafting the Complaint, did not read any of the documents with respect to the Complaint, was not aware of the affidavits attached to it, and did not give permission for his name to be specifically included in this action.  When the Court asked Wood if he gave permission to have his name included on the pleadings or briefs, Wood answered:

> I do not specifically recall being asked about the Michigan complaint, but I had generally indicated to Sidney Powell that if she needed a, quote/unquote, trial lawyer that I would certainly be willing and available to help her.[16]
>
> In this case obviously my name was included.  My experience or my skills apparently were never needed so I didn't have any involvement with it.
>
> Would I have objected to be included by name?  I don't believe so . . . .

---

[15] Although the issue of whether non-signing attorneys can be sanctioned is discussed in this Rule 11 section, the Court concludes for the same reasons that they can be sanctioned under § 1927 and the Court's inherent authority, as well. The same is true for Wood, Newman, and Rohl, who are discussed in the next subsections.

[16] Wood, therefore, admittedly "*offer[ed]* to provide . . . legal services in this jurisdiction."  MRPC 8.5(a) (emphasis added).

28

(ECF No. 157 at Pg ID 5360.)  The Court then asked Wood if he gave Powell

permission to include his name on the filings in this matter, to which he responded:

> I didn't object to it, but I did not know – I actually did not know
> at the time that my name was going to be included, but I
> certainly told Ms. Powell in discussions that I would help her if
> she needed me in any of these cases, and in this particular
> matter apparently I was never needed so I didn't have anything
> to do with it.

(*Id.* at Pg ID 5360-61.)

Wood then denied being served with the motion for sanctions and stated that

he was present only at the hearing because the Court required him to be there.  (*Id.*)

According to Wood, he only discovered that he had been included as counsel for

Plaintiffs in this matter when he saw a newspaper article about the sanctions

motion: "I didn't receive any notice about this until I saw something in the

newspaper *about being sanctioned*."  (*Id.* at Pg ID 5362, 5366 (emphasis added).)

When the Court turned to Powell and asked whether she told Wood his name

was being placed on the pleading, Powell first answered:

> My view, your honor, is that I did specifically ask Mr.
> Wood for his permission.  I can't imagine that I would
> have put his name on any pleading without understanding
> that he had given me permission to do that.

(*Id*. at Pg ID 5371.)  Powell then suggested that perhaps there was "a misunderstanding" between her and Wood.[17]  (*Id*.)  And Kleinhendler did not recall whether he spoke to Wood before Wood's name was included on the pleading. (*Id*.)  The Court does not believe that Wood was unaware of his inclusion as counsel in this case until a newspaper article alerted him to the sanctions motion filed against him and this is why.

First, the City's motion for sanctions was filed on January 5, 2021.  (ECF No. 78.)  At no time between that date and the July 12 hearing did Wood ever notify the Court that he had been impermissibly included as counsel for Plaintiffs in this action.  Almost a month before the motion hearing, the Court entered an order requiring "[e]ach attorney whose name appears on any of Plaintiffs' pleadings or briefs" to be present at the hearing.  (ECF No. 123.)  Wood still did not submit anything to the Court claiming that his name was placed on those

---

[17] The existence of a misunderstanding seems improbable given that several similar lawsuits seeking to overturn the presidential election results were filed in Georgia, Wisconsin, and Arizona, each bearing the same "Of Counsel" listing for Wood as appears here.  *See* Compl., *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. filed Nov. 25, 2020), ECF No. 1 at Pg 103; Compl., *Feehand v. Wisconsin Elections Commission*, No. 2:20-cv-01771 (E.D. Wis. filed Dec. 1, 2020), ECF No. 1 at Pg 51; Compl., *Bowyer v. Ducey*, No. 2:20-cv-02321 (D. Ariz. filed Dec. 2, 2020), ECF No. 1 at Pg 53.  Wood moved for pro hac vice admission in the Arizona proceedings.  *See* Remark, *Bowyer*, No. 2:20-cv-02321 (D. Ariz. Dec. 4, 2020). He did not do so in Wisconsin but, like Michigan, the District Court for the Eastern District of Wisconsin does not permit pro hac vice motions.  E.D. Wis. LR 83(c)(2)(E).

filings without his permission.  No reasonable attorney would sit back silently if his or her name were listed as counsel in a case if permission to do so had not been given.

Second, Wood is not credible. [18]  He claims that he was never served with the City's motion for sanctions; however, counsel for the City represents that the motion was sent to Wood via e-mail and regular mail.  (ECF No. 157 at Pg ID 5363-64.)  Kimberly Hunt, the office manager for the City's attorneys, affirms in an affidavit that she mailed via First Class U.S. Mail a copy of the Safe Harbor Letter and the Safe Harbor Motion to Wood, among others, on December 15, 2020, and that no copies were returned as undeliverable.  (ECF No. 164-3 at Pg ID 6393 ¶¶ 5, 8.)  And despite being told that he had the opportunity to attach an affidavit to

---

[18] Notably, while Wood stated at the July 12 hearing that he only learned about the motions seeking sanctions against him when he read about it in a newspaper article, Wood suggests in his supplemental brief that he in fact learned of his purported involvement in the lawsuit when he received a call from one of the attorneys in this matter in mid- to late-June 2021, alerting him to the Court's order requiring him to appear at the hearing on the sanctions motions.  (ECF No. 162 at Pg ID 6102.)

31

his supplemental brief in order to put his oath behind his factual assertions (*see* ECF No. 157 at Pg ID 5517), Wood surprisingly chose not to do so.[19, 20]

More importantly, Wood's social media postings undermine his current assertions, as do his statements in other court proceedings.  As discussed during the July 12 hearing, on the day the City e-mailed copies of the Safe Harbor Letter and Safe Harbor Motion to Plaintiffs' counsel, Wood tweeted a link to an article containing a copy of the motion, stating "[w]hen you get falsely accused by the likes of David Fink and Mark Elias . . . in a propaganda rag like Law & Crime, you smile because you know you are over the target and the enemy is runningscared

---

[19] Wood asserts in his supplemental brief that he "and his legal assistant have performed a diligent search of all email correspondence as well as U.S. mail at Mr. Wood's Atlanta office and elsewhere.  They have turned up no evidence to indicate they were provided with any Rule 11 notice prior to the filing of the motion." (ECF No. 162 at Pg ID 6122.)  Yet no affidavit is offered from Wood or his legal assistant to attest to these assertions.  And notably, the address listed for Wood on the filings in this matter (and thus where the City's attorneys mailed items to him) is a post office box, not his firm's address.

[20] Wood contends that he is entitled to a "full evidentiary hearing"—"should the Court determine that material factual questions do exist"—so that he "may present to the Court with the evidence of record, sufficient to establish the factual representations" made in his supplemental brief regarding why this Court does not have "jurisdiction" to sanction him.  (ECF No. 162 at Pg ID 6124.)  He is entitled to no such thing.  *See In re Big Rapids Mall Assoc.*, 98 F.3d at 929 (recognizing that an evidentiary hearing is "not necessarily required where the court has full knowledge of the facts and is familiar with the conduct of the attorneys").  The July 12 hearing provided Wood the opportunity to present his evidence and, as noted *supra*, he had the further opportunity to attach an affidavit as evidence to his supplemental brief.

32

[*sic*]!"  (ECF No. 164-6 at Pg ID 6424; ECF No. 157 at Pg ID 5369-70.)  On

January 5, 2021, the day the City filed the motion, Wood tweeted a link to an

article with the motion, stating that it was "unfair" for the City to seek sanctions

against him.  (ECF No. 164-7 at Pg ID 6426.)  In a federal courtroom in the

Eastern District of New York on January 11, Wood acknowledged that the City

was "trying to get [him] disbarred."  (ECF No. 164-12 at Pg ID 6506.)

Even more importantly, prior to the July 12 hearing, Wood took credit for

filing this lawsuit.[21]  In a brief submitted in the Delaware Supreme Court, Wood

claimed, through his counsel:

> [Wood] *represented plaintiffs challenging the results of*
> *the 2020 Presidential election in Michigan* and
> Wisconsin. . . . In the days and weeks following the
> [General Election of 2020], Wood became involved in
> litigation contesting the election's results or the manner
> votes were taken or counted in critical "swing states."
> *Among those cases in which Wood became involved were*
> *lawsuits in* Wisconsin, *Michigan*, and Wood's own suit
> in the State of Georgia.

---

[21] Notably, Rohl stated under oath that Wood, along with Powell, "spearheaded"
this lawsuit.  (ECF No. 111-1 at Pg ID 4597.)  Though the Court hesitates to rely
too much on the assertions of any of Plaintiffs' attorneys because their positions—
as counsel for the City aptly describes—have been like "[s]hifting [s]ands[,]" the
Court notes that Rohl's sworn affidavit was attached to a supplemental brief filed
by Plaintiffs' counsel in response to the City's motion for sanctions.  (*See* ECF No.
111 at Pg ID 4556, 4559, 4561-62.)  No member of Plaintiffs' legal team objected
to any part of Rohl's affidavit.

(ECF No. 164-13 at Pg ID 6525-26 (emphasis added) (internal citation omitted).)

These statements are binding on Wood.  *See K.V.G. Props., Inc. v. Westfield Ins. Co.*, 900 F.3d 818, 822 (6th Cir. 2018) (citing Fed. R. Evid. 801(d)(2)) (noting that pleadings, which are judicial admissions, "are binding legal documents that can be admitted as evidence against that party in subsequent proceedings").[22]

For these reasons, while Wood now seeks to distance himself from this litigation to avoid sanctions, the Court concludes that he was aware of this lawsuit when it was filed, was aware that he was identified as co-counsel for Plaintiffs, and as a result, shares the responsibility with the other lawyers for any sanctionable conduct.

### 3.    Emily Newman & Gregory Rohl

Newman contends that she had a limited role in this lawsuit, having "not play[ed] a role in drafting the complaint" and spending "maybe five hours on [the matter]" "from home."  (ECF No. 157 at Pg. ID 5317-18, 5324.)  Therefore, Newman argues, she should not be subject to sanctions.

---

[22] *See also United States v. Burns*, 109 F. App'x 52, 58 (6th Cir. 2004) (noting that courts have "discretion to consider statements made in a brief to be a judicial admission" and binding on the party who made them); *Beasley v. Wells Fargo Bank, N.A. for Certificate Holders of Park Place Sec., Inc.*, 744 F. App'x 906, 914 (6th Cir. 2018) (same).

By placing her name on the initial and amended complaints, Newman presented pleadings to the Court asserting that Defendants committed constitutional and state law violations.  Newman does not suggest that her name was included without her permission.  In addition, Newman does not cite case law suggesting that an attorney may not be sanctioned under Rule 11 or any other source of sanctions authority if the time spent on the relevant lawsuit does not surpass an unidentified threshold.  (*See generally* ECF No. 168.)  And Newman's responsibility for any Rule 11 violation is not diminished based on where those working hours were spent (particularly during a global pandemic when many individuals were working remotely from home).  *See* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment) ("[S]anction[s] should be imposed on the persons—whether attorneys, law firms, or parties—who have violated the rule *or who may be determined to be responsible for* the violation. . . . The revision permits the court to consider whether other attorneys in [a] firm, co-counsel, other law firms, or the party itself should be held accountable *for their part* in causing a violation," even if they were not "the person actually making the presentation to the court."); *see Morris*, 2007 WL 2126344, at *9.  So long as the attorney bears some responsibility, the attorney may be sanctioned.  Fed. R. Civ. P. 11(c)(1).

In an affidavit filed in this case, Rohl stated that at "approximately 6:30 PM" on the day this lawsuit was filed, he "was contacted by an associate who asked

35

Rohl if he would assist in litigation involving alleged election fraud in Michigan."
(ECF No. 111-1 at Pg ID 4597.)  He thereafter received a copy of "the already
prepared" 830-page initial complaint and Rohl "took well over an hour" to review
it.  (*Id.*)  "[M]aking no additions, deletions or corrections" to the Complaint (*id.* at
Pg ID 4598), Rohl had his secretary file it at 11:48 p.m.  (*Id.* at Pg ID 4597; ECF
No. 1.)

To the extent Rohl asserts he should not be sanctioned because he read the
pleading only on the day of its filing, the argument does not fly.  Rule 11(b)
"obviously require[s] that a pleading, written motion, or other paper be read before
it is filed or submitted to the court," Fed. R. Civ. P. 11 Advisory Committee Notes
(1993 Amendment), and the Court finds it exceedingly difficult to believe that
Rohl read an 830-page complaint in just "well over an hour" on the day he filed it.
So, Rohl's argument in and of itself reveals sanctionable conduct.  Rule 11(b) also
explains that, by presenting a pleading to the court, an attorney certifies that "to the
best of the person's knowledge, information, and belief, formed *after a reasonable
inquiry* under the circumstances," the complaint is not being filed for an improper
purpose and is well-grounded in law and fact.  Fed. R. Civ. P. 11(b) (emphasis
added).  The Court finds it even more difficult to believe that any inquiry Rohl
may have conducted between the time he finished reading the Complaint and 11:48
p.m. could be described as a "reasonable" one.  But also, Rohl cannot hide behind

36

his co-counsel.  As a signer of the complaints, Rohl certified to the Court that the

claims asserted were not frivolous.  Moreover, because his co-counsel were not

admitted to practice in the Eastern District of Michigan, the complaints could not

have been filed without Rohl's signature.  *See* E.D. Mich. LR 83.20(f)(1),

(i)(1)(D)(i).  Therefore, to the extent Rohl contends that he was only helping co-

counsel, he still failed to fulfill his obligations as an officer of the court.

### 4.    Safe Harbor Requirement

At least 21 days before submitting a Rule 11 motion to a court, the movant

must serve "[t]he motion" on the party against whom sanctions are sought and the

motion "must describe the specific conduct that allegedly violates Rule 11(b)."

Fed. R. Civ. P. 11(c)(2).  As indicated above, the City served a copy of its Rule 11

motion on Plaintiffs' counsel at least 21 days before it was filed.[23]  Plaintiffs argue

_____

[23] With each new brief filed and opportunity to argue before the Court, Plaintiffs'
attorneys raise a new argument for why they were not adequately served with the
City's Safe Harbor Letter and Safe Harbor Motion.  First, in their original response
to the motion, Plaintiffs' counsel argued only that the notice served upon them was
deficient because it was not accompanied by the City's more detailed brief.  (*See*
ECF No. 95 at Pg ID 4119.)  Then, at the July 12 motion hearing, Wood and
Newman suddenly claimed that they had not been served at all with the City's safe
harbor materials.  (ECF No. 157 at Pg ID 5317, 5362.)  In the supplemental brief
filed by Campbell on behalf of Plaintiffs' counsel Hagerstrom, Haller, Johnson,
Kleinhendler, Powell, and Rohl, counsel insinuates that the Rule 11 motion was
not properly served pursuant to Rule 5 of the Federal Rules of Civil Procedure, as
required under Rule 11(c)(2).  (*See* ECF No. 161 at Pg ID 5805 n.6.)  No specific
argument is made, however, as to how service did not comply with Rule 5.  (*Id.*);
*see McPherson v. Kelsey*, 125 F.3d 989, 995-96 (6th Cir. 1997) ("It is not

37

that the City failed to comply with this "safe harbor" provision because the brief in

support of the motion, which was filed later, was not included.  (*See* ECF No. 95 at

Pg ID 4118-19; ECF No. 161 at Pg ID 5805-06.)  According to Plaintiffs, the

City's motion "makes only conclusory statements and blanket assertions regarding

the alleged violations of Rule 11 and fails altogether to 'describe the specific

conduct that allegedly violates Rule 11(b).'"  (ECF No. 95 at Pg ID 4119 (quoting

Fed. R. Civ. P. 11(c)(2)).)

Rule 11, however, requires service of only "[t]he motion" to trigger the

commencement of the 21-day safe harbor period.  *See* Fed. R. Civ. P. 11(c)(2)

("The *motion* must be served . . . .");  *see also Star Mark Mgmt. v. Koon Chun Hing*

---

sufficient for a party to mention a possible argument in the most skeletal way,
leaving the court to . . . put flesh on its bones.")  In his next filing on behalf of
Hagerstrom, Haller, Johnson, Kleinhendler, Powell, and Rohl, Campbell raises two
new arguments: (i) the City did not mail a copy of the safe harbor materials to the
correct address for Johnson, and (ii) in a footnote of the safe harbor motion,
concurrence was only sought from Powell.  (ECF No. 167 at Pg ID 6679 n.1
(citing ECF No. 164-4 at Pg ID 6409 n.1).)  Newman picked up the same refrain
about her address in her supplemental brief.  (*See* ECF No. 168 at Pg ID 7608-09.)
Wood said nothing in his supplemental brief to challenge the address where he was
served; however, in his response to the City's supplemental brief, he claimed for
the first time that the zip code used by the City when mailing the safe harbor
materials to him was incorrect.  (*See* ECF No. 170 at Pg ID 6801.)  However, the
addresses used by the City for each of these attorneys, including Wood's zip code
(*see* ECF No. 161-3 at Pg ID 6058), were the exact addresses provided by
Plaintiffs in their filings (*see, e.g.*, ECF No. 1 at Pg ID 75; ECF No. 6 at Pg ID
957).  The belated argument regarding footnote 1 of the City's Safe Harbor Motion
is frivolous as the Safe Harbor Letter was addressed to all counsel.  (ECF No. 161-
3 at Pg ID 6058.)

38

*Kee Soy & Sauce Factory, Ltd.*, 682 F.3d 170, 176 (2d Cir. 2012) (citing *Ideal Instruments, Inc. v. Rivard Instruments, Inc.*, 243 F.R.D. 322, 339 (N.D. Iowa 2007)) (finding that the defendant's delivery of its sanctions motion met the procedural requirements of the safe harbor provision of Rule 11(c)(2) despite not serving at that time supporting affidavits or a memorandum of law); *Burbidge Mitchell & Gross v. Peters*, 622 F. App'x 749, 757 (10th Cir. 2015) (quoting *Star Mark*, 682 F.3d at 176 and "join[ing] the Second Circuit in declining 'to read into the rule a requirement that a motion served for purposes of the safe harbor period must include supporting papers such as a memorandum of law and exhibits'"). As Plaintiffs' attorneys correctly point out (*see* ECF No. 161 at Pg ID 5805-06), the Local Rules for the Eastern District of Michigan require a motion to be accompanied by a brief, *see* E.D. Mich. LR 7.1(d)(1)(A), and judges in this District strike motions not complying with this requirement, *see, e.g., Williams Huron Gardens 397 Trust v. Waterford Twp.*, No. 18-12319, 2019 WL 659009, at *1 (E.D. Mich. Jan. 26, 2019). But this speaks to when a motion is *filed*. Moreover, the issue here is not whether the City complied with the District's local rules; rather, it is whether the City satisfied Rule 11's safe harbor requirements.

The Safe Harbor Motion the City served on Plaintiffs' counsel on December 15, 2020, "describe[s] the specific conduct that allegedly violates Rule 11(b)."

39

Fed. R. Civ. P. 11(c)(2).  Specifically, the City asserted violations of subdivisions

(b)(1)-(3) of the rule:

1. "Initiat[ing] the instant suit for improper purposes, including harassing the City and frivolously undermining 'People's faith in the democratic process and their trust in our government.' . . . [U]nderst[anding] that the mere filing of a suit (no matter how frivolous) could, without any evidence, raise doubts in the minds of millions of Americans about the legitimacy of the 2020 presidential election."  (ECF No. 161-3 at Pg ID 6060 (quoting ECF No. 62 at Pg ID 3329-30).)

2. Asserting "causes of action . . . in the Complaints (ECF Nos. 1 and 6), Emergency Motion for Declaratory, Emergency, and Permanent Injunctive Relief and Memorandum in Support Thereof (ECF No. 7), and Emergency Motion to Seal (ECF No. 8) [that] were frivolous and legally deficient under existing law and because Plaintiffs failed to present any non-frivolous arguments to extend, modify, or reverse existing law."  (ECF No. 161-3 at Pg ID 6061.)  The City then went on to detail the legal deficiencies as to Plaintiffs' Elections and Electors Clauses, Equal Protection Clause, and Due Process Clause claims, and further argued that Plaintiffs lacked standing and their claims were moot and barred by laches.  (*Id*. at Pg ID 6061-63.)

3. Raising "factual contentions . . . in the complaints and motions [which were] false."  (*Id*. at 6063.)  The City wrote further: "The key 'factual' allegations from the supposed fact witnesses, some of whom attempt to cloak their identities while attacking democracy, have been debunked.  The allegations about supposed fraud in the processing and tabulation of absentee ballots by the City at the TCF Center have been rejected by

40

every court which has considered them."  (*Id*. at Pg ID
6064.)

Plaintiffs' attorneys maintain that the City's motion was deficient because it
"did not cite a single case or fact supporting [its] arguments" (ECF No. 161 at Pg
ID 5806) and "fail[ed] to identify any specific factual allegation or witness that
lacks evidentiary support" (ECF No. 95 at Pg ID 4119).  Plaintiffs' attorneys do
not identify any authority requiring case citations in a Rule 11 motion to satisfy the
safe harbor requirements.[24]  Moreover, the failure to identify specific facts or
witnesses has no bearing on the adequacy of the motion as to the claimed
violations of Rule 11(b)(1) or (2).

And as to the claimed violations of Rule 11(b)(3), the motion was specific as
to the violative conduct: All of the allegations discussed in the Rule 11(b)(3)
analysis below (with the exception of one) concern supposed fraud in the
processing and tabulation of absentee ballots by the City at the TCF Center (*see
infra* 68-78)—just as the City specifically identified.  And the one exception
concerns a key factual allegation that was debunked in *Costantino*.  (*See* ECF No.
31-15 at 2440-41.)  Moreover, in the Safe Harbor Motion, the City expressly refers
to its response to Plaintiffs' Motion for Injunctive Relief "for a detailed debunking

---

[24] As discussed earlier, Rule 11(c)(2) does not require a memorandum of law or
exhibits to satisfy the safe harbor requirements.  *Star Mark Mgmt.*, 682 F.3d at
176; *Ideal Instruments, Inc.*, 243 F.R.D. at 339; *Burbidge Mitchell & Gross*, 622 F.
App'x at 757.

41

of Plaintiffs' baseless factual contentions."[25]  (ECF No. 161-3 at Pg ID 6064

(citing ECF No. 39 at Pg ID 2808-2[8]33).)

### C.    Sanctions Pursuant to the Court's Inherent Authority

"Even if there are sanctions available under statutes or specific federal rules

of procedure, . . . the 'inherent authority' of the court is an independent basis for

sanctioning bad faith conduct in litigation."  *Dell, Inc. v. Elles*, No. 07-2082, 2008

WL 4613978, at *2 (6th Cir. June 10, 2008) (citing *Chambers v. NASCO, Inc.*, 501

U.S. 32, 49-50 (1991)); *see also Runfola & Assocs. v. Spectrum Reporting II, Inc.*,

88 F.3d 368, 375 (6th Cir. 1996) ("In addition to Rule 11 and 28 U.S.C. § 1927, a

district court may award sanctions pursuant to its inherent powers when bad faith

occurs.").  To award attorneys' fees under this "bad faith exception," a district

court must find that (i) "the claims advanced were meritless"; (ii) "counsel knew or

should have known this"; and (iii) "the motive for filing the suit was for an

improper purpose such as harassment."  *Big Yank Corp. v. Liberty Mut. Fire Ins.*

*Co.*, 125 F.3d 308, 313 (6th Cir. 1997) (citation omitted) ("The district court has

the inherent authority to award fees when a party litigates in bad faith, vexatiously,

wantonly, or for oppressive reasons." (internal quotation marks omitted)).

---

[25] Even if the City did not specify every allegation in Plaintiffs' pleading
lacking evidentiary support, the same conduct could be sanctioned (and, as found
*infra*, is sanctionable) under the Court's inherent authority.

The Sixth Circuit has further explained:

> For a court to impose sanctions under its inherent powers, it is not necessary that the court find that an action was meritless as of filing, or even shortly thereafter.  It can become apparent part-way through a suit that an action that initially appeared to have merit is in fact meritless; parties and attorneys have a responsibility to halt litigation *whenever* they realize that they are pursuing a meritless suit. . . . [M]oreover, a party or firm might enter an action long after the filing of the initial complaint, but may still be sanctionable under a court's inherent powers if it acts in bad faith.  The "something more" that a court must find to meet the third prong of the *Big Yank* test may similarly occur at any stage of the proceedings.  A court imposing sanctions under its inherent powers may consider the nature and timing of the actions that led to a finding of bad faith in determining whether to impose sanctions on conduct from that point forward, or instead to infer that the party's bad faith extended back in time, perhaps even prior to the filing of the action.

*BDT Prod., Inc. v. Lexmark Int'l, Inc*., 602 F.3d 742, 753 n.6 (6th Cir. 2010) (emphasis in original).  The Supreme Court has held that "a federal court's inherent authority to sanction a litigant for bad-faith conduct by ordering it to pay the other side's legal fees . . . is limited to the fees the innocent party incurred solely because of the misconduct."  *In re Bavelis*, 743 F. App'x 670, 675 (6th Cir. 2018) (quoting *Goodyear Tire & Rubber Co. v. Haeger*, 137 S. Ct. 1178, 1183-84 (2017)).  In other words, "[t]he complaining party . . . may recover 'only the portion of his fees that he would not have paid but for' the misconduct" but courts

have "considerable room" to "exercise discretion and judgment" when making this "but for" determination.  *Id.* at 676 (quoting *Goodyear Tire*, 137 S. Ct. at 1187).

Plaintiffs' attorneys contend that the Court cannot rely on its inherent authority because "[t]he comments accompanying Rule 11 indicate that its procedures are controlling when the Court exercises its inherent authority."  (ECF No. 161 at Pg ID 5804.)  This argument is misleading.  Plaintiffs' counsel first quote the Advisory Committee's 1993 comment to Rule 11: "The power of the court to act on its own initiative is retained, but with the condition that this be done through a show cause order."  (*Id.* (quoting Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment)).)  But this comment simply explains that the amendment retained the authority for courts to issue *sua sponte* sanctions pursuant to *Rule 11* but with the added requirement of a show cause order.

To maintain that the show cause requirement applies to sanctions under a court's inherent authority, Plaintiffs' attorneys quote a second statement in the comments but strategically omit the following key italicized language: "[T]he procedures specified in Rule 11—*notice, opportunity to respond, and findings*— should ordinarily be employed when imposing a sanction under the court's inherent authority."  (*Id.* (omitted language added).)  Nothing in the comments suggests that the additional procedures in Rule 11 apply when a court sanctions

44

pursuant to its inherent authority or that Rule 11 supplants this authority.  In fact,

the Advisory Committee's 1993 comment specifically states the opposite:

> Rule 11 is not the exclusive source for control of
> improper presentations of claims, defenses, or
> contentions.  It does not supplant statutes permitting
> awards of attorney's fees . . . . *It does not inhibit the*
> *court* in punishing for contempt, *in exercising its inherent*
> *powers*, or in imposing sanctions, awarding expenses, or
> directing remedial action authorized under other rules or
> under 28 U.S.C. § 1927.

Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment) (emphasis

added).

When invoking its inherent authority to sanction, "[a] court must, of course,

. . . comply with the mandates of due process, both in determining that the requisite

bad faith exists and in assessing fees."  *Chambers*, 501 U.S. at 50 (citing *Roadway*

*Express, Inc. v. Piper*, 447 U.S. 752, 767 (1980)).  The Sixth Circuit has further

explained:

> The district court must [] afford the parties concerned . . .
> at least minimal procedural protections, including notice
> and the opportunity to respond or to be heard.  *Miranda*,
> 710 F.2d at 522.  We do not, in so holding for due
> process purposes, indicate that there must be a formal
> 'complaint' lodged with specifications in the event of a
> proposed sanction, or that a 'full fledged' hearing is
> mandated, but notice and a reasonable opportunity to be
> heard is a minimum protection to be afforded.

*Ray A. Scharer & Co. v. Plabell Rubber Prod., Inc.*, 858 F.2d 317, 321 (6th Cir.

1988) (additional internal citations omitted) (discussing due process in context of

45

court's inherent authority); *see also Banner v. City of Flint*, 99 F. App'x 29, 37

(6th Cir. 2004) (explaining that, when exercising its inherent authority, a court

must "give . . . minimal procedural protections, but no[] formal notice detailing the

penalties or a full evidentiary hearing" is required "when the court has sufficient

relevant information, including pleadings or materials filed in the record, to

decide"); *In re Big Rapids Mall Assoc.*, 98 F.3d at 929 (recognizing that an

evidentiary hearing is "not necessarily required where the court has full knowledge

of the facts and is familiar with the conduct of the attorneys"). Ultimately, when a

court intends to invoke its inherent authority, "[a]t the very least, responsive

briefing . . . [can] provide[] the procedural safeguards necessary." *KCI USA, Inc.

v. Healthcare Essentials, Inc.*, 797 F. App'x 1002, 1007 (6th Cir. 2020); *see also

Red Carpet Studios*, 465 F.3d at 647 (finding that the court provided due process

when sanctioning via its inherent authority where sanctioned party "argued his case

in writing and at a hearing, and [] makes no argument why the notice and the

hearing he received were inadequate").

Plaintiffs' lawyers have been afforded due process here. Through the

multiple motions for sanctions and related briefs and during the July 12 motion

hearing, they received notice of: (i) who sanctions were being sought against; (ii)

the reasons why; (iii) the authority pursuant to which sanctions were requested;

and (iv) the types of sanctions requested. Counsel were provided the opportunity

46

to answer the sanctions allegations in responsive briefs, orally at the six-hour
hearing, and in supplemental briefing.  To the extent the Court questioned
Plaintiffs' counsel about materials attached to their pleadings which had not been
specifically addressed in the movants' briefs, counsel had an opportunity to
respond to those concerns in their supplemental briefs—and counsel took
advantage of that opportunity.  (*See, e.g.*, ECF No. 161 at Pg ID 5815-19; ECF No.
165 at Pg ID 6578-80; ECF No. 167 at Pg ID 6682-84, 6684 n.3).

## IV.   Discussion[26]

### A.   Whether Plaintiffs' Counsel Violated 28 U.S.C. § 1927

The Court first considers whether Plaintiffs' counsel unreasonably and
vexatiously multiplied proceedings by failing to dismiss this case when even they
acknowledged it became moot.  *Ridder*, 109 F.3d at 298 (quoting 28 U.S.C.
§ 1927).

Plaintiffs expressly acknowledged in their petition for writ of certiorari to
the Supreme Court that "[o]nce the electoral votes are cast, subsequent relief would
be pointless," and "the petition would be moot."  (ECF No. 105 at Pg ID 4362
(citing ECF No. 105-2 at Pg ID 4401, 4409).)  Michigan's electors cast their votes

---

[26] At last, this opinion arrives at the issue of whether Plaintiffs' attorneys should be
sanctioned.  The Court is aware of how long it took to get here.  But addressing
Plaintiffs' counsel's arguments concerning the Court's ability to impose sanctions
was first required, and—as noted previously—those arguments shifted and
multiplied with each new brief they filed.

47

on December 14.  "Yet, that date came and went with no acknowledgement by Plaintiffs and their counsel to Defendants or this Court," the State Defendants argue, forcing the State Defendants and Intervenor-Defendants to file motions to dismiss on December 22.  (*Id.* (citing ECF No. 70); *see also* ECF Nos. 72, 73.)

During the July 12 motion hearing, Campbell contended that—over the course of the litigation—"things change[d]."  (ECF No. 157 at Pg ID 5345.)  He explained, when this case was filed on November 25, counsel "thought honestly and truly that the drop-dead date was December 8th, and that's what [they] said to this Court."  (*Id.* at Pg ID 5346.)  Later, "a judge in Wisconsin said," according to Campbell, "Well, why are you guys all hurrying for December 8th.  It should be December 14th."  (*Id.*)  Campbell continued, because "[s]omebody else came along and said, 'Why not December 14th?' . . . [counsel] didn't argue with that" and gave the United States Supreme Court that date as the one upon which the case becomes moot.  (*Id.*)  And on December 14, "three [] [] Plaintiffs were, in their opinion, properly elected as electors" and, Campbell further explained, "[t]hat changed things, and [then] the Supreme Court's determination did have life."  (*Id.*)

In other words, Plaintiffs' attorneys maintain that this lawsuit was no longer moot after December 14 because three Plaintiffs subjectively believed that they had become electors.  The attorneys cite no authority supporting the notion that an individual's "[personal] opinion" that he or she is an elector is sufficient to support

48

the legal position that the individual is in fact an elector.  Of course, such a belief is

contrary to how electors are appointed in Michigan.  *See* Mich. Comp. Laws

§ 168.42.  In any event, Plaintiffs' attorneys fail to provide a rational explanation

for why this event breathed life into this action.  Moreover, prior to the July 12

hearing, Plaintiffs never told anyone about this newly-formed subjective belief.

They did not tell this Court that the case would no longer be moot after December

8, despite telling this Court the exact opposite when filing this lawsuit on

November 25.  And they did not tell the Supreme Court that the case would no

longer be moot after December 14, despite telling that Court the exact opposite on

December 11.  The fact that it was never shared suggests that counsel's argument

as to why the case had to be pursued after December 14 is contrived.

        Plaintiffs' attorneys proffer several additional unpersuasive arguments.

First, citing *Beverly v. Shermetta Legal Grp.*, No. 2:19-CV-11473, 2020 WL

2556674 (E.D. Mich. May 20, 2020), they argue that the act of filing the initial

complaint is not enough to warrant sanctions under § 1927.  (ECF No. 85 at Pg ID

3887, 3890, 3894; ECF No. 93 at Pg ID 4071; ECF No. 112 at Pg. ID 4609, 4625-

26; ECF No. 161 at Pg ID 5808-09; ECF No. 165 at Pg ID 6572.)  This argument

misses the crux of opposing counsel's argument for § 1927 sanctions, which is that

Plaintiffs' counsel multiplied proceedings by failing to dismiss the case when their

claims became moot on December 14 (if not earlier) and by pursuing their legal

49

claims even after the Court issued its opinion clearly informing Plaintiffs and their

counsel that their legal claims were weak and lacked factual support.

Second, Plaintiffs' counsel contend that they "moved as expeditiously as

possible from the outset through the termination of this proceeding" and "had not

injected new legal claims or evidence after this Court's December 7, 2020[] Order

denying the TRO Motion."  (ECF No. 85 at Pg ID 3893-94; ECF No. 112 at Pg ID

4625.)  Even if true, it misses the point as to why counsel unreasonably and

vexatiously multiplied the proceedings.  "[I]f events that occur subsequent to the

filing of a lawsuit . . . deprive the court of the ability to give meaningful relief, then

the case is moot and must be dismissed." *Sullivan v. Benningfield*, 920 F.3d 401,

410 (6th Cir. 2019) (quoting *Ailor v. City of Maynardvill*e, 368 F.3d 587, 596 (6th

Cir. 2004)).  Here, Plaintiffs conceded that their claims were moot after December

14.  Yet, in the month that followed, Plaintiffs refused to voluntarily dismiss their

claims, forcing Defendants to file their motions to dismiss and the Court to decide

Plaintiffs' motion for additional time to respond to the motions to dismiss, which

Plaintiffs ultimately did not do.[27]  In the end, Plaintiffs' attorneys prolonged the

---

[27] Notably when the State Defendants sought concurrence in their Motion to
Dismiss on December 22 (ECF No. 105-3 at Pg ID 4432), Plaintiffs' counsel
responded that they were "not in a position to respond to [the State Defendants']
request until [the] appeals [before the Sixth Circuit and United States Supreme
Court] are decided," and noted that "[they] do not believe the district court has
jurisdiction to consider [the State Defendants'] motion while the case is on

inevitable and "caused both [the State Defendants and Intervenor-Defendants] and the [C]ourt to waste resources" in the meantime. *Morris v. City of Detroit Water & Sewage Dep't*, 20 F. App'x 466, 468 (6th Cir. 2001); *see also Andretti v. Borla Performance Indus., Inc.*, 426 F.3d 824, 835 (6th Cir. 2005) (affirming impositions of sanctions where attorney "refus[ed] to voluntarily dismiss the count and forc[ed] [opposing counsel] to pursue a dispositive motion in order to have the claim dismissed"); *Davis v. Detroit Downtown Dev. Auth.*, 782 F. App'x 455, 458 (6th Cir. 2019).

Finally, Plaintiffs' attorneys contend that the facts and outcome of several cases cited by the State Defendants in support of § 1927 sanctions are distinguishable. (ECF No. 112 at Pg ID 4627-32.) Plaintiffs' attorneys distinguish *Ridder* because there, unlike here, "an attorney pursued . . . a claim for five years without offering any evidence." (*Id.* at Pg ID 4629.) But this does not matter: Forcing Defendants and Intervenor-Defendants to file any pleading or brief at any

---

appeal." (*Id.*) Of course, because neither this Court, the Sixth Circuit, nor the United States Supreme Court had entered a stay—and Plaintiff had not moved for one in any court—this Court retained its jurisdiction to consider the Motion to Dismiss. *See Zundel v. Holder*, 687 F.3d 271, 282 (6th Cir. 2012) ("[A]n appeal from an order granting or denying a preliminary injunction does not divest the district court of jurisdiction to proceed with the action on the merits.") And for some reason, Plaintiffs eventually voluntarily dismissed this lawsuit while it remained on appeal in the Sixth Circuit and Supreme Court, even though they previously refused to concur as to Defendants' motions to dismiss *because* it was on appeal in those courts.

51

point after Plaintiffs' claims became moot required them to file one pleading or brief too many.  *Andretti*, 426 F.3d at 835.  Plaintiffs' attorneys also take issue with the State Defendants' use of *Big Yank*, pointing out that the court stated— according to Plaintiffs' counsel—that "the bad faith exception requires that the district court make actual findings of fact that demonstrate that the claims were . . . pursued for an improper purpose."  (ECF No. 112 at Pg ID 4630 (citing *Big Yank*, 125 F.3d at 314).)  But the portion of the *Big Yank* opinion cited discusses a court's *inherent authority* to sanction, not sanctions under § 1927 as pursued by the State Defendants.  Plaintiffs' counsel's contention as to the three remaining cases— *Salkil*, 458 F.3d 520, *Jones*, 789 F.2d 1225, and *In re Ruben*, 825 F.2d 1225—are plainly meritless and worthy of no further discussion.  (*See* ECF No. 112 at Pg ID 4627-29.)

The Court finds that Plaintiffs' counsel unreasonably and vexatiously multiplied the proceedings in this case and their arguments to the contrary are unavailing.

**B.    Whether Plaintiffs' Counsel Violated Rule 11**

**1.    Whether Plaintiffs' counsel submitted claims, defenses, or other legal contentions not warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law in violation of Rule 11(b)(2)**

**a)    Counsel's presentment of claims not warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law**

The Court said it before and will say it again: At the inception of this lawsuit, all of Plaintiffs' claims were barred by the doctrines of mootness, laches, and standing, as well as Eleventh Amendment immunity.  (*See* ECF No. 62 at Pg ID 3302-24.)  Further, Plaintiffs' attorneys did not provide a nonfrivolous argument for extending, modifying, or reversing existing law or for establishing new law to render their claims ripe or timely, to grant them standing, or to avoid Eleventh Amendment immunity.  The same can be said for Plaintiffs' claims under the Elections and Electors, Equal Protection, and Due Process Clauses, and the alleged violations of the Michigan Election Code.[28]  Finally, the attorneys have not

---

[28] There is no reason to repeat what the Court already has stated regarding the legal merit of Plaintiffs' claims under the Elections, Electors, and Equal Protection Clauses.  (*See* ECF No. 62 at Pg ID 3324-28.)  The briefs filed by the State Defendants and Intervenor-Defendants provide further detail as to why those claims, as well as Plaintiffs' Due Process and Michigan Election Code claims, are legally flawed and why Plaintiffs and their counsel knew or should have known this to be the case.

identified any authority that would enable a federal court to grant the relief sought in this lawsuit.

Plaintiffs asked this Court to enjoin the State Defendants from sending Michigan's certified results to the Electoral College (ECF No. 6 at Pg ID 84-86); but as reported publicly, Governor Whitmer had already done so before Plaintiffs filed this lawsuit.[29]  Plaintiffs sought the impoundment of all voting machines in Michigan (*id.* at Pg ID 86); however, those machines are owned and maintained by Michigan's local governments, which are not parties to this lawsuit.  Mich. Comp. Laws §§ 168.37, .37a, .794a.  Plaintiffs demanded the recount of absentee ballots (ECF No. 6 at Pg ID 85), but granting such relief would have been contrary to Michigan law as the deadline for requesting and completing a recount already had passed by the time Plaintiffs filed suit.  Mich. Comp. Laws § 168.879.  Further, a recount may be requested only by a candidate.  *Id.*  And while Plaintiffs requested the above relief, their ultimate goal was the decertification of Michigan's presidential election results and the certification of the losing candidate as the winner—relief not "warranted by existing law or a nonfrivolous argument for

---

[29] *See* Governor Gretchen E. Whitmer, State of Michigan: Office of the Governor, Certificate of Ascertainment of the Electors of the President and Vice President of the United States of America (Nov. 23, 2020, 5:30 PM), https://perma.cc/NWS4-9FAB; Governor Gretchen Whitmer (@GovWhitmer), Twitter (Nov. 24 2020, 12:04 PM), https://perma.cc/22DF-XJRY.

extending, modifying, or reversing existing law or for establishing new law."  Fed. R. Civ. P. 11(b)(2).

While courts do have the authority to grant injunctive relief affecting conduct related to elections, no case suggests that courts possess the authority to issue an injunction of the scope sought here.  Plaintiffs' attorneys maintain that the strongest case is *Bush v. Gore*, 531 U.S. 98 (2000).  There, however, the Supreme Court was asked neither to order a recount nor to decertify Florida's presidential election results.  Instead, the Court was asked to *stop* a recount ordered by the Florida Supreme Court, which infringed the State's legislatively enacted scheme. *Bush*, 531 U.S. at 532-33.  Ultimately, the Court halted the Florida recount of the presidential election *to allow the previously certified vote results to stand*, *id.*, which had declared President Bush the winner in the State.[30]

At the July 12 hearing, Plaintiffs' counsel pointed for the first time to the Supreme Court's decision in *United States v. Throckmorton*, 98 U.S. 61 (1878), as supporting this Court's authority to take—it seems the attorneys are suggesting— any equitable action in connection with the 2020 presidential election.  (ECF No. 157 at Pg ID 5335.)  Apparently *Throckmorton*'s quotation of the maxim "fraud vitiates everything" is a refrain that has been oft-repeated on social media by those

---

[30] Notably, this was a recount sought by a candidate in accordance with Florida's contest provisions. *Bush*, 531 U.S. at 528.

who question the results of the 2020 presidential election and believe Former

President Trump should be declared the winner.[31, 32]   (ECF No. 164-8.)  The City is

correct that Plaintiffs' counsel's citation to *Throckmorton* is puzzling, both because

the case relates to a nineteenth-century land grant and has nothing to do with

election law and because the Supreme Court held that the grant could *not* be

collaterally attacked on the basis that the judgment was procured by fraud.  98 U.S.

at 68.  Simply put, the case does not support Plaintiffs' legal contentions directly or

even by extension.  Yet counsel's citation to *Throckmorton* is enlightening in that

it reflects, as the City puts it, "that this suit has been driven by partisan political

posturing, entirely disconnected from the law" and "is the dangerous product of an

online feedback loop, with these attorneys citing 'legal precedent' derived not from

---

[31](*See* ECF No. 164-8 at Pg ID 2 (listing Twitter posts that state, among other things, that (i) "[A]ny fraud located . . . constitutes nullification of the presidential contest.  This means, Trump wins by default because of the vote switching by Dominion Machines. Look up Throckmorton 1878."; (ii) "[F]raud will DISQUALIFY Biden completely and mean that Trump will be the winner of all 50 states . . . . There can be no other outcome. 'Fraud vitiates everything' US v. Throckmorton . . . ."; (iii) "[F]raud vitities everything.  Meaning one state commits voter fraud they all go down!  So DJTrump wins the 2020 election."; and (iv) "Fraud vitiates everything it touches. [THROCKMORTON] . . . . Thus the Biden/Harris 'swearing in' is negated, quashed annulled, invalidated, revoked and abrogated.").)

[32] Of course, the Supreme Court did not hold in *Throckmorton* that "fraud vitiates everything"; rather, it merely quoted this phrase from a treatise and then held that, in fact, fraud did not justify overturning a federal district court's 20-year-old decree.  98 U.S. at 65, 68.

a serious analysis of case law, but from the rantings of conspiracy theorists sharing

amateur analysis and legal fantasy in their social media echo chambers."  (ECF No.

164 at Pg ID 6143.)

It is not lost upon the Court that the same claims and requested relief that

Plaintiffs' attorneys presented here were disposed of, for many of the same

reasons, in Michigan courts[33] and by judges in several other "battleground"

jurisdictions where Plaintiffs' counsel sought to overturn the election results[34].

The fact that no federal district court considering the issues at bar has found them

worthy of moving forward supports the conclusion that Plaintiffs' claims are

frivolous.

---

[33] Op. & Order, *Costantino*, No. 20-014780-AW (Wayne Cnty. Cir. Ct. filed Nov. 13, 2020); *Donald J. Trump for President, Inc. v. Sec'y of State*, Nos. 355378, 355397, 2020 Mich. LEXIS 2131 (Mich. Ct. App. Dec. 11, 2020), *appeal denied* 951 N.W.2d 353 (Mich. 2020).

[34] *See* 12/7/20 Tr., *Pearson v. Kemp*, No. 1:20-cv-04809 (N.D. Ga. filed Dec. 8, 2020), ECF No. 79 at Pg 41-44; *Wood v. Raffensperger*, 501 F. Supp. 3d 1310 (N.D. Ga. 2020), *aff'd* 981 F.3d 1307 (11th Cir. 2020); *Feehan v. Wis. Elections Comm'n*, 506 F. Supp. 3d 596 (E.D. Wis. 2020); *Bowyer v. Ducey*, 506 F. Supp. 3d 699 (D. Ariz. 2020).

       **b)**    **Counsel's contention that acts or events violated Michigan election law (when the acts and events, even if they occurred, did not)**

      Plaintiffs alleged that certain acts or events violated the Michigan Election Code when, in fact, they did not.

      To support the allegation that Defendants violated Michigan election laws by accepting "unsecured ballots . . . without any chain of custody,"[35] the Amended Complaint states that Whitney Meyers "observed passengers in cars dropping off more ballots than there were people in the car."[36]  But when the Court asked Plaintiffs' counsel whether individuals other than the voter can drop off a ballot in Michigan, Campbell answered in the affirmative.  (ECF No. 157 at Pg ID 5486.) And of course, anyone easily could have learned this by consulting Michigan law. *See* Mich. Comp. Laws § 168.764a (explaining at Step 5(c) that a household member or family member (as defined by Michigan law) may return a voter's absentee ballot).  It seems to the Court, then, that Plaintiffs' counsel knew or should have known that this conduct did not violate existing state law.

---

[35] (ECF No. 6 at Pg ID 879 ⁋ 15(A), 943 ⁋ 190(k) (citing IIC).)

[36] (*See* IIC - "Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted," Subsection 7 - "Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline," ECF No. 6 at Pg ID 906 ⁋ 101 (referencing Meyers Aff., ECF No. 6-3 at PDF Pg 130-31).)

The Amended Complaint further claims that Michigan election laws were

violated because ballots that lacked postmarks were counted.[37, 38] But when the

Court asked Plaintiffs' attorneys whether Michigan absentee ballots must be

received through U.S. mail—and therefore postmarked—to be counted, counsel

went on about not being able to "rely on the Secretary of State's guidance."  (ECF

No. 157 at Pg ID 5468.)  Noticeably absent from that response, however, was an

answer to the Court's question.  Tellingly, when the City's counsel stated that

ballots are not required to be mailed or postmarked in Michigan—as they "are

often handed in by hand"; "[via] boxes in front of clerk's offices by hand"; and

sometimes "right across the desk in the clerk's office" (*id.* at Pg ID 5470)—

Plaintiffs' counsel did not object to or refute this recitation of the law.  *See* Mich.

Comp. Laws § 168.764a (explaining that absentee ballots may be delivered

---

[37] (ECF No. 6 at Pg. ID 879 ⁋ 15(C), 942 ⁋ 190(h) (citing IIC); *see* IIC -
"Additional Violations of Michigan Election Code That Caused Ineligible, Illegal
or Duplicate Ballots to Be Counted," Subsection 4 - "Election Officials Counted
Ineligible Ballots with No Signatures or No Dates or with No Postmark on Ballot
Envelope," ECF No. 6 at Pg ID 904 ⁋ 96 (referencing Brunell Aff., ECF No. 6-3 at
PDF Pg 35-36; Spalding Aff., ECF No. 6-3 at PDF Pg 61-62; and Sherer Aff., ECF
No. 6-3 at PDF Pg 126-28).)

[38] When one searches through the unindexed affidavits attached as Exhibit 3 to
Plaintiffs' pleading and eventually locates these affidavits, however, one finds that
none of the affiants state that ballots without postmarks were counted.  (*See* ECF
No. 6-3 at PDF Pg 35-36, 61-62, 126-28.)

59

"[p]ersonally to the office of the clerk, to the clerk, or to an authorized assistant of the clerk, or to a secure drop box").

To support the allegation that Defendants "count[ed] ineligible ballots—and in many cases—multiple times," in violation of Michigan election law,[39] the Amended Complaint cites to several affidavits in which the affiants state that batches of ballots were repeatedly run through the vote tabulation machines[40]. When the Court asked whether Plaintiffs' counsel inquired as to why a stack of ballots might be run through tabulation machines more than once, Plaintiffs' counsel did not answer the Court's question and instead proclaimed that "ballots are not supposed to be put through more than once. Absolutely not. That would violate Michigan law." (ECF No. 157 at Pg ID 5462.) But bafflingly, Plaintiffs' counsel did not offer a cite to the law violated, and counsel did not identify such a law in the Amended Complaint either. However, the affidavit of Christopher Thomas, Senior Advisor to the Detroit City Clerk, filed in *Costantino* ("Thomas Affidavit"), explained that "ballots are often fed through the high-speed reader

_____

[39] (ECF No. 6 at Pg. ID 879 ▯ 15(B), 942 ▯ 190(g) (citing IIC).)

[40] (*See* IIC - "Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted," Subsection 2 - "Ineligible Ballots Were Counted—Some Multiple Times," ECF No. 6 at Pg ID 903 ▯ 94 (referencing Helminen Aff., Waskilewski Aff., Mandelbuam Aff., Rose Aff., Sitek Aff., Posch Aff., Champagne Aff., and Bomer Aff.).)

60

more than once" "as a routine part of the tabulation process."  (ECF No. 78-14 at

Pg ID 3772 ¶ 20.)  And he detailed a myriad of reasons why this may be necessary,

including "if there is a jam in the reader" or "if there is a problem ballot (e.g.,

stains, tears, stray markings, . . . etc.) in a stack."[41]  (*Id.*)

At the July 12 hearing, Kleinhendler told the Court that it was "completely

irrelevant" whether the conduct Plaintiffs claimed was violative of Michigan law

was actually unlawful.  This is because, counsel argued, the conduct "raise[d] a

suspicion" and what was significant was the mere *chance* for misfeasance to

occur.[42]  (ECF No. 157 at Pg ID 5484.)  But litigants and attorneys cannot come to

federal court asserting that certain acts violate the law based only upon an

*opportunity* for—or counsel and the litigant's suspicions of—a violation.

---

[41] Thomas goes on to explain: "To an untrained observer[,] it may appear that the
ballot is being counted twice, however, the election worker will have cancelled the
appropriate count on the computer screen.  Any human error in the process would
be identified during the canvass.  If not, the number of voters at the absent voter
counting board would be dramatically different than the number of counted votes."
(ECF No. 78-14 at Pg ID 3772 ¶ 20.)

[42] To make his point, Kleinhendler used the analogy of handing someone an open
can of Coke and assuring the recipient that a drink had not been taken from it.
(ECF No. 157 at Pg ID 5484.)  But it is just as plausible that the can had been
sipped before delivery, as it is plausible that it had not been.  A "pleading must
contain something more than a statement of facts that merely creates a suspicion of
a legally cognizable right of action."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544,
556 (2007) (citation, internal quotation marks, brackets and ellipsis omitted).

61

### c)    Counsel's failure to inquire into the requirements of Michigan election law

Plaintiffs alleged that certain acts or events constituted violations of the Michigan Election Code when, in fact, Plaintiffs' counsel failed to make any inquiry into whether such acts or events were in fact unlawful.

In light of Plaintiffs' allegation that Defendants violated the Michigan Election Code by permitting ballots to arrive at the TCF Center "not in sealed ballot boxes," "without any chain of custody," and "without envelopes"[43] and because the Amended Complaint does not identify a provision in the Michigan Election Code prohibiting the actions about which Plaintiffs complain[44], the Court asked Plaintiffs' attorneys at the July 12 hearing about their understanding regarding Michigan's ballot-bin requirements.  (*Id.* at Pg ID 5478-79.)  Counsel's response: "[W]e do not purport to be experts in Michigan's process," (*id.* at Pg ID 5479-80), and, they argued, the affidavit that supported this allegation—that of Daniel Gustafson ("Gustafson Affidavit")—was copied and pasted from

---

[43] (ECF No. 6 at Pg. ID 879 ⁋ 15(F), 943 ⁋ 190(k) (citing IIC; *see* IIC - "Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted," Subsection 7 - "Election Workers Accepted Unsecured Ballots, without Chain of Custody, after 8:00 PM Election Day Deadline," ECF No. 6 at Pg ID 905-06 ⁋ 100 (quoting Gustafson Aff., ECF No. 6-4 at PDF Pg 48-49).)

[44] (*See* ECF No. 6 at Pg ID 878 ⁋ 14(C) (advancing this specific allegation but citing no Michigan Election Code provision violated); *id.* at Pg ID 879 ⁋ 15(F) (same); *id.* at Pg ID 905-06 ⁋ 100 (same); *id.* at Pg ID 943 ⁋ 190(k) (same).)

62

*Costantino* (*id.*).  These evasive and non-responsive answers to the Court's direct questions amount to an admission that Plaintiffs' counsel did not bother to find out what the Michigan Election Code requires, and whether the acts alleged to constitute violations of the Michigan Election Code were actually prohibited.

In *Costantino*—which was decided approximately two weeks before Plaintiffs filed the instant lawsuit—Wayne County Circuit Court Judge Timothy M. Kenny credited the Thomas Affidavit (ECF No. 78-11 at Pg ID 3738-39, 3742, 3745)—thereby informing Plaintiffs' counsel that what Gustafson observed did not in fact violate Michigan Election Code, or at a minimum putting counsel on notice that there was a duty to inquire further.  And even if Plaintiffs' counsel lacked expertise as to the Michigan Election Code, they undoubtedly were required to be familiar enough with its provisions to confirm that the conduct they *asserted* violated that code in fact *did*.

The Court finds Plaintiffs' counsel's arguments to the contrary unavailing. First, the attorneys assert that neither opposing counsel nor the Thomas Affidavit took issue with the facts as outlined in the Gustafson Affidavit (ECF No. 157 at Pg ID 5481-82) and, therefore, the Gustafson Affidavit does not suggest that Plaintiffs' counsel engaged in any conduct worthy of sanctions.  This misses the point.  The sanctionable conduct is not based on whether the facts described in the Gustafson Affidavit are true or false.  What is sanctionable is counsel's *allegation*

63

that violations of the Michigan Election Code occurred based on those facts, without bothering to figure out if Michigan law actually prohibited the acts described.

Second, Plaintiffs' counsel argued that permitting ballots to be handled and transported in the manner described in the Gustafson Affidavit "raises a suspicion" and "[w]hether [such acts are] required under Michigan law or not[] [is] completely irrelevant." (*Id.* at Pg ID 5484.) But the Amended Complaint repeatedly asserts that Defendants violated the Michigan Election Code and Plaintiffs' state law, Equal Protection, Due Process, and Electors and Elections Clauses claims are based on these alleged violations. (*See, e.g.*, ECF No. 6 at Pg ID 877, 879, 892, 903, 937-48, 953, 955.) And, again, a mere "suspicion" is not enough—this is especially so when neither the litigant nor his or her counsel has bothered to figure out exactly what the law is or what it permits.

For the reasons discussed in the three subsections above, the Court concludes that Plaintiffs' attorneys presented claims not warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing existing law.

> **2.      Whether Plaintiffs' counsel presented pleadings for which the factual contentions lacked evidentiary support or, if specifically so identified, would likely have evidentiary support in violation of Rule 11(b)(3)**

Before analyzing whether Plaintiffs' counsel violated Rule 11(b)(3), the Court pauses to answer two questions.

64

*The sanctionable conduct under Rule 11(b)(3)*

Plaintiffs' attorneys argue that they genuinely believed the factual allegations in this lawsuit, and otherwise filed this suit and the accompanying documents in good faith. (*See* ECF No. 157 at Pg ID 5415, 5418, 5419, 5492-93, 5501.) They also argue that the affiants genuinely believed the same and submitted their affidavits also in good faith. (*Id.* at Pg ID 5403.) Because all of this was done in good faith, counsel contends, they should not be sanctioned.

Of course, an "empty-head" but "pure-heart" does not justify lodging patently unsupported factual assertions.[45] And the good or bad faith nature of actions or submissions is not what determines whether sanctions are warranted under Rule 11(b)(3). What the City claims and the Court agrees is sanctionable as a violation of the rule is the filing of pleadings claiming violations of the Michigan Election Code, Equal Protection Clause, Due Process Clause, and Electors and Elections Clauses where the factual contentions asserted to support those claims lack evidentiary support. The Court spent significant time during the July 12 hearing inquiring about the various reports and affidavits Plaintiffs attached to their pleadings not necessarily because Plaintiffs' counsel may have filed this lawsuit in

---

[45] *See* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment) (noting that Rule 11's objective standard is "intended to eliminate any 'empty-head pure-heart' justification for patently frivolous arguments"); *Tahfs*, 316 F.3d at 594 ("A good faith belief in the merits of a case is insufficient to avoid sanctions.").

65

bad faith, and not necessarily because the affiants may have submitted their affidavits in bad faith. Rather, the Court did so because—as discussed below—no reasonable attorney would accept the assertions in those reports and affidavits as fact or as support for factual allegations in a pleading when based on such speculation and conjecture. And no reasonable attorney would repeat them as fact or as support for a factual allegation without conducting the due diligence inquiry required under Rule 11(b).

To be clear, as to Rule 11(b)(3), the Court is not concerned with whether counsel's conduct was done in bad faith.[46] The Court is concerned only with what the reports and affidavits say and reveal on their face, and what Plaintiffs' counsel should (or should not) have done before presenting them in light of what is revealed on their face.[47]

_____

[46] This does not mean, however, that violating Rule 11(b)(3) by presenting pleadings for which the factual contentions lacked evidentiary support cannot be done in bad faith or for an improper purpose. If it is, this would of course constitute a violation of Rule 11(b)(1). *See infra*, Section IV, Subsection B, Part 3—"Whether Plaintiffs' counsel acted with an improper purpose in violation of Rule 11(b)(1)."

[47] Plaintiffs' attorneys further contend that they did more than was required by attaching this "evidence" to their pleadings. (ECF No. 157 at Pg ID 5534.) True, Plaintiffs were not required to attach evidence to support their factual allegations; but, they did. Therefore, they had an obligation to scrutinize the contents and doing so would have revealed that key factual assertions made in their pleading lacked evidentiary support.

66

*No evidentiary hearing is needed*

Plaintiffs' attorneys contend that "[t]he proper method for evaluating affidavits is an evidentiary hearing" during which a court tests the veracity of the affiants and, without one, the Court cannot sanction counsel. (*See, e.g.*, ECF No. 161 at Pg ID 5815, 5816 n.10; ECF No. 157 at Pg ID 5491-93.)  However, the affiants' credibility and the truth or falsity of their affidavits have no bearing on what the Court finds sanctionable under Rule 11(b)(2) and (3).

Instead, what is sanctionable under Rule 11(b)(2) as discussed above is, among other things, (i) asserting that acts or events violated Michigan election law, when the acts and events (even if they occurred) did not and (ii) failing to inquire into the requirements of Michigan election law.  What is sanctionable under Rule 11(b)(3) as discussed below is (i) presenting factual assertions lacking evidentiary support; (ii) presenting facts taken from affidavits containing speculation and conjecture because, at no stage during the litigation process, would such "evidence" count as evidentiary support for a factual allegation; (iii) failing to ask questions of affiants who submitted affidavits that were central to the factual allegations that the affidavits supported; (iv) failing to inquire (sufficiently, if at all) into recycled affidavits first used by different attorneys in earlier election-challenge lawsuits; and (v) failing to inquire into information readily discernible as false.

67

Because ascertaining whether Plaintiffs' counsel committed any Rule 11(b)(2) or (3) infraction does not turn on the veracity of the affiants and the Court obtained the information it needed during the hearing and via the sanctions briefing, an evidentiary hearing is of no use.[48]

### a) Counsel's failure to present any evidentiary support for factual assertions

Plaintiffs' counsel failed to present any evidence to support their allegation of "illegal double voting."  (*See* ECF No. 6 at Pg ID 903 ¶ 93.)  To support this factual assertion, Plaintiffs pointed to a single piece of "evidence": the affidavit of Jessy Jacob ("Jacob Affidavit").[49]  That affidavit states in part: "I observed a large number of people who came to the satellite location to vote in-person, but they had

---

[48] Plaintiffs' attorneys complain that the Court focused on only a limited number of affidavits at the July 12 motion hearing, when more were laced throughout their 960-page Amended Complaint.  (ECF 157 at Pg ID 5450-51.)  However, as the Court noted at the motion hearing, the affidavits focused on were often the only evidence cited to support key factual assertions in Plaintiffs' pleadings.  (*Id.* at Pg ID 5358, 5410, 5420, 5428, 5435, 5448, 5452.)  And, as discussed below, all of the affidavits the Court references in this Opinion & Order's Rule 11(b)(3) analysis were in fact the *only* pieces of evidence offered to support the relevant factual allegation.

[49] (ECF No. 6 at Pg. ID 942 ¶ 190(f) (citing IIC); *see* IIC - "Additional Violations of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to Be Counted," Subsection 1 - "Illegal Double Voting," ECF No. 6 at Pg ID 903 ¶ 93 (referencing Jacob Aff., ECF No. 6-4 at PDF Pg 36-38).)

68

already applied for an absentee ballot."[50]  (ECF No. 6-4 at PDF Pg 37 (emphasis

added).)[51]  Of course, *applying* for an absentee ballot is not evidence that someone

*voted* via an absentee ballot, and when the Court highlighted this lack of evidence

as to "double voting" during the hearing, Plaintiffs' counsel responded: "I think

there's inferences that can be drawn, and it should not shock this Court that

somebody could show up, after having *asked* for an absentee ballot … and then

show up and vote again."  (ECF No. 157 at Pg ID 5454-55 (emphasis added).)

It does not shock the Court that a Michigan resident can request an absentee

ballot and thereafter decide to vote in person.  Indeed, Michigan law says that

voters can.  Mich. Comp. Laws § 168.769(1) ("An absent voter may vote in person

within his or her precinct at an election, notwithstanding that he or she applies for

an absent voter ballot and the ballot is mailed or otherwise delivered to the absent

voter by the clerk" if, "[b]efore voting in person," "the absent voter [] return[s] the

---

[50] Jacob does claim that people came to vote in person at the satellite location
where she worked who had already applied for an absentee ballot, and that those
individuals voted without returning the mailed absentee ballot or signing an
affidavit that the ballot had been lost.  (ECF No. 6-4 at PDF Pg 37 ¶ 10.)  Michigan
law makes it a felony to vote both in person and absentee.  *See* Mich. Comp. Laws
§ 168.769(4).  Of course, Jacob does not state that these individuals voted in
person and absentee.  As such, her affidavit in fact does not plausibly support
"illegal double voting."  (ECF No. 6 at Pg ID 903.)

[51] Some of the documents filed by the parties contain illegible docket headers.  In
such instances, the Court references the "PDF" page numbers instead of the "Page
IDs."

absent voter ballot.").  But the Court is concerned that Plaintiffs' attorneys believe that a Michigan resident's choice to do so serves as circumstantial evidence that the Michigan resident "double voted."  It does not.  Inferences must be reasonable and come from facts proven, not speculation or conjecture.  *United States v. Catching*, 786 F. App'x 535, 539 (6th Cir. 2019) (citations omitted) (explaining that "reasonable inferences from the evidence" are allowed but not "mere speculative inferences"); *see also id.* (quoting *Cold Metal Process Co. v. McLouth Steel Corp.*, 126 F.2d 185, 188 (6th Cir. 1942) ("An inference is but a reasonable deduction and conclusion from proven facts.")).

### b)    Counsel's presentment of conjecture and speculation as evidentiary support for factual assertions

Plaintiffs' counsel presented affidavits that were based on conjecture, speculation, and guesswork.

To support the allegation that "unsecured ballots arrived at the TCF Center loading garage, not in sealed ballot boxes, without any chain of custody, and without envelopes, after the 8:00 PM Election Day deadline," Plaintiffs quote the

70

affidavit of Matt Ciantar ("Ciantar Affidavit"),[52, 53] which is a masterclass on

making conjectural leaps and bounds:

> The afternoon following the election[,] as I was taking
> my normal dog walk (mid-afternoon), I witnessed a dark
> van pull into the small post office located in downtown
> Plymouth, MI.  I witnessed a young couple . . . pull into
> the parking lot . . . and proceed to exit their van (no
> markings) . . . and open[] up the back hatch and
> proceed[] to take 3-4 very large clear plastic bags out . . .
> and walk them over to a running USPS Vehicle that
> *appeared as if* it was "waiting" for them. . . .
>
> There was no interaction between the couple and any
> USPS employee *which I felt was very odd*. . . . They did
> not walk inside the post office like a *normal* customer to
> drop of[f] mail.  It was *as if* the postal worker was told to
> meet and standby until these large bags arrived. . . .
>
> [T]he bags were clear plastic with markings in black on
> the bag and on the inside of these clear bags was another
> plastic bag that was not clear (*could not see what was
> inside*) . . . . [There were] *what looked like* a black
> security zip tie on each back [*sic*] *as if* it were "tamper
> evident" type of device to secure the bag. . . . [B]y the
> time I realized I should take pictures of the bags once I
> noticed this looked "*odd*[,]" they had taken off.

---

[52] (ECF No. 6 at Pg ID 943 ¶ 190(k) (citing IIC); *see* IIC - "Additional Violations
of Michigan Election Code That Caused Ineligible, Illegal or Duplicate Ballots to
Be Counted," Subsection 7 - "Election Workers Accepted Unsecured Ballots,
without Chain of Custody, after 8:00 PM Election Day Deadline," ECF No. 6 at Pg
ID 906 ¶ 103 (quoting Ciantar Affidavit, ECF No. 6-7 at Pg ID 1312-14).)

[53] Plaintiffs also reference the Gustafson and Meyers Affidavits to support this
allegation.  (ECF No. 6 at Pg ID 905-06 ¶¶ 100-03.)  For the reasons discussed
above (*see supra* 58, 63-64), these two affidavits are of little to no evidentiary
value.

> The other *oddity* was that [*sic*] the appearance of the couple.  After the drop, they were smiling, laughing at one another.
>
> What I witnessed and considered that *what could be in those bags could be ballots* going to the TCF center or coming from the TCF center . . . .

(ECF No. 6-7 at Pg ID 1312-14 (emphasis added).)

When the Court asked Plaintiffs' attorneys how any of them, as officers of the court, could present this affidavit as factual support of anything alleged in their pleadings and Motion for Injunctive Relief, counsel emphatically argued that "[t]he witness is setting forth exactly what he observed and [the] information that he bases it on. . . . He saw these plastic bags . . . . It is a true affidavit."  (ECF No. 157 at Pg ID 5488-89.)  The Court accepts that the affidavit is true in that Ciantar memorialized what he saw at the time.  But the Court cannot find it reasonable to assert, as Plaintiffs' attorneys do, that this "shows fraud."  (*Id.* at Pg ID 5489.)  Absolutely nothing about this affidavit supports the allegation that ballots were delivered to the TCF Center after the Election Day deadline.  And even if the Court entertained the assertion of Plaintiffs' counsel that this affidavit "is one piece of a pattern" reflecting fraud or Defendants' violations of Michigan election laws (*id.*), this would be a picture with many holes.  This is because a document containing the lengthy musings of one dog-walker after encountering a "smiling, laughing"

72

couple delivering bags of unidentified items in no way serves as evidence that state laws were violated or that fraud occurred.

During the hearing, Plaintiffs' counsel further asserted that "we don't typically rewrite what an affiant says." (*Id.* at Pg ID 5490.) That is good. But, pursuant to their duties as officers of the court, attorneys typically do not offer factual allegations that have no hope of passing as evidentiary support at any stage of the litigation.

To support the allegation that Defendants "fraudulently add[ed] tens of thousands of new ballots . . . to the [Qualified Voter File] . . . on November 4, 2020, all or nearly all of which were votes for Joe Biden,"[54] Plaintiffs quote the affidavit of Melissa Carone ("Carone Affidavit"),[55] which describes "facts" that demonstrate no misconduct or malfeasance, and amount to no more than strained and disjointed innuendo of something sinister:

---

[54] (ECF No. 6 at Pg. ID 942 ⫼ 190(a) (citing IIB).)

[55] Plaintiffs also reference the affidavit of Andrew Sitto ("Sitto Affidavit") and Robert Cushman ("Cushman Affidavit") to support this allegation. (ECF No. 6 at Pg ID 905-06 ⫼⫼ 100-03.) But as Judge Kenny concluded in *Constantino*, Sitto's affidavit is "rife with speculation and guess-work about sinister motives" and he "knew little about the process of the absentee voter counting board activity." (ECF No. 31-15 at Pg ID 2443.) Indeed, the evidentiary value of the Sitto Affidavit is questionable at best. And while the Court does not discuss the Cushman Affidavit in this Opinion and Order, the Court notes that Plaintiffs describe the Carone Affidavit as "the most probative evidence" of the factual allegation at bar. (ECF No. 6 at Pg ID 899 ¶ 84.)

73

> There was [*sic*] two vans that pulled into the garage of
> the counting room, one on day shift and one on night
> shift.  These vans were apparently bringing food into the
> building . . . . I never saw any food coming out of these
> vans, coincidently it was announced on the news that
> Michigan had discovered over 100,000 more ballots—not
> even two hours after the last van left.[56]

The Amended Complaint calls this an "illegal vote dump."  (ECF No. 6 at Pg ID

900 �ℙ 84.)

But nothing described by Carone connects the vans to any ballots; nothing

connects the illusory ballots to President Biden; and nothing connects the illusory

votes for President Biden to the 100,000 ballots "coincidently" announced on the

news as "discovered" in Michigan.[57]  Yet not a single member of Plaintiffs' legal

team spoke with Carone to fill in these speculation-filled gaps before using her

---

[56] (*See* IIB – "Election Workers Fraudulently Forged, Added, Removed or
Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting
Records," Subsection 1 – "Election Workers Fraudulently Added 'Tens of
Thousands' of New Ballots and New Voters in the Early Morning and Evening of
November 4," ECF No. 6 at Pg ID 899-900 ⅋ 84 (quoting Carone Affidavit, ECF
No. 6-5 at Pg ID 1306 ⅋ 8).)

[57] And nothing in the affidavit enlightens its reader as to what is meant by
"discovered."

affidavit to support the allegation that tens of thousands of votes for President

Biden were fraudulently added.[58, 59]  (*See* ECF No. 157 at Pg ID 5426-28.)

It is also notable that, when the Court asked Plaintiffs' counsel whether an

affiant's observation of a self-described "coincidence" serves as evidentiary

support for the allegation that an "illegal vote dump" occurred, Plaintiffs' counsel

appeared to say that it was okay in this case because Ramsland "relied on [the

Carone Affidavit] for . . . his statistical analysis" and "an expert can rely on

hearsay."  (*Id.* at Pg ID 5429.)  But the problem with the Carone Affidavit does not

concern hearsay—it concerns conjecture.  And surely Plaintiffs' attorneys cannot

fail to reasonably inquire into an affiant's speculative statements and thereafter

escape their duty to "stop-and-think" before making factual allegations based on

the statements, simply because their expert did the same.  *See* Fed. R. Civ. P. 11

Advisory Committee Notes (1993 Amendment) ("The rule continues to require

litigants to 'stop-and-think' before initially making legal or factual contentions.").

_____

[58] Without engaging in such an inquiry—much less a reasonable one—counsel's
affirmative decision to label the 100,000 ballots discussed on the news—or the
illusory ballots theoretically removed from two vans—an "illegal vote dump"
serves as a quintessential example of guesswork laced with bad faith.

[59] Kleinhendler emphasized during the hearing that Carone "publicly testified . . .
in Michigan about her findings."  (ECF No. 157 at Pg ID 5427.)  It is
nonsensical to suggest that supporting a key factual allegation with nothing
more than speculation is justified because that speculation was repeated publicly.

75

Plaintiffs' counsel further emphasized that if Carone "[said] things that don't turn out to be entirely accurate, that can be discovered through the processes that this Court is very familiar with."  (ECF No. 157 at Pg ID 5429.)  The Court assumes the attorneys were referring to the discovery process.  But here's the snag: Plaintiffs are not entitled to rely on the discovery process to mine for evidence that never existed in the first instance.  *See Goldman v. Barrett*, 825 F. App'x 35, 38 (2d Cir. 2020) (explaining that a plaintiff "may not rely on discovery to manufacture a claim that lacks factual support in the first instance" but "may use discovery to *bolster* evidence").

And speculation, coincidence, and innuendo could never amount to evidence of an "illegal vote dump"—much less, anything else.[60]

---

[60] The Supreme Court has made clear that where there are perfectly plausible alternative explanations for an event—here, for example, legally cast ballots simply being delivered and counted—a plaintiff's allegations are not to be accepted as true.  *See Twombly*, 550 U.S. at 557 (explaining the "need at the pleading stage for allegations plausibly suggesting (not merely consistent with)" liability).  And of course, the mere fact that the affiant and/or Plaintiffs' counsel opted to use seemingly sinister language to describe an event does not make that event sinister, wrongful, unlawful, or fraudulent.

76

### c) Counsel's failure to inquire into the evidentiary support for factual assertions

Plaintiffs' counsel failed to ask questions of the individuals who submitted affidavits that were central to the factual allegations in the pleadings.

To support the allegation that Defendants permitted "election workers [to] change votes for Trump and other Republican candidates,"[61] Plaintiffs point to one thing—namely, Articia Bomer's affidavit ("Bomer Affidavit"):

> I observed a station where election workers were working on scanned ballots that had issues that needed to be manually corrected. I *believe* some of these workers were changing votes that had been cast for Donald Trump and other Republican candidates.[62]

Per the Amended Complaint, this is the only evidence and only "eyewitness testimony of election workers manually changing votes for Trump to votes for Biden." (ECF No. 6 at Pg ID 902 ₱ 91.)

When the Court asked whether an affiant's *belief* that something occurred constitutes *evidentiary support* for that occurrence, Plaintiffs' counsel stated: "[I]f you see it, that would certainly help you to form a belief." (ECF No. 157 at Pg ID

---

[61] (ECF No. 6 at Pg. ID 942 ₱ 190(d) (citing IIB).)

[62] (*See* IIB – "Election Workers Fraudulently Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records," Subsection 4 - "Election Workers Changed Votes for Trump and Other Republican Candidate," ECF No. 6 at Pg ID 902 ₱ 91 (quoting Bomer Aff., ECF No. 6-3 at Pg ID 1008-10) (emphasis added).)

5450.)  The Court then asked: "[D]id anyone inquire as to whether or not [] Bomer actually saw someone change a vote?"  (*Id.* at Pg ID 5452.)  The Court was met with silence.  (*Id.*)

As an initial matter, an affiant's subjective belief that an event occurred does not constitute evidence that the event in fact occurred.  But more importantly, during the hearing, Plaintiffs' counsel conceded that the Bomer Affidavit had evidentiary value only if Bomer *saw* election workers manually changing votes for Former President Trump to votes for President Biden.  Yet, without asking Bomer if she *saw* such manual changes, Plaintiffs' counsel submitted her affidavit as evidentiary support that such manual changes *in fact* occurred.  This alone fell short of counsel's obligation to conduct a reasonable inquiry and is the very laxity that the sanctions schemes are designed to penalize.

And Plaintiffs' counsel's failure to ask this material question—when paired with their affirmative decision to label Bomer's testimony as "*eyewitness testimony of election workers manually changing votes*"—evinces bad faith.  Plaintiffs' counsel may not bury their heads in the sand and thereafter make affirmative proclamations about what occurred above ground.  In such cases, ignorance is not bliss—it is sanctionable.

### d)   Counsel's failure to inquire into evidentiary support taken from other lawsuits

As evidentiary support in this case, Plaintiffs' counsel attached affidavits to their pleadings that were submitted in two previously filed election-challenge lawsuits without engaging in a reasonable inquiry as to their contents.

For example, to support the allegation that Defendants "fraudulently add[ed] tens of thousands of new ballots and/or new voters to the [Qualified Voter File] . . . on November 4, 2020,"[63] Plaintiffs quote the Sitto Affidavit[64].  When the Court inquired about factual assertions in the Sitto Affidavit (*Id.* at Pg ID 5412), Kleinhendler responded that "[t]hese were affidavits that were submitted by counsel in [*Costantino*]" (*id.* at Pg ID 5414-15).  Plaintiffs' attorneys admit to similarly lifting the Carone Affidavit from *Costantino* and filing it in this case as evidentiary support without engaging in an independent inquiry as to its merits.[65]

---

[63] (ECF No. 6 at Pg. ID 942 ⁋ 190(a) (citing IIB).)

[64] (*See* IIB – "Election Workers Fraudulently Forged, Added, Removed or Otherwise Altered Information on Ballots, Qualified Voter List and Other Voting Records," Subsection 1 – "Election Workers Fraudulently Added 'Tens of Thousands' of New Ballots and New Voters in the Early Morning and Evening of November 4," ECF No. 6 at Pg ID 899 ⁋ 82 (quoting Sitto Aff., ECF No. 6-4 at PDF Pg 40-42).)

[65] (ECF No. 157 at Pg ID 5433 (**Ms. Haller**: "I would just point out that the [Carone Affidavit] . . . [is] documented as a document from the [*Costantino*] court . . . . It is not represented to be a document that was created by us.  It is not represented to be anything other than what it was, which is a document from a

79

The attorneys admit the same as to the Bomer Affidavit.  (*Id.* at Pg ID 5448-49.)

And suggest the same as to the Jacob Affidavit.  (*Id.* at Pg ID 5440-45.)  In fact,

almost every (if not every) non-expert affidavit attached to Plaintiffs' pleadings

here (*see* ECF Nos. 6-3 to 6-6, 6-13, 6-14) was filed by other attorneys in prior

lawsuits.  *See* Complaint Exs. 1-4, *Donald J. Trump for President, Inc.*, No. 1:20-

cv-01083 (W.D. Mich. filed Nov. 11, 2020), ECF Nos. 1-2 to 1-4; Complaint Exs.

A-F, *Costantino*, No. 20-014780 (Wayne Cnty. Cir. Ct. filed Nov. 8, 2020).

When the Court asked whether Plaintiffs' counsel inquired as to the

affidavits copied and pasted from the other cases, Plaintiffs' counsel dipped and

dodged the question and did not disclaim the City's counsel's assertions that they

did not.  (*See, e.g.*, ECF No. 157 at Pg ID 5440-47, 5452-55.)  "[O]ther lawyers

saw it" and "[t]hey believed it to be appropriate for submission to the Court in that

circumstance," Plaintiffs' attorneys argued.  (*Id.* at Pg ID 5445.)  "[Y]ou've got to

be able to trust when something has been submitted by counsel because of the oath

that we take" knowing that "everybody else within the profession" therefore

believes that the attorney's submission "should have tremendous value."  (*Id.* at Pg

ID 5419.)  Clearly, Plaintiffs' counsel relied on the assessment of counsel for the

different court. . . . It is a document that is not hearsay.  It is a simple document
that is a sworn statement from another court that is cited to by our expert, and we
rely upon it to the extent that it's cited in the complaint.").)

plaintiffs in other cases as to the affidavits from those cases that Plaintiffs' counsel recycled here.

This is not okay.  The Court remains baffled after trying to ascertain what convinced Plaintiffs' counsel otherwise.  "Substituting another lawyer's judgment for one's own does not constitute reasonable inquiry."  *Schottenstein v. Schottenstein*, 230 F.R.D. 355, 361-62 (S.D.N.Y. 2005); *see also Pravic v. U.S. Indus.-Clearing*, 109 F.R.D. 620, 622 (E.D. Mich. 1986) (holding that counsel's reliance on a memorandum prepared by a separate law firm was not reasonable because, among other things, counsel "did no independent research").  In short, Plaintiffs' counsel cannot hide behind the attorneys who filed *Costantino* or any other case to establish that Plaintiffs' counsel fulfilled their duty to ensure that the affidavits they pointed to as evidentiary support for the pleadings *here*, in fact had any chance of ever amounting to evidence.[66]

In their supplemental brief in support of their motion for sanctions, the State Defendants contend that Plaintiffs' counsel failed to engage in the requisite pre-filing inquiry, pointing to several statements Powell made in an election-related

---

[66] Plaintiffs' attorneys argue that "[t]he court never held an evidentiary hearing in *Costantino* and, as a result, did not properly assess the merits of the action" and "[t]his was one of the reasons why the[y] presented affidavits from that action in this case."  (ECF No. 161 at Pg ID 5816 n.10.)  The point, however, is that presenting those affidavits required counsel to first conduct a reasonable inquiry into the factual allegations contained therein.

defamation case, which is based in part on allegations made in the instant lawsuit. (*See* ECF No. 118-2 at Pg ID 4806.)  In a motion to dismiss filed in that case, Powell argued that, even if the plaintiffs "attempt[] to impugn the various declarations as unreliable[] [or] attack the veracity or reliability of the various declarants," "[l]awyers involved in fast-moving litigation concerning matters of transcendent public importance, who rely on sworn declarations, are entitled to no less protection" than "[j]ournalists [who] usually repeat statements from sources (usually unsworn, often anonymous) on whom they rely for their stories, and sometimes those statements turn out not to be true."  (*Id.* at PDF Pg 66-67.) "Journalists"—like attorneys, Powell argued—"must be free to rely on sources they deem to be credible, without being second-guessed by irate public figures who believe that the journalists should have been more skeptical."  (*Id.* at PDF Pg 67.)

In response to the State Defendants' supplemental brief, instead of explaining what efforts they undertook to investigate the veracity of the affidavits, Plaintiffs' attorneys argue that they "never stated that lawyers cannot be held to account."  (ECF No. 120 at Pg ID 5004.)  "Instead," they argue, the motion to dismiss "justifies lawyers being afforded the same type of Constitutional protections as journalists," "who . . . would lose the protection afforded to them by the Supreme Court . . . if they were 'drawn into long court battles designed to

deconstruct the accuracy of sources on which they rely.'" (*Id.* at Pg 5004-05 (quoting ECF 118-2 at PDF Pg 66-67).)

Attorneys are not journalists. It therefore comes as no surprise that Plaintiffs' attorneys fail to cite a single case suggesting that the two professions share comparable duties and responsibilities. Perhaps this confused understanding as to the job of an attorney, and what the law says about the attendant duties and obligations, is what led Plaintiffs' counsel to simply copy and paste affidavits from prior lawsuits. Perhaps not. But what is certain is that Plaintiffs' counsel will not escape accountability for their failure to conduct due diligence before recycling affidavits from other cases to support their pleadings here.

### e)   Counsel's failure to inquire into Ramsland's outlandish and easily debunked numbers

Plaintiffs' counsel attached Ramsland's affidavit to their pleadings to support the assertion that hundreds of thousands of illegal votes were injected into Michigan's election for President. (*See* ECF No. 6-24.) In his affidavit, Ramsland refers to several statistical "red flag[s]," including: (i) reports of 6,000 votes in Antrim County being switched from Former President Trump to President Biden and (ii) 643 precincts in Michigan with voter turn-out exceeding 80% (e.g., 460.51% in Zeeland Charter Township, 215.21% in Grout Township, Gladwin County, and 139.29% in Detroit). (*Id.* at Pg ID 1573-74 ¶¶ 10, 11.)

However, the State issued a bulletin well before this lawsuit was filed explaining the user error that led to the miscount in Antrim County's unofficial results, which had been "quickly identified and corrected."  (ECF No. 39-12.)  And *official* election results for Michigan—reporting voter turnout rates vastly lower than the numbers in Ramsland's affidavit—were published and readily available shortly after the election and well-before his report was filed here.[67]  A reasonable attorney, seeing Ramsland's striking original figures, would inquire into their accuracy or at least question their source.

Even the most basic internet inquiry would have alerted Plaintiffs' counsel to the wildly inaccurate assertions in Ramsland's affidavit.  For example, in comparison to the voter turnout of 139.29% in the City of Detroit claimed by Ramsland, the official turnout was recorded on or before November 19, 2020 as

---

[67] Ramsland fails to identify the source of his figures in the initial affidavit presented in this case, indicating only that he and his colleagues "have studied the information that is publicly available concerning the November 3, 2020 election results."  (*See* ECF No. 6-24 at Pg ID 1573 ¶ 9.)  He astoundingly claims, however, that "[s]ome larger precincts in Wayne Co[unty] and others are no longer publicly reporting their data[.]"  (*Id*. at Pg ID 1574 ¶ 11.)  And after it was widely reported that Ramsland's figures were grossly inaccurate, Plaintiffs' counsel submitted new numbers from Ramsland in an "expert report" filed December 3, 2020, where Ramsland claims that "[t]he source of that original data was State level data that no longer exists [f]or some unexplained reason" and, for the first time, identifies those purported sources.  (ECF No. 49-3 at Pg ID 3123 ¶ 6.)

84

being 50.88%.[68]  Ramsland reported that voter turnout in Zeeland Charter

Township was a whopping 460.51%, when an official report ran on November 11

showed that the average turnout for the four precincts within the township was

80.11%.[69]  And unlike Ramsland's assertion of an eye-popping 781.9% turnout in

the City of North Muskegon, the two precincts in the city had a turnout of 73.53%

and 82.21%, averaging 77.78%, as indicated as of November 13, 2020.[70]

And before Plaintiffs' counsel presented Ramsland's affidavit here, there

was more to alert them as to the unreliability of Ramsland's figures and to put

them on notice that further inquiry was warranted.  Specifically, attorneys used an

affidavit from Ramsland in Wood's challenge to the presidential election results in

Georgia.  *See* Aff., *Wood v. Raffensperger*, No. 20-04651 (N.D. Ga. Nov. 18,

2020), ECF No. 7-1.  But there, Ramsland represented data as being from

Michigan when, in fact, the townships listed were in Minnesota.  *See id*. at Pgs. 3,

6.  Moreover, it was widely publicized before Plaintiffs' counsel offered

---

[68] Official Results for November 3, 2020 General Election, City of Detroit (Nov. 19, 2020, 2:11 PM), https://perma.cc/A8MY-FZEJ.

[69] Official Results for Ottawa County Precinct, Ottawa County (Nov. 11, 2020, 4:20 PM), at PDF Pg 918-54, https://perma.cc/3W57-D33G.

[70] Official Results for Muskegon County Precinct, Muskegon County (Nov. 13, 2020, 5:55 PM), at PDF Pg 466-67, https://perma.cc/9MAA-J6RU.

85

Ramsland's affidavit here that even for the Minnesota locations, Ramsland's conclusions about over-votes was not supported by official data from the State.[71]

It is true, as Plaintiffs' attorneys assert to defend their use of Ramsland's affidavit, that Ramsland adjusted his voter turnout figures in a subsequently filed report. (*See* ECF No. 157 at Pg ID 5396; ECF No. 49-3 at Pg ID 3124.) However, counsel never drew attention to this modification in the reply brief to which Ramsland's updated report was attached, or anywhere else. (*See* ECF No. 49.) But more importantly, this does not change the fact that a reasonable inquiry was not done before Ramsland's initial affidavit was presented.[72]

For the reasons discussed in subsections a-e above, the Court concludes that Plaintiffs' counsel presented pleadings for which the factual contentions lacked evidentiary support.

---

[71] *See, e.g.*, Aaron Blake, *The Trump Campaign's Much-Hyped Affidavit Features a Big, Glaring Error*, Washington Post (Nov. 21, 2020, 7:39 AM), https://perma.cc/E6LY-AL44.

[72] It is unclear from counsel's answers to the Court's questions at the July 12 hearing whether Plaintiffs' attorneys questioned Ramsland about the startling numbers in his affidavit before it was filed or after. (*See* ECF No. 157 at Pg ID 5395-96 (Kleinhendler explaining that he asked Ramsland about "these numbers" and "[Ramsland] said, 'Yes, yes, I did  question them.  Yes, I did review, and yes, it was an error' that he corrected on his reply affidavit.").)  However, even if Kleinhendler questioned Ramsland about the numbers before the affidavit was filed, such inquiry clearly was insufficient considering the readily available data contradicting them.

86

### 3. Whether Plaintiffs' counsel acted with an improper purpose in violation of Rule 11(b)(1)

The Court already concluded that Plaintiffs' counsel acted with an improper purpose when affirmatively labeling as an "illegal vote dump" the 100,000 ballots discussed on the news, despite failing to inquire as to the gaps that established the relevant affidavit as nothing more than conjecture.  Evidence of improper purpose can also be found in their decision to label as "eyewitness testimony" an affidavit that *does not* state that the affiant saw election workers manually changing votes, especially when opting not to even ask the affiant if she saw such a thing.  And still, evidence of bad faith abounds.

First, Campbell filed an emergency motion within hours of the July 12 hearing's conclusion, asking the Court to publicly release the recording of the proceeding.  (ECF No. 152.)  In that motion, some of the attorneys representing Plaintiffs argued:

> [O]n June 17, 2021, the Court issued an order that "[e]ach attorney whose name appears on any of Plaintiffs' pleadings or briefs shall be present at the motion hearing."  [ECF No. 123.]  Media around the country picked up this story, including large internet news sites such as Yahoo, The Hill, and MSN. . . .
>
> Indicative of the public's interest, the Sanctions Hearing, at its peak, "attracted more than 13,000 people watching the live video" on YouTube as broadcasted by the Court. The national media, from the Associated Press to CNN to the New York Times, ran stories on the hearing.  ***Most outlets presented a narrative that counsel for plaintiffs***

87

> **believe to be incorrect. Those characterizations may**
> **change if the Court republishes the video and allows**
> **others to view it**. . . . [T]he recording is no longer
> available on the Court's website. Consequently, **counsel**
> **is unable to refute what they believe to be public**
> **mischaracterizations**. . . .
>
> There was a lot of "spirit" in the hearing in this court,
> which the public should be able to experience in its
> entirety—**enabling citizens to draw their own inferences**
> **from the presentations instead of depending on media**
> **presentations**.

(*Id.* at Pg ID 5284-89 (emphasis added and footnotes omitted).)[73]

Notwithstanding the apparent belief of Plaintiffs' counsel, this case is being

tried in a court of law, not the court of public opinion. As noted throughout this

decision, statutes, rules, and standards of professional responsibility apply.

Considering Plaintiffs' attorneys' obligation to act within these parameters, this

Court is curious as to what narrative Plaintiffs' attorneys wished to present through

the video's release. The Telegram message Wood posted within hours of the

hearing's conclusion gives some insight,[74] as do the introductory remarks in

---

[73] Plaintiffs' attorneys also asserted that the video would assist them with the
drafting of their supplemental briefs; however, this justification for releasing the
video was not made until late in their brief and was addressed in only two
paragraphs of the 15-paragraph submission. (ECF No. 152 at Pg ID 5289-90.)

[74] In the post, Wood expressed in part that he "thought [he] was attending a hearing
in Venezuela or Communist China." (ECF No. 151-1 at Pg ID 5278.) He further
expressed that "[t]he rule of law and due process does [*sic*] not exist at this time in
our country except in a very, very few courtrooms." (*Id.*)

Plaintiffs' counsel's supplemental brief[75].  What is most important, however, and what very clearly reflects bad faith is that Plaintiffs' attorneys are trying to use the judicial process to frame a public "narrative."  Absent evidentiary or legal support for their claims, this seems to be one of the primary purposes of this lawsuit.

Second, there is a basis to conclude that Plaintiffs' legal team asserted the allegations in their pleadings as opinion rather than fact, with the purpose of furthering counsel's political positions rather than pursuing any attainable legal relief.

As an initial matter, several of the allegations asserted in this and similar lawsuits filed by Plaintiffs' attorneys are the subject of a lawsuit that the companies responsible for the Dominion election machines and software filed against Powell and her company, Defending the Republic, Inc.:  *U.S. Dominion, Inc. v. Powell*, No. 1:21-cv-00040 (D.D.C. filed Jan. 8, 2021) ("*Dominion Action*"). [76]  The State Defendants assert this in their supplemental brief.  (ECF No. 118-2 at Pg ID 4797, 4803-05.)  And Powell admits this in response to the State

---

[75] (Supp. Br. Filed by Campbell, ECF No. 167 at Pg ID 6679 ("Bias is hard for attorneys to avoid and it is undoubtedly no less difficult for judges.  The difference is that there can be no tolerance for the influence of [] bias on a judicial decision.  The issue of sanctions cannot be a partisan political exercise." (internal citations omitted)).)

[76] Other statements by Powell are at issue in the *Dominion* Action but the Court's focus here is on those that are made in the instant lawsuit.

Defendants' brief (ECF No. 120 at Pg ID 4998, 5003), as well as in her motion to dismiss the *Dominion* Action (ECF No. 118-2 at PDF Pg 46 (conceding that "[t]he lawsuits containing the underlying allegations" in the *Dominion* Action, including "the exhibits and evidence on which the alleged defamatory statements are based," "were filed in . . . Michigan")).

In response to the *Dominion* plaintiffs' claim that Powell's assertions here were defamatory, Powell has maintained that the statements were "opinions" which "reasonable people would not accept . . . as fact." (*Id.* at PDF Pg 63.) Powell makes clear that at least some of the allegations in the current lawsuit were made to support her chosen political candidate. Specifically, Powell's brief in support of her motion to dismiss in the *Dominion* Action states: "Given the highly charged and political context of the statements, it is clear that Powell's statements were made as an attorney-advocate for her preferred candidate and in support of her legal and political positions." (*Id.* at PDF Pg 62.) "The highly charged and political nature of the statements," Powell continues in her brief, "underscores their political and hence partisan nature." (*Id.* at PDF Pg 61.) Powell characterizes her statements and allegations as "vituperative, abusive and inexact" "political speech," as well as "inherently prone to exaggeration and hyperbole." (*Id.* at PDF Pg 62-63.) Powell latched onto the *Dominion* plaintiffs' assertion that her allegations amounted to "wild accusations" and "outlandish claims" and therefore,

90

she argued, "reasonable people would not accept" these alleged statements and allegations "as fact but view them only as claims that await testing by courts through the adversary process." (*Id.* at PDF Pg 62.)

It is not acceptable to support a lawsuit with opinions, which counsel herself claims no reasonable person would accept as fact and which were "inexact," "exaggerate[ed]," and "hyperbole." Nor is it acceptable to use the federal judiciary as a political forum to satisfy one's political agenda. Such behavior by an attorney in a court of law has consequences. Although the First Amendment may allow Plaintiffs' counsel to say what they desire on social media, in press conferences, or on television, federal courts are reserved for hearing genuine legal disputes which are well-grounded in fact and law. *See Saltany v. Reagan*, 886 F.2d 438, 440 (D.C. Cir. 1989) (explaining that the circuit court does "not conceive it a proper function of a federal court to serve as a forum for 'protests,' to the detriment of parties with serious disputes waiting to be heard" and suggesting the same for use as a "political [] forum"); *see also Knipe v. Skinner*, 19 F.3d 72, 77 (2d Cir. 1994) (affirming the imposition of Rule 11 sanctions where, as the district court found, the filing of the action was "[a]nother creative avenue to beat a dead horse" and the "pursui[t of] a personal agenda against [a government entity]" without a good faith basis).

The Court pauses to briefly discuss Plaintiffs' attorneys' attempt to cloak their conduct in this litigation under First Amendment protection. The attorneys have argued:

> Setting a precedent to sanction an attorney whose case is denied at the district court level on procedural grounds is a grave abuse of the disciplinary process and potentially constitutes intimidation for filing a grievance against the government, which is a core protection of the First Amendment.

(ECF No. 112 at Pg ID 4615.) The attorneys have further argued that a sanctions order "would implicate Plaintiffs' and their counsel's First Amendment right of access to the courts." (ECF No. 93 at Pg ID 4078.) The attorneys are incorrect.

An attorney's right to free speech while litigating an action "is extremely circumscribed." *Mezibov v. Allen*, 411 F.3d 712, 717, 720-21 (6th Cir. 2005) (quoting *Gentile v. State Bar of Nev.*, 501 U.S. 1030, 1071 (1991)). As the Sixth Circuit explained in *Mezibov*:

> It is not surprising that courts have thus far been reluctant to allow the First Amendment to intrude into the courtroom. At first blush, the courtroom seems like the quintessential arena for public debate, but upon closer analysis, it is clear this is not, and never has been, an arena for *free* debate. . . . An attorney's speech in court and in motion papers has always been tightly cabined by various procedural and evidentiary rules, along with the heavy hand of judicial discretion. . . . [and in] [t]he courtroom[,] . . . the First Amendment rights of everyone (attorneys included) are at their constitutional nadir.

92

*Id*. at 717 (internal citations omitted) (emphasis in original).  Attorneys "voluntarily agree[] to relinquish [their] rights to free expression in [] judicial proceeding[s]" and "voluntarily accept[] almost unconditional restraints on [their] personal speech rights" when before a court.  *Id*. at 719-20.  For that reason, the Sixth Circuit has "see[n] no basis for concluding that free speech rights are violated by a restriction on that expression."[77]  *Id*. at 719.

Third, the Court finds an improper purpose because Plaintiffs' counsel failed to conduct the pre-filing reasonable inquiry required of them as officers of the court, despite most of the attorneys acknowledging that "no one is immune to confirmation bias" and, therefore, "attorneys should look beyond their prejudices and political beliefs, and view evidence with a level of professional skepticism." (Supp. Br. Filed by Campbell, ECF No. 161 at Pg ID 5818.)  Plaintiffs' attorneys attempt to excuse their failure to objectively evaluate their "evidence" because "[they] are not the only individuals who viewed the[] affidavits [attached to their pleadings] as evidence of serious fraud."  (*Id.* at Pg ID 5817.)  They say Former President Trump "susp[ected]" it too (*id.* at Pg ID 5817-18), and "millions of []

---

[77] The Court drew Plaintiffs' counsel's attention to *Mezibov* at the motion hearing in response to their repeated refrain that the First Amendment protects them from any sanctions for their conduct in this litigation.  Despite doing so and urging counsel to review the Sixth Circuit's decision (*see* ECF No. 157 at Pg ID 5497), Junttila continued to argue First Amendment protection in her supplemental brief—albeit in a more illogical and incoherent fashion.  (ECF No. 165 at Pg ID 6563-64).

93

Americans . . . believed that their president would not intentionally mislead them" (*id.* at Pg ID 5817).  As officers of the court, Plaintiffs' counsel had an obligation to do more than repeat opinions and beliefs, even if shared by millions.  Something does not become plausible simply because it is repeated many times by many people.[78]

Counsel's failure to "look beyond their prejudices and political beliefs" during this litigation and before filing this lawsuit strongly suggests improper motive.  The evidence of bad faith and improper motive becomes undeniably clear when paired with the fact that Plaintiffs' counsel violated Rule 11 in a multitude of ways.  *See supra*.  In other words, by failing to take the basic pre-filing steps that any reasonable attorney would have taken and by flouting well-established pleading standards—all while knowing the risk associated with failing to remain professionally skeptical, Plaintiffs' counsel did everything in their power to ensure that their bias—that the election was fraudulent, as proclaimed by Former President Trump—was confirmed.  Confirmation bias notwithstanding, Plaintiffs' counsel advanced this lawsuit for an improper purpose and will be held to account for their actions.

Fourth, circumstances suggest that this lawsuit was not about vindicating rights in the wake of alleged election fraud.  Instead, it was about ensuring that a

---

[78] This is a lesson that some of the darkest periods of history have taught us.

preferred political candidate remained in the presidential seat despite the decision of the nation's voters to unseat him.

Before the 2020 general election, Powell appears to have been certain that those who did not support Former President Trump already engaged in fraudulent illegal activity. On Election Day, Powell gave an interview during which she described "the many multifaceted efforts the democrats are making to steal the vote," including "develop[ing] a computer system to alter votes electronically," spreading the "COVID . . . apocalypse hoax," and ensuring that "people . . . have not gotten their absentee ballots" even though "they've . . . request[ed] them three different times[] and been told they were cancelled." (*See, e.g.,* Interview Tr., *U.S. Dominion, Inc. v. Powell*, No. 21-cv-00040 (D.D.C. filed Jan. 8, 2021), ECF No. 1-20 at Pg 2:13-24.) Why would someone, who believes that election fraud is already happening and will likely reach peak levels on Election Day, not raise the alarm with the entity the individual claims can fix things—specifically, the judiciary? It is because Plaintiffs' counsel was equally certain—even before the polls closed—that Former President Trump was going to win the 2020 election. (*Id.* at Pg 3:23-4:9 (claiming that the results of the 2020 election would be "the Trump victory," and stating that "[Democrats] [have] effectively conceded that Trump is going to win at the voting booth").)

Indeed, Plaintiffs' attorneys waited until after votes were tallied to file this lawsuit, even though the record suggests that—well in advance of Election Day— they knew or should have known about the things of which they complained.  (*See, e.g.*, ECF No. 6 at Pg ID 927-933 (supporting allegation about "[D]ominion vulnerabilities to hacking" with an expert report dated August 24, 2020; a law review article dated December 27, 2019; letters dated October 6, 2006 and December 6, 2019; news articles dated May 4, 2010, August 10, 2017, and August 8, 2019; a public policy report published in 2016; and a cybersecurity advisory dated October 30, 2020).)

This game of wait-and-see shows that counsel planned to challenge the legitimacy of the election if and only if Former President Trump lost.  And if that happened, they would help foster a predetermined narrative making election fraud the culprit.  These things—separately, but especially collectively—evince bad faith and improper purpose in bringing this suit.

Fifth, Joshua Merritt is someone whose identity counsel redacted, referring to him only as "Spyder" or "Spider," and who counsel identified in their pleadings and briefs as "a former electronic intelligence analyst with 305th Military Intelligence" and a "US Military Intelligence expert."  (*Id.* at Pg ID 880 ¶ 17, 932 ¶ 161; ECF No. 7 at Pg ID 1835.)  Yet, even after learning that Merritt never

96

completed any intelligence analyst training program with the 305th Military

Intelligence Battalion, Plaintiffs' counsel remained silent as to this fact.

In its motion for sanctions, the City emphasizes Merritt's statement that the

"original paperwork [he] sent in [to Plaintiffs' counsel] didn't say that" he was an

electronic intelligence analyst under 305th Military Intelligence.  (ECF No. 78 at

Pg ID 3657.)  According to the City, a spokeswoman for the U.S. Army

Intelligence Center of Excellence, which includes the battalion, stated that

"[Merritt] kept washing out of courses . . . [h]e's not an intelligence analyst."  (*Id.*)

Plaintiffs' counsel did not dispute these assertions in their response brief.  (ECF

No. 95 at Pg ID 4144.)  Nor did Plaintiffs' counsel dispute these assertions during

the hearing.

Instead, Kleinhendler argued during the hearing that Merritt's "expertise" is

based on "his years and years of experience in cyber security as a confidential

informant working for the United States Government" (ECF No. 157 at Pg ID

5375)—not Merritt's purported military intelligence training.  Clearly this is

dishonest.  This was not the experience on which Plaintiffs' attorneys premised

Merritt's expertise in their pleadings and Motion for Injunctive Relief, and Merritt

never claims in his declaration that he has "years and years of experience in cyber

security as a confidential informant working for the United States Government."[79]

(*See* ECF No. 6-25.) Instead, it was precisely Merritt's experience as "an

electronic intelligence analyst under 305th Military Intelligence" that Plaintiffs'

attorneys presented to convince the Court and the world that he is a reliable expert.

Kleinhendler argued during the hearing, however, that he first learned about

this inconsistency after the case was dismissed on January 14. (ECF No. 157 at Pg

ID 5375.) "I had no reason to doubt," Kleinhendler explained. (*Id.*) This also is

dishonest.

First, the City attached an article from the Washington Post to its January 5

motion for sanctions,[80] which at least put Plaintiffs' counsel on notice that Merritt

lacked the expertise they claimed. Yet curiously, during the hearing, when the

Court asked if "anyone ask[ed] [Plaintiffs' counsel] if, or suggest[ed] to [them]

that, [Merritt] was not a military intelligence expert," Kleinhendler, Haller, and

---

[79] To the extent that Plaintiffs' attorneys claim that an "affidavit" attached to their reply to the motion to seal includes this assertion (*see* ECF No. 157 at Pg ID 5385 (citing ECF Nos. 50, 50-1)), it does not. That "affidavit" is not signed by or associated with anyone, much less someone named Spyder, Spider, or Joshua Merritt. (ECF No. 50-1.)

[80] (ECF No. 78-18); Emma Brown, Aaron C. Davis, and Alice Crites, *Sidney Powell's Secret 'Military Intelligence Expert,' Key to Fraud Claims in Election Lawsuits, Never Worked in Military Intelligence*, Washington Post (Dec. 11, 2020, 6:29 PM), https://perma.cc/2LR2-YTBG.

Powell said "no" and all other counsel agreed by remaining silent.  (*Id.* at Pg ID 5386-87.)

Second, the Court finds it implausible (for several conspicuous reasons) that absolutely no member of Plaintiffs' legal team learned of the Washington Post article (and thus the questions it raised) shortly after it was published on December 11, 2020.  This is especially so considering that, according to the Washington Post article, when "[a]sked about Merritt's limited experience in military intelligence," Powell stated "in a text to The [Washington] Post: 'I cannot confirm that Joshua Merritt is even Spider.  Strongly encourage you not to print.'"[81]

Kleinhendler further argued that Plaintiffs' counsel's assertion that Merritt was a U.S. military intelligence expert was "not technically false" or "technically [] wrong" because "[h]e did spend, from [Kleinhendler's] understanding, seven months training with the 305th." (*Id.* at Pg ID 5375, 5384-85.)  The Court is unconvinced by this effort to mischaracterize.  Kleinhendler himself admitted that labeling Merritt as a U.S. military intelligence expert is "not [] the full story." (*Id.* at Pg ID 5384.)  Surely, any reasonable attorney would find it prudent to be forthcoming after learning that one of his experts never actually *completed* the training upon which the expert's purported expertise is based.

---

[81] (ECF No. 78-18 at Pg ID 3799.)

99

And Kleinhendler appears to concede that this argument is a poor one because he nonetheless admits that "[h]ad [he] known in advance [of the January 14 dismissal] that [Merritt] had transferred out, [he] would have made [it] clear." (*Id.* at Pg ID 5375, 5384-85, 5387.) But this is yet another misrepresentation. As detailed above, by January 5, Kleinhendler knew Merritt never completed the training that formed the basis of his purported expertise. Yet, Kleinhendler did not "make it clear." Co-counsel for Plaintiffs also had reason to question Merritt's expertise by no later than January 5. Yet, they remained silent too.

Ultimately, Plaintiffs' counsel's decision to not make clear "the full story" about Merritt not completing military intelligence training was for the improper purpose of bolstering their star witness' expertise and misleading the Court, opposing counsel, and the world into believing that Merritt was something that he was not.

Finally, despite what this Court said in its December 7, 2020 decision and what several other state and federal courts have ruled in similar election-challenge lawsuits, Plaintiffs' lawyers brazenly assert that they "would file the same complaints again." (*Id.* at Pg ID 5534.) They make this assertion even after witnessing the events of January 6 and the dangers posed by narratives like the one counsel crafted here. An attorney who willingly continues to assert claims doomed

100

to fail, and which have incited violence before, must be deemed to be acting with an improper motive.

In sum, each of the six matters discussed above individually evince bad faith and improper purpose. But when viewed collectively, they reveal an even more powerful truth: Once it appeared that their preferred political candidate's grasp on the presidency was slipping away, Plaintiffs' counsel helped mold the predetermined narrative about election fraud by lodging this federal lawsuit based on evidence that they actively refused to investigate or question with the requisite level of professional skepticism—and this refusal was to ensure that the evidence conformed with the predetermined narrative (a narrative that has had dangerous and violent consequences). Plaintiffs' counsel's politically motivated accusations, allegations, and gamesmanship may be protected by the First Amendment when posted on Twitter, shared on Telegram, or repeated on television. The nation's courts, however, are reserved for hearing legitimate causes of action.

### C.     Whether the Court May Sanction Plaintiffs' Counsel Pursuant to Its Inherent Authority

To award attorneys' fees pursuant to its inherent authority, a district court must find that (i) "the claims advanced were meritless," (ii) "counsel knew or should have known this," and (iii) "the motive for filing the suit was for an improper purpose such as harassment." *Big Yank*, 125 F.3d at 313.

As discussed in the preceding subsections, Plaintiffs' counsel advanced claims that were not well-grounded in the law, as demonstrated by their (i) presentment of claims not warranted by existing law or a nonfrivolous argument for extending, modifying, or reversing the law; (ii) assertion that acts or events violated Michigan election law, when the acts and events (even if they occurred) did not; and (iii) failure to inquire into the requirements of Michigan election law. Plaintiffs' counsel advanced claims that were also not well-grounded in fact, as demonstrated by their (i) failure to present any evidentiary support for factual assertions; (ii) presentment of conjecture and speculation as evidentiary support for factual assertions; (iii) failure to inquire into the evidentiary support for factual assertions; (iv) failure to inquire into evidentiary support taken from other lawsuits; and (v) failure to inquire into Ramsland's outlandish and easily debunked numbers.

And, for the reasons discussed above, Plaintiffs' counsel knew or should have known that these claims and legal contentions were not well-grounded in law or fact. Moreover, for the reasons also discussed above, the Court finds that Plaintiffs and their counsel filed this lawsuit for improper purposes.

Accordingly, sanctions also are warranted pursuant to the Court's inherent authority.

## V.     Conclusion

In summary, the Court concludes that Plaintiffs' counsel filed this lawsuit in bad faith and for an improper purpose.  Further, they presented pleadings that (i) were not "warranted by existing law or by a nonfrivolous argument for extending, modifying, or reversing existing law or establishing new law" and (ii) contained factual contentions lacking evidentiary support or likely to have evidentiary support. [82]  Finally, by failing to voluntarily dismiss this lawsuit on the date Plaintiffs' counsel acknowledged it would be moot and thereby necessitating the filing of motions to dismiss, Plaintiffs' attorneys unreasonably and vexatiously multiplied the proceedings.

For these reasons (and not for any conduct that occurred on appeal), the Court holds that sanctions against Plaintiffs' counsel are warranted under Rule 11, § 1927, and the Court's inherent authority.  Sanctions are required to deter the filing of future frivolous lawsuits designed primarily to spread the narrative that

---

[82] And for these reasons, this lawsuit is not akin to *Brown v. Board of Education*, 347 U.S. 483 (1954), as Plaintiffs' counsel, Powell, baselessly suggested during the July 12 hearing.  (ECF No. 157 at Pg ID 5534.)  Yes, attorneys may and should raise difficult and even unpopular issues to urge change in the law where change is needed.  But unlike Plaintiffs' attorneys here, then-attorney Thurgood Marshall had the requisite legal footing on which his clients' claims were grounded in *Brown*, and the facts were not based on speculation and conjecture.  *Brown* arose from an undeniable history during which Black Americans were treated as second-class citizens through legalized segregation in the schools of our country.  In stark comparison, the present matter is built on fantastical claims and conspiracy theories.

103

our election processes are rigged and our democratic institutions cannot be trusted. Notably, many people have latched on to this narrative, citing as proof counsel's submissions in this case.  The narrative may have originated or been repeated by Former President Trump and it may be one that "many Americans" share (*see* ECF No. 161 at Pg ID 5817); however, that neither renders it true nor justifies counsel's exploitation of the courts to further spread it.

### A.    Whether Sanctions Should be Awarded to Intervenor-Defendants

Plaintiffs do not challenge the Court's power to award sanctions to Intervenor-Defendants.  However, Plaintiffs maintain that, under § 1927, "a party seeking sanctions . . . has a duty to mitigate their damages."  (*Id.* at Pg ID 5809 (citing *Carter v. Hickory Healthcare, Inc.*, 905 F.3d 963, 970 (6th Cir. 2018)); *see also* ECF No. 165 at Pg ID 6573 (same).)  According to Plaintiffs, the City and Davis did just the opposite by intervening in this lawsuit where they were not being sued and, Plaintiffs assert, had no necessary interest to protect.

The Court already concluded, however, that Davis and the City possess a substantial legal interest in this matter warranting their intervention either as a matter of right or permissibly.  (*See* ECF No. 28.)  Of course, every intervenor could mitigate its damages by staying out of a lawsuit; however, choosing to step in does not on its own mean parties cannot seek an award of sanctions when they prevail in protecting their interests.

104

Despite this, the Court declines to award sanctions to Davis because he did

not substantially contribute to the resolution of the issues in this case.  As the Court

noted in its opinion denying Davis' request to intervene as of right, the State

Defendants, the DNC/MDP, and the City aimed to protect the interests of all

Wayne County voters, including Davis.  (*Id.* at Pg ID 2143-44.)  Although the

Court granted Davis' request for permissive intervention, the Court noted that its

decision was a "close call" and that it granted Davis' request only because "[his]

intervention [would] not unduly delay or prejudice the adjudication of the original

Defendants' rights."  (*Id.* at Pg ID 2146, 2145 n.2 (citations omitted).)

In fact, Davis' involvement did more to interfere with than assist the

advancement of this litigation.  Davis' briefs added little to the discussion,[83] and he

often clogged the Court's docket with inconsequential requests and wasted the

---

[83] Davis' Response to Emergency Motion for Temporary Restraining Order
contained two brief arguments and a note that "[he] hereby incorporates by
reference all of the legal arguments asserted by Defendants and Intervening
Defendants in their respective responses to Plaintiffs' motion for TRO" "[i]n order
to alleviate redundancy."  (ECF No. 37 at Pg ID 2749.)  And Davis' Motion for
Sanctions summarized and quoted—for nearly the entire length of the brief—a
Detroit Free Press article, the Court's December 7, 2020 Opinion & Order Denying
Plaintiffs' Motion for Injunctive Relief, and case law regarding § 1927 and a
court's inherent authority, as well as proffered a disjointed argument about why the
alleged falsity of Ramsland's affidavit resulted in the unreasonable and vexatious
multiplication of proceedings in violation of § 1927.  (ECF No. 69.)

Court's limited time with the same[84].  Moreover, despite speaking only twice

during the almost six-hour long sanctions hearing (ECF No. 157 at Pg ID 5340,

———————————————

[84] For example, (i) Davis' Emergency Motion to Strike Amended Complaint (ECF Nos. 41, 42), filed on December 3, 2020, was denied in a text-only order on the same day;

(ii) Davis' Emergency Motion to Strike Emergency Motion for Temporary Restraining Order (ECF No. 45), also filed on December 3, 2020, was withdrawn on December 4 (ECF No. 51);

(iii) the Emergency Motion to Expedite Briefing, Scheduling and Adjudication of Intervenor Defendant Robert Davis' Emergency Motions to Strike (ECF No. 46), also filed on December 3, 2020, was withdrawn on December 4 (ECF No. 51);

(iv) Davis' Emergency Motion for Court to Take Judicial Notice of Newspaper Articles Published in Detroit Free Press and Associated Press (ECF No. 59), filed on December 5, 2020, was denied on December 6 via a text-only order, which stated that "[t]he Court [found] the newspaper articles unnecessary to resolve the pending [Motion for Injunctive Relief]";

(v) Davis' Emergency Motion to Strike Motion for Extension of Time to File Response/Reply as to Motion for Sanctions (ECF No. 75), filed on January 4, 2021 because Plaintiffs' counsel "mistakenly selected and identified [] Davis as the 'filer'" of Plaintiffs' counsel's motion for extension of time (*id.* at Pg ID 3603), was denied as moot on January 5, after the Court ordered "the Clerk's Office [to] correct the docket entry text associated with Plaintiffs' motion [] so that the filing party is noted as 'All Plaintiffs'—not 'Robert Davis'" (ECF No. 76 at Pg ID 3611);

(vi) Davis' Motion for Court to Take Judicial Notice of Motion to Withdraw as Counsel Filed in the U.S. District Court for the Eastern District of Pennsylvania against Donald J. Trump for President, Inc. (ECF No. 79), filed on January 8, 2021, was denied on July 19, 2021 in an order, which stated that "the Court [did not] find it necessary to consider the motion to withdraw filed in another federal district court . . . to decide the pending sanctions motions" (ECF No. 149 at Pg ID 5267);

5519), Davis' counsel (unlike counsel to every other party to this case) opted not to file any supplemental briefing—presumably because, again, Davis had nothing to contribute.

Ultimately, the Court refuses to reward Davis for taking the Court's time and giving nothing back.

### B.    Sanctions Imposed

This lawsuit should never have been filed.  The State Defendants and the Intervenor-Defendants should never have had to defend it.  If Plaintiffs' attorneys are not ordered to reimburse the State Defendants and the City for the reasonable fees and costs incurred to defend this action, counsel will not be deterred from continuing to abuse the judicial system to publicize their narrative.  Moreover, this Court has found that Plaintiffs' counsel initiated this litigation for an improper

---

(vii) Davis' Emergency Motion to Strike Voluntary Dismissal (ECF No. 97), filed on January 20, 2021 after Plaintiffs' counsel misidentified a document on January 14 by selecting the wrong activity on the Court's electronic filing system, asked the Court to "sanction Plaintiffs' counsel for refusing to correct the error that was promptly brought to her attention by [] Davis' counsel" on January 18—the Court denied the motion via a 3-page order on January 25 (ECF No. 99); and

(viii) Davis' Emergency Motion for Court to Take Judicial Notice of Michigan Senate Oversight Committee's June 23, 2021 Report on November 2020 presidential election (ECF No. 124), filed on June 23, 2021, was denied on July 19, 2021 in an order, which stated that "the Court [did not] find it necessary to consider . . . the Michigan Senate Oversight Committee's June 21, 2021 report . . . to decide the pending sanctions motions" (ECF No. 149 at Pg ID 5267).

purpose, rendering this the "unusual circumstance" in which awarding attorneys' fees is warranted.

Further, given the deficiencies in the pleadings, which claim violations of Michigan election law without a thorough understanding of what the law requires, and the number of failed election-challenge lawsuits that Plaintiffs' attorneys have filed, the Court concludes that the sanctions imposed should include mandatory continuing legal education in the subjects of pleading standards and election law.

Lastly, the conduct of Plaintiffs' counsel, which also constituted violations of the Michigan Rules of Professional Conduct, *see, e.g.,* MRPC 3.1 and 3.3, calls into question their fitness to practice law. This warrants a referral for investigation and possible suspension or disbarment to the appropriate disciplinary authority for every state bar and federal court in which each attorney is admitted, *see* Fed. R. Civ. P. 11 Advisory Committee Notes (1993 Amendment) (explaining that such referrals are available as a sanction for violating the rule); E.D. Mich. LR 83.22(c)(2). [85]

---

[85] The Court is troubled that Powell is profiting from the filing of this and other frivolous election-challenge lawsuits. *See https://defendingtherepublic.org* (website of company run by Powell on which donations are solicited to support the "additional cases [being prepared] every day"). Other attorneys for Plaintiffs may be as well, given that their address (according to the filings here) is the same address listed on this website. What is concerning is that the sanctions imposed here will not deter counsel from pursuing future baseless lawsuits because those sanctions will be paid with donor funds rather than counsel's. In this Court's view,

Accordingly,

**IT IS ORDERED** that the motions for sanctions filed by the State

Defendants (ECF No. 105) and City of Detroit (ECF No. 78) are **GRANTED**.  The

Court is granting in part and denying in part Davis' motion for sanctions (ECF No.

69) in that the Court finds sanctions warranted but not an award of Davis'

reasonable attorneys' fees or costs.

**IT IS FURTHER ORDERED** that Plaintiffs' attorneys shall jointly and

severally pay the fees and costs incurred by the State Defendants and the City of

Detroit to defend this action.  *See* Fed. R. Civ. P. 11(c)(4).

**IT IS FURTHER ORDERED** that within fourteen (14) days of this

Opinion and Order, the State Defendants and City of Detroit shall submit time and

expense records, specifying for each attorney who performed work on the matter,

the date, the hours expended, the nature of the work performed, and, where

applicable, the attorney's hourly rate.  Plaintiffs' counsel may submit objections to

the requested amount within fourteen (14) days of each movants' filing.

**IT IS FURTHER ORDERED** that Plaintiffs' attorneys shall each complete

at least twelve (12) hours of continuing legal education in the subjects of pleading

standards (at least six hours total) and election law (at least six hours total) within

---

this should be considered by any disciplinary authority reviewing counsel's
behavior.

109

six months of this decision.  Any courses must be offered by a non-partisan

organization and must be paid for at counsel's expense.  Within six months of this

decision, each attorney representing Plaintiffs shall file an affidavit in this case

describing the content and length of the courses attended to satisfy this

requirement.

**IT IS FURTHER ORDERED** that the Clerk of the Court shall send a copy

of this decision to the Michigan Attorney Grievance Commission and the

appropriate disciplinary authority for the jurisdiction(s) where each attorney is

admitted, referring the matter for investigation and possible suspension or

disbarment: (i) Sidney Powell - Texas; (ii) L. Lin Wood - Georgia; (iii) Emily

Newman - Virginia; (iv) Julia Z. Haller - the District of Columbia, Maryland, New

York and New Jersey; (v) Brandon Johnson - the District of Columbia, New York,

and Nevada; (vi) Scott Hagerstrom - Michigan; (vii) Howard Kleinhendler - New

York and New Jersey; (viii) Gregory Rohl - Michigan; and (iv) Stefanie Lynn

Junttila - Michigan.

**IT IS SO ORDERED.**

s/ Linda V. Parker
LINDA V. PARKER
U.S. DISTRICT JUDGE

Dated: August 25, 2021

110