Sidney Powell (pro hac application forthcoming)
Sidney Powell PC
Texas Bar No. 16209700
(517) 763-7499
Sidney@federalappeals.com

Alexander Kolodin, AZ Bar No. 030826
Christopher Viskovic, AZ Bar No. 035860[1]
**KOLODIN LAW GROUP PLLC**
3443 N. Central Ave. Ste. 1009
Phoenix, AZ  85012
Telephone: (602) 730-2985
Facsimile: (602) 801-2539
E-Mail:
Alexander.Kolodin@KolodinLaw.com
CViskovic@KolodinLaw.com
SAtkinson@KolodinLaw.com (file copies)

*Attorneys for Plaintiffs*
*(Additional counsel listed on signature page)*

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| TYLER BOWYER, MICHAEL JOHN BURKE, NANCY COTTLE, JAKE HOFFMAN, ANTHONY KERN, CHRISTOPHER M. KING, JAMES R. LAMON, SAM MOORHEAD, ROBERT MONTGOMERY, LORAINE PELLEGRINO, GREG SAFSTEN, SALVATORE LUKE SCARMARDO, KELLI WARD, and MICHAEL WARD<br><br>Plaintiffs,<br><br>v.<br><br>DOUG DUCEY, in his official capacity as Governor of the State of Arizona, and KATIE HOBBS, in her official capacity as the Arizona Secretary of State<br><br>Defendants. | Case No.<br><br><br>**COMPLAINT FOR DECLARATORY, EMERGENCY, AND PERMANENT INJUNCTIVE RELIEF**<br><br>(Election Matter)<br><br>(TRO Requested) |

---

[1] District of Arizona admission scheduled for 12/9/2020.

Exhibit 1

**NATURE OF THE ACTION**

1.      This civil action brings to light a massive election fraud, of the Election and Electors Clauses, and the Equal Protection and Due Process Clauses of the Fourteenth Amendment, of the U.S. Constitution and multiple violations of the Arizona election laws. These violations occurred during the 2020 General Election throughout the State of Arizona, as set forth in the affidavits of eyewitnesses and the voter data cited, the statistical anomalies and mathematical impossibilities detailed in the affidavits of expert witnesses.

2.      The scheme and artifice to defraud was for the purpose of illegally and fraudulently manipulating the vote count to manufacture an election of Joe Biden as President of the United States, and also of various down ballot democrat candidates in the 2020 election cycle. The fraud was executed by many means, but the most fundamentally troubling, insidious, and egregious ploy was the systemic adaptation of old-fashioned "ballot-stuffing."  It has now been amplified and rendered virtually invisible by computer software created and run by domestic and foreign actors for that very purpose.  This Complaint details an especially egregious range of conduct in Maricopa County and other Arizona counties using employing Dominion Systems, though this conduct occurred throughout the State at the direction of Arizona state election officials.

3.      The multifaceted schemes and artifices implemented by Defendants and their collaborators to defraud resulted in the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots in the State of Arizona, that collectively add up to multiples of Biden's purported lead in the State of 10,457 votes.

4.      While this Complaint, and the eyewitness and expert testimony incorporated herein, identify with specificity sufficient ballots required to set aside the 2020 General Election results, the entire process is so riddled with fraud, illegality, and statistical impossibility that this Court, and Arizona's voters, courts, and legislators, cannot rely on, or certify, any numbers resulting from this election.  Accordingly, this Court must set aside the results of the 2020 General Election and grant the declaratory and injunctive relief

requested herein.

**Dominion Voting Systems Fraud and Manipulation**

5.      The fraud begins with the election software and hardware from Dominion Voting Systems Corporation ("Dominion") used in Maricopa County.  The Dominion systems derive from the software designed by Smartmatic Corporation, which became Sequoia in the United States.

6.      Smartmatic and Dominion were founded by foreign oligarchs and dictators to ensure computerized ballot-stuffing and vote manipulation to whatever level was needed to make certain Venezuelan dictator Hugo Chavez never lost another election.  *See* Ex. 1, Redacted Declaration of Dominion Venezuela Whistleblower ("Dominion Whistleblower Report").  Notably, Chavez "won" every election thereafter.

7.      As set forth in the Dominion Whistleblower Report, the Smartmatic software was contrived through a criminal conspiracy to manipulate Venezuelan elections in favor of dictator Hugo Chavez:

> Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic.  The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  In mid-February of 2009, there was a national referendum to change the Constitution of Venezuela to end term limits for elected officials, including the President of Venezuela. The referendum passed. This permitted Hugo Chavez to be re-elected an unlimited number of times.  . . .

> Smartmatic's electoral technology was called "Sistema de Gestión Electoral" (the "Electoral Management System"). Smartmatic was a pioneer in this area of computing systems. Their system provided for transmission of voting data over the internet to a computerized central tabulating center. The voting machines themselves had a digital display, fingerprint recognition feature to identify the voter, and printed out the voter's ballot. The voter's thumbprint was linked to a computerized record

1

2

of that voter's identity. Smartmatic created and operated the entire system. *See Exh. 1.* ¶¶ 10 & 14.

3

4

5

8.      A core requirement of the Smartmatic software design ultimately adopted by Dominion for Arizona's elections was the software's ability to hide its manipulation of votes from any audit.  As the whistleblower explains:

> Chavez was most insistent that Smartmatic design the system in a way that the system could change the vote of each voter without being detected. He wanted the software itself to function in such a manner that if the voter were to place their thumb print or fingerprint on a scanner, then the thumbprint would be tied to a record of the voter's name and identity as having voted, but that voter would not tracked to the changed vote. He made it clear that the system would have to be setup to not leave any evidence of the changed vote for a specific voter and that there would be no evidence to show and nothing to contradict that the name or the fingerprint or thumb print was going with a changed vote. Smartmatic agreed to create such a system and produced the software and hardware that accomplished that result for President Chavez. *Id.* ¶15.

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

9.      The design and features of the Dominion software do not permit a simple audit to reveal its misallocation, redistribution, or deletion of votes.  First, the system's central accumulator does not include a protected real-time audit log that maintains the date and time stamps of all significant election events.  Key components of the system utilize unprotected logs.  Essentially this allows an unauthorized user the opportunity to arbitrarily add, modify, or remove log entries, causing the machine to log election events that do not reflect actual voting tabulations—or more specifically, do not reflect the actual votes of or the will of the people.[2]

22

23

10.      This Complaint will show that Dominion violated physical security standards by connecting voting machines to the Internet, allowing Dominion, domestic third parties

24

25

26

27

28

---

[2]  *See* Ex. 7, August 24, 2020 Declaration of Harri Hursti, ¶¶45-48 (expert testimony in Case 1:17-cv-02989 in the U.S. District Court for the Northern District of Georgia). The Texas Secretary of State refused to certify Dominion for similar reasons as those cited by Mr. Hursti.  *See* Ex. 11A, 11B, State of Texas Secretary of State, Elections Division, Report of Review of Dominion Voting Systems Democracy Suite 5.5-A at 2 (Jan. 24, 2020).

4

or hostile foreign actors to access the system and manipulate election results, and moreover potentially to cover their tracks due to Dominion's unprotected log. Accordingly, a thorough forensic examination of Dominion's machines and source code is required to document these instances of voting fraud, as well as Dominion's systematic violations of the Voting Rights Act record retention requirements through manipulation, alteration, destruction and likely foreign exfiltration of voting records. See 52 U.S.C. § 20701.

11.     These and other problems with Dominion's software have been widely reported in the press and been the subject of investigations. In using Dominion Voting Systems Democracy Suite, Arizona officials disregarded all the concerns that caused Dominion software to be rejected by the Texas Board of elections in 2020 because it was deemed vulnerable to undetected and non-auditable manipulation. Texas denied Certification because of concerns that it was not safe from fraud or unauthorized manipulation. (See Exhs 11A&11B ).

12.     An industry expert, Dr. Andrew Appel, Princeton Professor of Computer Science and Election Security Expert has recently observed, with reference to Dominion Voting machines: "I figured out how to make a slightly different computer program that just before the polls closed, it switches some votes around from one candidate to another. I wrote that computer program into a memory chip and now to hack a voting machine you just need 7 minutes alone with a screwdriver."[3]

13.     Further, Dominion's documented, and intentional, security flaws facilitated foreign interference in the 2020 General Election.  For example, in the accompanying redacted declaration of a former electronic intelligence analyst with 305th Military Intelligence with experience gathering SAM missile system electronic intelligence, the Dominion software was accessed by agents acting on behalf of China and Iran in order to monitor and manipulate elections, including the most recent US general election in 2020. (See Ex. 12, copy of redacted witness affidavit).

---

[3] Andrew W. Appel, *et al.*, "Ballot Marking Devices (BMDs) Cannot Assure the Will of the Voters" at (Dec. 27, 2019),( attached hereto as Ex. 10 ("Appel Study")).

14.     Because this Complaint concerns mainly federal questions, it was not styled as a Statement of Contest within the meaning of ARS §§ 16-671 - 16-678.

15.     Nonetheless, the factual basis of this Complaint would also support an election contest under Arizona law since A.R.S. § 16-672 allows for contests on the grounds of misconduct, offenses against the elective franchise, on account of illegal votes, and by reason of erroneous count of votes.

16.     Similarly, the relief sought is in accord with Arizona law. A.R.S. § 16-676 provides clear remedies in the event of a successful contest, providing that the results of an election may either be annulled and set aside, A.R.S. § 16-676(B), or, if it appears that the winner was other than the person certified, the erroneously declared winner's certificate of election can be revoked A.R.S. § 16-676(C).

17.     In the event that the election is annulled and set aside, there would certainly not be time to hold a new election, especially given the issues identified herein. However, it would be eminently proper for the question of the choice of electors to then revert to the legislature, for "[t]here is no doubt of the right of the legislature to resume the power [to appoint electors] at any time, for it can neither be taken away nor abdicated." *Bush v. Gore*, 531 U.S. 98, 104, 121 S. Ct. 525, 529-30, 148 L.Ed.2d 388, 398 (2000) (citing with approval *McPherson v. Blacker*, 146 U.S. 1, 35, 13 S. Ct. 3, 10, 36 L.Ed. 869, 877 (1892)).

18.     Furthermore, this Court need not be concerned with whether such weighty questions can be addressed on an expedited timeline, because Arizona law provides very aggressive deadlines for the resolution of elections challenges. Specifically, Arizona law provides for election challenges to be resolved on the merits within 10 days of filing. A.R.S. § 16-676(A).

**Expert Witness Testimony on Widespread Voting Fraud**

19.     This Complaint presents expert witness testimony demonstrating that several  thousands of illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A. Unreturned mail ballots unlawfully ordered by third parties (average for Dr. Briggs Error #1): 219,135

B. Returned ballots that were deemed unreturned by the state (average for Dr. Briggs Error #2): 86,845

C. Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D. "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E. And Plaintiffs can show Mr. Biden received a statistically significant Advantage, based on fraud, from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

20.     Except for the estimate of illegal out-of-state votes, each of these experts has identified distinct sources of illegal votes in sufficient numbers (*i.e.*, greater than Biden's purported margin of 10,457 votes), not only to affect, but to change the result of the 2020 General Election in Arizona.  Taken together, the irregularities, anomalies and physical and statistical impossibilities, account for at least 412,494 illegal ballots that were counted in Arizona.  This provides the Court with sufficient grounds to set aside the results of the 2020 General Election and provide the other declaratory and injunctive relief requested herein.

21.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below.  Section I describes specific violations of Arizona law.  Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct.  Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and the history of Dominion and its executives demonstrating that

Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

## JURISDICTION AND VENUE

22.     This Court has subject matter under 28 U.S.C. § 1331 which provides, "The district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws, or treaties of the United States."

23.     This Court also has subject matter jurisdiction under 28 U.S.C. § 1343 because this action involves a federal election for President of the United States. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush v. Gore*, 531 U.S. 98, 113 (2000) (Rehnquist, C.J., concurring); *Smiley v. Holm*, 285 U.S. 355, 365 (1932).

24.     The jurisdiction of the Court to grant declaratory relief is conferred by 28 U.S.C. §§ 2201 and 2202 and by Rule 57, Fed. R. Civ. P.

25.     This Court has jurisdiction over the related Arizona constitutional claims and state-law claims under 28 U.S.C. § 1367.

26.     Venue is proper because a substantial part of the events or omissions giving rise to the claim occurred in the District of Arizona. 28 U.S.C. § 1391(b) & (c).

27.     Because the United States Constitution reserves for state legislatures the power to set the time, place, and manner of holding elections for Congress and the President, state executive officers have no authority to unilaterally exercise that power, much less flout existing legislation.

## THE PARTIES

28.     Each of the following Plaintiffs is a registered Arizona voter and a nominee of the Republican Party to be a Presidential Elector on behalf of the State of Arizona: Tyler Bowyer, a resident of Maricopa County; Nancy Cottle, a resident of Maricopa County; Jake Hoffman, a resident of Maricopa County; Anthony Kern, a resident of Maricopa County; James R. Lamon, a resident of Maricopa County; Samuel Moorhead, a resident of Gila County; Robert Montgomery, a resident of Cochise County; Loraine Pellegrino, a

resident of Maricopa County; Greg Safsten, a resident of Maricopa County; Kelli Ward, a resident of Mohave County; and Michael Ward, a resident of Mohave County.

29.     Plaintiff Michael John Burke is a registered Arizona voter residing in Pinal County.  Mr. Burke is the Republican Party Chairman for Pinal County.

30.     Plaintiff Christopher M. King is a registered Arizona voter residing in Pima County.  Mr. Burke is the Republican Party Vice Chairman for Pima County.

31.     Plaintiff Salvatore Luke Scarmado is a registered Arizona voter residing in Mohave County.  Mr. Burke is the Republican Party Chairman for Mohave County.

32.     Presidential Electors "have a cognizable interest in ensuring that the final vote tally reflects the legally valid votes cast," as "[a]n inaccurate vote tally is a concrete and particularized injury to candidates such as the Electors."  *Carson v. Simon*, 978 F.3d 1051, 1057 (8th Cir. 2020) (affirming that Presidential Electors have Article III and prudential standing to challenge actions of state officials implementing or modifying State election laws); *see also McPherson v. Blacker*, 146 U.S. 1, 27 (1892); *Bush v. Palm Beach Cty. Canvassing Bd.*, 531 U.S. 70, 76 (2000) (per curiam).

33.     Plaintiffs bring this action to prohibit certification of the election results for the Office of President of the United States in the State of Arizona and to obtain the other declaratory and injunctive relief requested herein.  Defendants certified those results on November 30, 2020, indicating a plurality for Mr. Biden of 10,457 votes out of 3,420,565 cast.

34.     The Defendants are Arizona Governor Doug Ducey, and Arizona Secretary of State Katie Hobbs.

35.     Defendant Governor Doug Ducey is named as a defendant in his official capacity as Arizona's governor.

36.     Defendant Secretary of State Katie Hobbs is named as a defendant in her official capacity as Arizona Secretary of State, who serves as the chief election officer in the State of Arizona.

## STATEMENT OF FACTS

37.      Plaintiffs bring this action under 42 U.S.C. §§ 1983 and 1988, to remedy deprivations of rights, privileges, or immunities secured by the Constitution and laws of the United States and to contest the election results, and the corollary provisions under the Arizona Constitution.

38.      The United States Constitution sets forth the authority to regulate federal elections. With respect to congressional elections, the Constitution provides:

39.

The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof; but the Congress may at any time by Law make or alter such Regulations, except as to the Places of choosing Senators.
U.S. CONST. art. I, § 4 ("Elections Clause").

40.      With respect to the appointment of presidential electors, the Constitution provides:

Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors, equal to the whole Number of Senators and Representatives to which the State may be entitled in the Congress: but no Senator or Representative, or Person holding an Office of Trust or Profit under the United States, shall be appointed an Elector.
U.S. CONST. art. II, § 1 ("Electors Clause").

41.      None of Defendants is a "Legislature" as required under the Elections Clause or Electors Clause to set the rules governing elections. The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley*, 285 U.S. 365. Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments." Id. at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 135 S. Ct. 2652, 2668 (U.S. 2015).

42.      While the Elections Clause "was not adopted to diminish a State's authority to determine its own lawmaking processes," *Ariz. State Legislature,* 135 S. Ct. at 2677, it does hold states accountable to their chosen processes when it comes to regulating federal elections, *id.* at 2668. "A significant departure from the legislative scheme for appointing Presidential electors presents a federal constitutional question." *Bush,* 531 U.S. at 113 (Rehnquist, C.J., concurring); *Smiley,* 285 U.S. at 365.

43.     Secretary Hobbs certified the Presidential Election results on November 30, 2020.  The Presidential election results in Arizona show a difference of 10,457 "tallied" votes in favor of former Vice-President Joe Biden over President Trump.

44.     The specific factual allegations of fraud and statutory and constitutional violations are set forth in greater detail below.  Section I describes specific violations of Arizona law.  Section II provides expert witness testimony quantifying the number of illegal votes due to distinct categories of voting fraud and other unlawful conduct.  Section III provides fact and expert witness testimony, as well as summaries of other publicly available evidence (including judicial and administrative proceedings) regarding Dominion voting systems' voting fraud in Arizona during the 2020 General Election, the security flaws that allow election workers, or even hostile foreign actors, to manipulate Arizona election results, and includes a summary of information relating to the motive and opportunity, and a pattern of behavior to prove that Dominion and its executives demonstrating that Dominion had the specific intent to interfere, and change the results of, the 2020 General Election.

45.     Based upon all the allegations of fraud, statutory violations, and other misconduct, as stated herein and in the attached affidavits, it is necessary to enjoin the certification of the election results and invalidate the election results...

## I.  VIOLATIONS OF ARIZONA ELECTION LAW

### A. Arizona Election Law

46.     Pursuant to A.R.S. § 16-550(A), the county recorder or other officer in charge of elections shall compare the signatures on the early ballot affidavit with the signature of the elector on the elector's registration record. If the signature is inconsistent, the county recorder or other officer in charge of elections shall make reasonable efforts to contact the voter and allow the voter to correct or confirm the inconsistent signature.

47.     Pursuant to A.R.S. § 16-625, the officer in charge of elections shall ensure that electronic data from and electronic or digital images of ballots are protected from physical and electronic access, including unauthorized copying or transfer, and that all

security measures are at least as protective as those prescribed for paper ballots.

**B.** Fact Witness Testimony of Arizona Law Violations

**1. Poll Watchers Failed to Adequately Verify Signatures on Ballots.**

48.     Affiant Burns stated that, while she was not permitted to be within viewing range of computer screens or monitors, she did have an opportunity to view "High Confidence" signatures following a brief power outage. *Id.*  Upon seeing these, she was "disturbed … that the signatures were not even close to the signatures that they were 'comparing' the ballot signature to," and because she was told by the one poll worker with whom she was allowed to speak that "these signatures were counted." *(See Exh. 21)*

**2. Biased and Partisan Maricopa County Poll Referees.**

49.     Affiant Low expressed concern that "the two Maricopa County *referees*, who [were] called upon to settle any unresolved disputes between the adjudicators, were registered 'Independent Party' members."  (See Exh. 20, Low aff. ¶7) (emphasis in original).  When asked about that, they told Mr. Low that "this *set up* was laid out per Arizona Statute." *Id.* (emphasis in original).

Due to the high likelihood of the Dominion machine rejecting ballots, a "set up" like the one discussed above, impacts the outcome of the results of theelection. The machines make determinations on what ballots to invalidate or validate based on an algorithm that operates offshore before tallying the votes locally..

To begin, the judges that adjudicate ballots must be evenly distributed amongst the major parties per A.R.S. § 16-531(A). There should be zero tolerance of fraud like this in any election system.

**3. Irregularities Involving Dominion Voting Machines & Employees.**

50.     Affiant Low and fellow poll watcher Greg Wodynski repeatedly asked the Dominion employee (named "Bruce") at their polling location as to whether the Dominion machines were connected to the internet and how data was backed up.  The Dominion employee repeatedly denied that the machines were connected to the Internet, *id.* ¶11, but "admitted that he took a complete copy of the voter files, being stored in the Dominion

system out of the building with him every night as a form of a 'back up' copy." *Id.* ¶22.

51.     Low's fellow poll watcher, Affiant Gregory Wodynski, provides more detail on these regularities.  First, Dominion employees and supervisors informed Mr. Wodynski "that about 12% of mail in ballots were being rejected and needed human intervention in the adjudication process," which "amounted to tens of thousands of ballots that required intervention" in the days he was an observer.  Ex. 22, Wodynski aff at ¶9.  Mr. Wodynski confirms that "Bruce" stated that "he would perform a manual daily system backup to an external hard drive," *id.* ¶10, and that "he made a daily second disk backup to a new spare hard drive[] … [that] were being physically moved off site to another building outside the MTEC building," but would not say where. *Id.* ¶11.  Bruce further stated "**there was NO CHAIN OF CUSTODY on data backup hard drives leaving the MTEC facility on a daily basis for an undisclosed location.**" *Id.* (emphasis in original).

52.     Mr. Wodynski also testified to a conversation with Dominion employee Bruce of the "the specifics of a process where he was manually manipulating stored scanner tabulation data files," which "he described as a processing issue at the numerous adjudication computer workstations." *Id.* ¶12.  Bruce claimed that this was to split large files into small files for adjudication.  *Id.* ¶13. Mr. Wydnoski was concerned because this "**was a human intervention process and therefore creating a potential for intention or non-intentional errors or lost ballot files.**" *Id.*

**4. Problems with Certification of Dominion Voting Machines.**

53.     Affiant Linda Brickman, the 1st Vice-Chair of the Maricopa County Republican Committee, oversaw the Secretary of State certification of Dominion voting machines on November 18, 2020.  Ex. 23, Brickman Aff at 1.  Mr. Brickman observed the following problems:

- Signature verification standards were constantly being lowered by Supervisors in order to more quickly process that higher amount of early and mail-in ballots (from approx. 15 points of similarities, to a minimum of 3, lowered to 1, and ultimately to none – "Just pass each signature verification through")  …

1

2

- Challenged signatures on envelopes where the signature was a completely different person than the name of the listed voter, was let through and approved by supervisors.

3

4

5

6

- Challenged runs or batches of envelopes for signature verification observed by me to be the exact same handwriting on the affidavit envelopes on numerous envelopes. When I asked if the County Attorney would be alerted for possible ballot fraud, I was told no, but supervisors would take care of it. …

7

8

9

10

11

- In the Duplication room, I observed with my Democratic partner the preparation of a new ballot since the original may have been soiled, damaged, or ripped, and wouldn't go through the tabulator. I read her a Trump/Republican ballot and as soon as she entered it into the system the ballot defaulted on the screen to a Biden/Democratic ballot. We reported this to supervisors, and others in the room commented that they had witnessed the same manipulation. We were never told what, if any, corrective action was taken.

12

13

14

15

16

17

18

19

- Election Office Observers – when it became apparent that more and more early and mail-in ballots would need to be processed, I mentioned that the current rule of the number of observers per party was not adequate (1 per party, unless all parties agreed to more). And since the Governor refused to call the Legislature into session for any reason, and little incentive for the Democrats to agree to a higher adequate number, there was no way 1 observer per Party, forced to the back of a room, or behind a see-through wall, had a legitimate opportunity to see what elections workers were seeing in real time and doing, especially where up to 20 or more workers processing tasks, sometimes in 10 seconds or less! And I personally observed most observers acting "clueless", and do not believe any of them even realized the challenges I made and referenced above.

20

21

22

23

24

25

26

27

28

- And lastly, one of the most egregious incidents in both the Duplication and Adjudication rooms which I worked, I observed the problem of Trump votes with voters checking the bubble for a vote for Trump, but ALSO, writing in the name "Donald Trump" and checking the bubble next to his hand written name again, as a duplicated vote, counting as an "OVERVOTE," which means – no vote was counted at all, despite the policy having been changed to allow these overvotes. Supervisors contradicted their own policies where the intent was clear. Ray Valenzuela, Director of Elections, told me openly at the morning of the Dominion Certification (November 18, 2020), that this was incorrect, the Supervisors were terribly mistaken and as an Adjudicator, I was instructed incorrectly, and these many votes SHOULD HAVE BEEN COUNTED AND NOT TURNED AWAY AS AN OVERVOTE.

*Id.* at 5-6.

## II.  EXPERT WITNESS TESTIMONY:
### EVIDENCE OF WIDESPREAD VOTER FRAUD

**1.      In Arizona 86,845 Mail-In Ballots Were Lost, and 219,135 More Were Fraudulently Recorded for Voters who Never Requested Mail-In Ballots.**

54.      The attached report of William M. Briggs, Ph.D. ("Dr. Briggs Report") summarizes the multi-state phone survey that includes a survey of Arizona voters collected by Matt Braynard, which was conducted from November 15-17, 2020. *See* Ex., Dr. Briggs Report at 1, and Att. 1 ("Briggs Survey").  The Briggs Survey identified two specific errors involving unreturned mail-in ballots that are indicative of voter fraud, namely: "**Error #1:** those who were recorded as receiving absentee ballots *without* requesting them;" and "**Error #2:** those who returned absentee ballots but whose votes went missing (*i.e.*, marked as unreturned)." *Id.*  Dr. Briggs then conducted a parameter-free predictive model to estimate, within 95% confidence or prediction intervals, the number of ballots affected by these errors are from a total population of 518,560 unreturned mail-in ballots for the State of Arizona.

55.      With respect to **Error #1**, Dr. Briggs' analysis estimated that **208,333 to 229,337 ballots** out of the total 518,560 unreturned ballots were recorded for voters who had **not** requested them.  *Id.*  All of these absentee ballots were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter.  *Id.*  (Ballots ordered by third parties that were voted, those would no longer be in the unreturned pool and therefore cannot be estimated from this data set.)

56.      With respect to **Error #2**, he found **78,714 to 94,975 ballots** out of 518,560 unreturned ballots recorded for voters who **did return their ballots, but were recorded as being unreturned.** *Id.*  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled

out by election workers, Dominion or other third parties.

57.     Taking the average of the two types of errors together, **303,305 ballots, or 58% of the total, are disenfranchisement and unlawful.***Id.* These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as **these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden,** and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

58.     Dr. Briggs' finding that 58% of "unreturned ballots" suffer from one of the two errors above is consistent with his findings in the four other States analyzed (Georgia 39%, Michigan 45%, Pennsylvania 37%, and Wisconsin 45%). His analysis also provides further support that these widespread "irregularities" or anomalies were one part of a much larger multi-state fraudulent scheme to rig the 2020 General Election for Joe Biden.

> **2.     Evidence That At Least 5,790 Ineligible Voters Who Have Moved Out-of-State Illegally Voted in Arizona.**

> 3.     Evidence compiled by Matt Braynard using the National Change of Address ("NCOA") Database shows that 5,085 Arizona voters in the 2020 General Election moved out-of-state prior to voting, and therefore were ineligible. Mr. Braynard also identified 744 Arizona voters who subsequently registered to vote in another state and were therefore ineligible to vote in the 2020 General Election. The merged number is 5,790 ineligible voters whose votes must be removed from the total for the 2020 General ElectionEstimate of Illegal or Fictitious Votes Due to Dominion Voting Fraud and Manipulation.

59.     Expert witness Russell James Ramsland, Jr. identifies two types of statistical anomalies that he concludes are the result of voting fraud. (*See* Ex. 17). First, as in other States Mr. Ramsland has analyzed (Georgia, Michigan and Wisconsin), Mr. Ramsland

finds historically unprecedented levels of turnout in specific counties or precincts.  Using publicly available data, Mr. Ramsland determined that 66 percent of Pima County precincts (164 of 248) had turn out above 80%, and at least 36 had turnout above 90%, and that 54 percent of Maricopa County precincts (300 of 558) had turnout of 80% or more, and at least 30 over 90%. *Id.* ¶14. The report concludes that these extraordinary, and likely fraudulent, turnout levels "compels the conclusion to a reasonable degree of professional certainty that the vote count in Arizona, in particular for Maricopa and Pima counties for candidates for President contain at least 100,724 illegal votes that must be disregarded. *Id.*¶14.

60.     Mr. Ramsland also identifies an impossibility: "an improbable, and possibly impossible spike in processed votes," *id.* ¶16, like those also found in Georgia, Michigan and Wisconsin.  Specifically, at 8:06:40 PM on November 3, 2020, there was a spike of 143,100 votes for Biden in Maricopa and Pima Counties. *Id.* Mr. Ramsland believes that the spike in Arizona, like those in the other three States he analyzed could have been manufactured by Dominion voting machines through a method described in greater detail in Section III below.  *Id.*

61.     The summation of sections A through C above provide the following conclusions for the reports cited above, respectively.

- Returned ballots that were deemed unreturned by the state (average for Briggs Error #1): 219,135.

- Unreturned mail ballots unlawfully ordered by third parties (average for Briggs Error #1): 86,845.

- Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

- "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima

1

County precincts: 100,724.

2

62.     In Conclusion, the Reports cited above show a total amount of illegal votes

3

identified that amount to 412,494 or over 40 times the margin by which candidate Biden

4

leads President Trump in the state of Arizona.

5

**III. FACTUAL ALLEGATIONS REGARDING DOMINION VOTING SYSTEMS**

6

    5.  The State of Arizona used Dominion Voting Systems in Maricopa County.

7

        Dominion's Results for 2020 General Election Demonstrate

8

        Dominion Manipulated Election Results.

9

63.     *]*

10

64.     Mr. Ramsland analyzed the Edison data reported to, and posted by, the New

11

York Times, and concludes that this data "strongly suggests" the use of an "additive

12

algorithm" (referred to as "ranked choice voting algorithm" ("RCV") in Dominion's user

13

guide), combined with blank ballots loaded by the election workers or system operators, to

14

manipulate votes in Arizona.[6]

15

65.     Mr. Ramsland cites two specific examples from the Edison data

16

demonstrating Dominion's algorithmic vote manipulation.  The figure below, reproduced

17

from his testimony, graphs the Edison data on election night for Arizona, where the blue

18

bars "indicate the percentage of the batch that went for Biden," while the red trend lines

19

and arrows "indicate the impossible consistencies" in that vote percentage.  *Id.* ¶15.  In

20

other words, the blue bars and the horizontal trend lines show that "the percentage of the

21

votes submitted in each batch that went towards candidate [Biden] remain unchanged for

22

a series of time and for a number of *consecutive* batches …"  *Id.*  Mr. Ramsland concludes

23

24

[6]  *See* Ex. 17, ¶15 (quoting Democracy Suite EMS Results Tally and Reporting User
Guide, Chapter 11, Settings 11.2.2, which reads in part, "**RCV METHOD: This will**

25

**select the specific method of tabulating RCV votes to elect a winner.**")  Using the
RCV method allows the operator to enter "blank ballots … into the system and treated as

26

'write-ins.' Then the operator can enter an allocation of the write-ins among candidates

27

as he or she wishes. The result then awards the winner based on "points" that the

28

algorithm computes, not actual voter votes."  *Id.*

-18-

that the probability of such a consistent percentage in multiple consecutive batches "approaches zero," and "makes clear an algorithm is allocating votes based on a percentage." *Id.*



Impossible consistency in percentage of votes counted

66.     The second example analyzed by Mr. Ramsland is "the improbable, and



1
2
3

possibly impossible spike in processed votes" for Biden, namely, the insertion of 143,100 Biden votes in Maricopa and Pima Counties at 8:06:40 PM on November 3, 2020.  *See id.* ¶16.

4
5
6
7
8
9
10
11
12
13

This spike, cast  largely for Biden, could easily be produced in the Dominion EMS control system by pre-loading batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure (to cast Write-In, Blank, or Error ballots) that is available to the operator of the system.  A few batches of blank ballots electronically pre-loaded into the adjudication files could easily produce a processed ballot stream this extreme so that actual paper ballots would not be needed until later to create "corroboration" for the electronic count. *Id.*

14
15

### 6.  Administrative and Judicial Decisions Regarding Dominion's Security Flaws.

16
17
18
19

67.      **Texas.**  Texas, through its by the Secretary of State, denied certification to nearly the same Dominion Democracy Suite on January 24, 2020, specifically because the "examiner reports raise concerns about whether Democracy Suite 5.5-A system … **is safe from fraudulent or unauthorized manipulation**."[7]

20
21
22
23
24
25
26

68.      **Wisconsin.** In 2018, Jill Stein was in litigation with Dominion Voting Systems ("DVS") after her 2016 recount request pursuant to WISCONSIN STAT.§5.905(4) wherein DVS obtained a Court Order requiring confidentiality on information including *voting counting source code*, which Dominion claims is proprietary – and must be kept secret from the public.  (*See* unpublished decision, Wisconsin Court of Appeals, No. 2019AP272 issued April 30, 2020).  Rather than engaging in an open and

27
28

[7]  See attached hereto, as Exh. 11, State of Texas Secretary of State, Elections Division, *Report of Review of Dominion Voting Systems Democracy Suite 5.5-A* at 2 (Jan. 24, 2020) (emphasis added).

transparent process to give credibility to Wisconsin's Dominion-Democracy Suite voting system, the processes were hidden during the receipt, review, opening, and tabulation of those votes in direct contravention of Wisconsin's Election Code and Federal law.

69.     **Georgia.** Substantial evidence of this vulnerability was discussed in Judge Amy Totenberg's October 11, 2020 Order in the USDC N.D. Ga. case of *Curling, et al. v. Kemp, et. al*, Case No. 1:17-cv-02989 Doc. No. 964. *See*, p. 22-23 ("This array of experts and subject matter specialists provided a huge volume of significant evidence regarding the security risks and deficits in the system as implemented in both witness declarations and live testimony at the preliminary injunction hearing."); p. 25 ("In particular, Dr. Halderman's testing indicated the practical feasibility through a cyber attack of causing the swapping or deletion of specific votes cast and the compromise of the system through different cyber attack strategies, including through access to and alteration or manipulation of the QR barcode.") The full order should be read, for it is eye-opening and refutes many of Dominion's erroneous claims and talking points.

70.     The Secretary of State appoints a committee of three people to test different voting systems. The committee is required to submit their recommendations to the Secretary of state who then makes the final decision on which voting system(s) to adopt. **A**.R.S. § 16-442(A) and (C)In explaining that "In summary, [the court] rejected the Secretary's argument that her certification of voting machines for use in Arizona is **a** political question that is inappropriate for judicial review." In doing so, the court explained the application of HAVA because Arizona requires that its voting systems are HAVA compliant which includes accreditation pursuant to HAVA. *Chavez v. Brewer*, 222 Ariz. 309, 317, 214 P.3d 397, 405, 2009). During the subsequent four years, the Arizona Legislature amended and enacted several statutes to effectuate HAVA. Among these changes, the legislature amended Arizona Revised Statutes (**A**.R.S.) section **16-442**(**A**) to require that the secretary of state determine the voting machines that are "certified for use" in elections. 2003 Ariz. Sess. Laws, ch. 260, § 9 (1st Reg. Sess.). The

21

legislature also amended the process for selecting electronic voting machines by
requiring that the secretary of state certify only voting machines that "comply with
[HAVA]" and requiring that all election machines or devices be "tested and approved by
**a** laboratory that is accredited pursuant to [HAVA]." *Id.;* **A**.R.S. § **16-442**(B) (2006). The
legislature also authorized the secretary of state to revoke the certification of any voting
system that fails to meet the new standards. 2003 Ariz. Sess. Laws, ch. 260, § 9; 2005
Ariz. Sess. Laws, ch. 144, § 2; **A**.R.S. § **16-442**(**C**), (D).

*Chavez v. Brewer*, 222 Ariz. 309, 312, 214 P.3d 397, 400, (App. 2009).
Dominion Voting Systems is not currently certified pursuant to the EAC Voting Systems

71.     A District Judge found that Dominion's BMD ballots are not voter verifiable,
and they cannot be audited in a software independent way. The credibility of a BMD ballot
can be no greater than the credibility of Dominion's systems, which copious expert analysis
has shown is deeply compromised.  Similar to the issues in Arizona and Wisconsin, Judge
Totenberg of the District Court of Georgia Northern District held:

> Georgia's Election Code mandates the use of the BMD system as the
> uniform mode of voting for all in-person voters in federal and statewide
> elections. O.C.G.A. § 21-2-300(a)(2). The statutory provisions mandate
> voting on "electronic ballot markers" that: (1) use "electronic technology to
> independently and privately mark a paper ballot at the direction of an
> elector, interpret ballot selections, ... such interpretation **for elector
> verification**, and print **an elector verifiable paper ballot;**" and (2)
> "produce paper ballots which are marked with the elector's choices **in a
> format readable by the elector**" O.C.G.A. § 21-2-2(7.1); O.C.G.A. § 21-
> 2-300(a)(2).  Plaintiffs and other voters who wish to vote in-person are
> required to vote on **a system that does none of those things**. Rather, the
> evidence shows that the Dominion BMD system does **not produce a voter-
> verifiable paper ballot or a paper ballot marked with the voter's
> choices in a format readable by the voter because the votes are
> tabulated solely from the unreadable QR code**.

> See Order, pp. 81-82. (Emphasis added).

72.     This case was later affirmed in a related case, in the Eleventh Circuit in 2018
related to Georgia's voting system in *Common Cause Georgia v. Kemp*, 347 F. Supp. 3d

1270 (11th Cir. 2018). The Court found that:

> In summary, while further evidence will be necessary in the future, the
> Court finds that the combination of the statistical evidence and witness
> declarations in the record here (and the expert witness evidence in the
> related *Curling* case which the Court takes notice of) persuasively
> demonstrates the likelihood of Plaintiff succeeding on its claims. Plaintiff
> has shown a substantial likelihood of proving that the Secretary's failure to
> properly maintain a reliable and secure voter registration system has and
> will continue to result in the infringement of the rights of the voters to cast
> their vote and have their votes counted. *Id. at* 1294-1295.

73.     The expert witness in the above litigation in the United States District

Court of Georgia, Case 1:17-cv-02989-AT, Harri Hursti, specifically testified to

the acute security vulnerabilities, *see* Ex. 107, wherein he testified or found:

A. "The scanner and tabulation software settings being employed
to determine which votes to count on hand marked paper ballots
are likely causing clearly intentioned votes to be counted" "The
voting system is being operated in Fulton County in a manner
that escalates the security risk to an extreme level" "Votes are
not reviewing their BMD printed ballots, which causes BMD
generated results to be un-auditable due to the untrustworthy
audit trail." 50% or more of voter selections in some counties
were visible to poll workers. Dominion employees maintain
near exclusive control over the EMS servers.    "In my
professional opinion, the role played by Dominion personnel in
Fulton County, and other counties with similar arrangements,
should be considered an elevated risk factor when evaluating the
security risks of Georgia's voting system." *Id.* ¶26.

B. A video game download was found on one Georgia Dominion
system laptop, suggesting that multiple Windows updates have
been made on that respective computer.

C. There is evidence of remote access and remote troubleshooting
which presents a grave security implication.

D. Certified identified vulnerabilities should be considered an
"extreme security risk."

E. There is evidence of transfer of control the systems out of the
physical perimeters and place control with a third party off site.

23

F. USB drives with vote tally information were observed to be removed from the presence of poll watchers during a recent election.

G. "The security risks outlined above – operating system risks, the failure to harden the computers, performing operations directly on the operating systems, lax control of memory cards, lack of procedures, and potential remote access are extreme and destroy the credibility of the tabulations and output of the reports coming from a voting system." *Id.* ¶49.

### 7. Foreign Interference/Hacking and/or Manipulation of Dominion Results.

#### a. The Origins of Dominion Voting Systems

74. Smartmatic and its inventors have backgrounds evidencing foreign connections with countries such as Serbia. Upon information and belief, the inventors listed below have such connections:

Applicant: SMARTMATIC, CORP.

Inventors**:** Lino Iglesias, Roger Pinate, Antonio Mugica, Paul Babic, Jeffrey Naveda, Dany Farina, Rodrigo Meneses, Salvador Ponticelli, Gisela Goncalves, Yrem Caruso[8]

75. Another Affiant witness testifies that in Venezuela, she was in official position related to elections and witnessed manipulations of petitions to prevent a removal of President Chavez and because she protested, she was summarily dismissed. She explains the vulnerabilities of the electronic voting system and Smartmatica to such manipulations. (See Ex. 17, Cardozo Aff. ¶8).

#### b. US Government Advisory on Vulnerability to Foreign Hackers.

76. In October of 2020 The FBI and CISA issued a JOINT CYBERSECURITY ADVISORY ON October 30, 2020 titled: **Iranian Advanced Persistent Threat Actor Identified Obtained Voter Registration Data**

---

[8] *See* Patents Assigned to Smartmatic Corp., *available at:* https://patents.justia.com/assignee/smartmatic-corp

1
2
3
4
5
6
7

> This joint cybersecurity advisory was coauthored by the Cybersecurity and
> Infrastructure Security Agency (CISA) and the Federal Bureau of
> Investigation (FBI). CISA and the FBI are aware of an Iranian advanced
> persistent threat (APT) actor targeting U.S. state websites to include
> election websites. CISA and the FBI assess this actor is responsible for the
> mass dissemination of voter intimidation emails to U.S. citizens and the
> dissemination of U.S. election-related disinformation in mid-October
> 2020.[1] (Reference FBI FLASH message ME-000138-TT, disseminated
> October 29, 2020). Further evaluation by CISA and the FBI has identified
> the targeting of U.S. state election websites was an intentional effort to
> influence and interfere with the 2020 U.S. presidential election.

8
9

(See CISA and FBI Joint Cyber Security Advisory of October 30, 2020, a copy attached hereto as Ex. 18.)

10
11
12

      **c. Expert Witness Testimony on Dominion Vulnerability to Foreign Interference and Ties to Hostile Foreign Governments**

13
14
15
16
17
18
19
20
21
22
23
24

     77.     A PhD Declarant analyzed the cumulative vote percentages sorted by ward or precinct sizes. This concept was previously used throughout the report on voter irregularities in lulu Fries'dat and Anselmo Sampietro's "*An electoral system in crisis"* at http://www. electoralsystemincrisis.org/. In Fries' dat's report there was an anomalous dependency on precinct size in many of the 2016 primary elections. The larger precincts had introduced the use of voting machines. However, one could also theorize the opportunity for cheaters to cheat in small precincts, where there may be less oversight. Normally, we would expect the cumulative vote percentage to converge to an asymptote, and bounce around the mean until convergence. An example of this can be found from the 2000 Florida Democratic presidential primary between Gore and Bradley. (*See* Exh. __, at p. 8). This is shown in Figure 8, and is taken from Fries' dat's report:

25
26
27
28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

Figure 8: Baseline Cumulative Fractions Sorted by Precinct Size

(*See* Exh. __, at p. 9).

The Declarant then analyzed Maricopa county in Arizona, in addition to other swing

states. The data was obtained from the Maricopa county recorder website at

https://recorder.maricopa.gov/media/ArizonaExportByPrecinct_110320.txt

The Declarant sorted precincts by size and tallied the cumulative vote percentages. It

should rapidly approach an asymptote, but again in Figure 18 we see an anomaly. The

Biden percentage is higher in the smaller precincts, primarily at the expense of Trump,

again suggesting vote switching, since the 3rd party percentages immediately approach

the asymptote.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28



Figure 18: Maricopa County Arizona Percentage vs Precinct Size

(*See* Exh. 19, at p. 14).

In Figure 19 the Declarant focuses on the third-party percentages, which we see are indeed independent of precinct size and converge quickly to the asymptote. This is about what we would expect if the third-party candidates were counted fairly. It is in sharp contrast to the precinct size dependency and slow convergence of the Trump and Biden percentages.



Figure 19: Third Party Percentages vs Size in Maricopa County

(*See* Exh. 19, at p. 15).

78.     An analysis of the Dominion software system by a former US Military Intelligence expert subsequently found that the Dominion Voting system and software are accessible - and was compromised by rogue actors, including foreign interference by Iran and China.  (*See* Ex. 12, Spider Declaration (redacted for security reasons).)

79.     The expert does an analysis and explains how by using servers and employees connected with rogue actors and hostile foreign influences combined with numerous easily discoverable leaked credentials, Dominion allowed foreign adversaries to access data and intentionally provided access to Dominion's infrastructure in order to monitor and manipulate elections, including the most recent one in 2020.  *Id*. Several facts are set forth related to foreign members of Dominion Voting Systems and foreign servers as well as foreign interference.).

80.     Another Declarant first explains the foundations of her opinion and then addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests. (*See* Ex. 13).  She explains that Dominion Voting Systems works with SCYTL, and that votes on route, before reporting, go to SCYTL in foreign countries.  On the way, they get mixed and an algorithm is applied, which is done through a secretive process.

> The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door… *Id*.

81.     The Affiant goes on to explain the foreign relationships in the hardware used by Dominion Voting Systems and its subsidiary Sequoia and explains specifically the port that Dominion uses, which is called Edge Gateway and that is a part of Akamai Technologies based in Germany and China.

82.     This Declarant further explains the foundations of her opinion and then

addresses the concerns of foreign interference in our elections through hardware components from companies based in foreign countries with adverse interests.

> The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS. The purpose of VSTL's being accredited and their importance is ensuring that there is no foreign interference / bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity". **Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door…**

(See Id. at ¶32).

83.     Scytle, contracts with the AP – which receives the results tallied by SCYTL on behalf of Dominion.  (See Exh. 13 at par. 33). This becomes highly relevant since SCYTLE is complete offshore.  (See Exh. 13 at par.44) And where the ballots go through a process described in three categories for a ballot cast, Step 1 involves Configuring the Data; Step 2 involves Cleansing which means determining which ballots are valid and which are not; and Step 3 involves "Shuffling" where the ballots get mixed and the algorithm is applied to distribute the votes. It is when the algorithm is applied, that happens secretly and the parameters of that algorithm are only known to SCYTL and Dominion. (See Exh. 13, pars. 44-50)  – and  where it gets encrypted as "ciphertexts."

> Certification Program, nor is its' provider.  China is not currently the only nation involved with COTS system provided to election machines or the networking, so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies – that have their offices in China and are linked to the server for Dominion Software.  (See Exh. 13 at par. 36))

Mathematical evidence of the seeding "injection"  of votes can be seen from the data feed on November 3, 2020 for Maricopa and Pima counties, where a spike can be seen which means a large number of votes were injected into the totals. (See Exh. 13 at par. 69).

84.     The Affiant explains the use of an algorithm and how it presents throughout the statement, but specifically concludes that,

**The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot**. Normally it would be assumed that the algorithm had a Complete Pivot.  Wilkinson's demonstrated the guarantee as:

$$\frac{\|U\|_\infty}{\|A\|_\infty} \le n^{\frac{1}{2}\log(n)}$$

Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX." (*See Id*. at pars. 67-69)

"The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection."

(*See Id*. at par. 73)

85.     And Russ Ramsland can support that further by documenting the data feed that came from Dominion Voting Systems to Scytl based on certain available data, that it was reported with decimal points, which is contrary to one vote as one ballot:  **"The fact that we observed raw vote data coming directly that includes decimal places establishes selection by an algorithm, and not individual voter's choice. Otherwise, votes would be solely represented as whole numbers (votes cannot possibly be added up and have decimal places reported)."**

## 8. Additional Independent Findings of Dominion Flaws.

86.      Further supportive of this pattern of incidents, reflecting an absence of mistake, Plaintiffs have since learned that the "glitches" in the Dominion system, that have the uniform effect of hurting Trump and helping Biden, have been widely reported in the press and confirmed by the analysis of independent experts.

### 1.Central Operator Can Remove, Discard or Manipulate Votes.

87.      Mr. Watkins further explains **that the central operator can remove or discard batches of votes.** "After all of the ballots loaded into the scanner's feed tray have been through the scanner, the "ImageCast Central" operator will remove the ballots from the tray then have the option to either "Accept Batch" or "Discard Batch" on the scanning menu …. " (Ex. 14, Watkins aff. ¶11).  ¶8.

88.      Mr. Watkins further testifies that the user manual makes clear that the system allows for threshold settings to be set to find all ballots get marked as "problem ballots" for discretionary determinations on where the vote goes stating:

> 9.  During the ballot scanning process, the "ImageCast Central" software will detect how much of a percent coverage of the oval was filled in by the voter. The Dominion customer determines the thresholds of which the oval needs to be covered by a mark in order to qualify as a valid vote. If a ballot has a marginal mark which did not meet the specific thresholds set by the customer, then the ballot is considered a "problem ballot" and may be set aside into a folder named "NotCastImages".

> 10.  Through creatively tweaking the oval coverage threshold settings, and advanced settings on the ImageCase Central scanners, it may be possible to set thresholds in such a way that a non-trivial amount of ballots are marked "problem ballots" and sent to the "NotCastImages" folder.

> 11.  The administrator of the ImageCast Central work station may view all images of scanned ballots which were deemed "problem ballots" by simply navigating via the standard "Windows File Explorer" to the folder named

"NotCastImages" which holds ballot scans of "problem ballots". It may be possible for an administrator of the "ImageCast Central" workstation to view and delete any individual ballot scans from the "NotCastImages" folder by simply using the standard Windows delete and recycle bin functions provided by the Windows 10 Pro operating system. Id. ¶¶ 9-11.

89.      The Voting Rights Act, 52 U.S.C. §10101(e), provides, in relevant part:

… When used in the subsection, the word "vote" includes all action necessary to make a vote effective including, but not limited to, registration or other action required by State law prerequisite to voting, casting a ballot, and having such ballot counted and included in the appropriate totals of votes cast with respect to candidates for public office and propositions for which votes are received in an election;

    a. The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

    b. No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

    c. Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

    d. Each voting system used in an election for Federal office shall meet the following requirements:   (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6)

    e. State laws define a "vote" as a "ballot" that clearly indicates the intent of the voter to choose a candidate.  "Ballot" means a ballot label, sheet of paper or

envelope on which votes are recorded. The term also includes a sheet or card, filmstrip or other device listing or containing information relative to offices, candidates and referenda which is placed, projected or composed on the board or screen inside a voting machine.  Wis. Stat. § 5.02Every ballot, except a voting machine ballot, shall bear substantially the following information on the face: "Notice to electors: This ballot may be invalid unless initialed by 2 election inspectors. If cast as an absentee ballot, the ballot must bear the initials of the municipal clerk or deputy clerk.   Wis. Stat. Ann. § 5.54 (emphasis in originalFederal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481. Among other things, it provides that, "Each voting system used in an election for Federal office shall meet the following requirements: …   (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State." 42 U.S.C. §15481(a)(6)

### 2.Dominion – By Design – Violates Federal Election & Voting Record Retention Requirements.

90.     The Dominion System put in place by its own design violates the intent of Federal law on the requirement to preserve and retain records – which clearly requires preservation of all records requisite to voting in such an election.

§ 20701. Retention and preservation of records and papers by officers of elections; deposit with custodian; penalty for violation

Every officer of election shall retain and preserve, for a period of twenty-two months from the date of any general, special, or primary election of which candidates for the office of President, Vice President, presidential elector, Member of the Senate, Member of the House of Representatives, or Resident Commissioner from the

Commonwealth of Puerto Rico are voted for, **all records and papers which come into his possession relating to any application, registration, payment of poll tax, or other act requisite to voting in such election,** except that, when required by law, such records and papers may be delivered to another officer of election and except that, if a State or the Commonwealth of Puerto Rico designates a custodian to retain and preserve these records and papers at a specified place, then such records and papers may be deposited with such custodian, and the duty to retain and preserve any record or paper so deposited shall devolve upon such custodian. Any officer of election or custodian who willfully fails to comply with this section shall be fined not more than $1,000 or imprisoned not more than one year, or both.

See 52 USC § 20701.

### 3. Dominion Vulnerabilities to Hacking.

91.     Plaintiffs have since learned that the "glitches" in the Dominion system -- that have the uniform effect of hurting Trump and helping Biden -- have been widely reported in the press and confirmed by the analysis of independent experts, a partial summary of which is included below.

(1) Users on the ground have full admin privileges to machines and software. The Dominion system is designed to facilitate vulnerability and allow a select few to determine which votes will be counted in any election.  Workers were responsible for moving ballot data from polling place to the collector's office and inputting it into the correct folder. Any anomaly, such as pen drips or bleeds, is not counted and is handed over to a poll worker to analyze and decide if it should count. This creates massive opportunity for improper vote adjudication.   (Ex. 14 Watkins aff. ¶¶8 & 11).

(2) Affiant witness (name redacted for security reasons), in his sworn testimony explains he was selected for the national security guard detail of the President of Venezuela, and that he witnessed the creation of Smartmatic for the purpose of election vote manipulation:

I was witness to the creation and operation of a sophisticated electronic

1
2
3
4
5
6
7
8
9

voting system that permitted the leaders of the Venezuelan government to manipulate the tabulation of votes for national and local elections and select the winner of those elections in order to gain and maintain their power.  Importantly, I was a direct witness to the creation and operation of an electronic voting system in a conspiracy between a company known as Smartmatic and the leaders of conspiracy with the Venezuelan government. This conspiracy specifically involved President Hugo Chavez Frias, the person in charge of the National Electoral Council named Jorge Rodriguez, and principals, representatives, and personnel from Smartmatic which included … The purpose of this conspiracy was to create and operate a voting system that could change the votes in elections from votes against persons running the Venezuelan government to votes in their favor in order to maintain control of the government.  (*Id.* ¶¶6, 9, 10).

10
11
12

92.      Specific vulnerabilities of the systems in question that have been well documented or reported include:

13
14
15
16
17
18

A.  Barcodes can override the voters' vote: As one University of California, Berkeley study shows, "In all three of these machines [including Dominion Voting Systems] the ballot marking printer is in the same paper path as the mechanism to deposit marked ballots into an attached ballot box.  This opens up a very serious security vulnerability:  the voting machine can make the paper ballot (to add votes or spoil already-case votes) after the last time the voter sees the paper, and then deposit that marked ballot into the ballot box without the possibility of detection." (See Ex. 10, Appel Study).

19
20

B.  Voting machines were able to be connected to the internet by way of laptops that were obviously internet accessible. If one laptop was connected to the internet, the entire precinct was compromised.

21
22
23
24
25
26

C.  October 6, 2006 – **Congresswoman Carolyn Maloney calls on Secretary of Treasury Henry Paulson to conduct an investigation into Smartmatic based on its foreign ownership and ties to Venezuela.**  (See Ex. 15).  Congresswoman Maloney wrote that "It is undisputed that Smartmatic is foreign owned and it has acquired Sequoia … Smartmatic now acknowledged that Antonio Mugica, a Venezuelan businessman has a controlling interest in Smartmatica, but the company has not revealed who all other Smartmatic owners are.  *Id.*

27
28

D.  Dominion "got into trouble" with several subsidiaries it used over alleged cases of fraud. One subsidiary is Smartmatic, a company "that

35

has played a significant role in the U.S. market over the last decade."[9] Dominion entered into a 2009 contract with Smartmatic and provided Smartmatic with the PCOS machines (optical scanners) that were used in the 2010 Philippine election, the biggest automated election run by a private company. The automation of that first election in the Philippines was hailed by the international community and by the critics of the automation. The results transmission reached 90% of votes four hours after polls closed and Filipinos knew for the first time who would be their new president on Election Day. In keeping with local Election law requirements, Smartmatic and Dominion were required to provide the source code of the voting machines prior to elections so that it could be independently verified. *Id.*

E.   Litigation over Smartmatic "glitches" alleges they impacted the 2010 and 2013 mid-term elections in the Philippines, raising questions of cheating and fraud. An independent review of the source codes used in the machines found multiple problems, which concluded, "The software inventory provided by Smartmatic is inadequate, … which brings into question the software credibility."[10]

F.   Dominion acquired Sequoia Voting Systems as well as Premier Election Solutions (formerly part of Diebold, which sold Premier to ES&S in 2009, until antitrust issues forced ES&S to sell Premier, which then was acquired by Dominion). This map illustrates 2016 voting machine data—meaning, these data do not reflect geographic aggregation at the time of acquisition, but rather the machines that retain the Sequoia or Premier/Diebold brand that now fall under Dominion's market share. Penn Wharton Study at 16.

G.   In late December of 2019, three Democrat Senators, Warren, Klobuchar, Wyden and House Member Mark Pocan wrote about their 'particularized concerns that secretive & "trouble -plagued companies"' "have long skimped on security in favor of convenience," in the context of how they described the voting machine systems that three large vendors – Election Systems & Software, Dominion Voting Systems, &

[9]   *Voting Technology Companies in the U.S. – Their Histories and Present Contributions,* Access Wire, (Aug. 10, 2017), *available at:* https://www.accesswire.com/471912/Voting-Technology-Companies-in-the-US--Their-Histories.

[10]   *Smartmatic-TIM Running Out of Time to Fix Glitche*s, ABS-CBN News (May 4, 2010), *available at*: https://news.abs-cbn.com/nation/05/04/10/smartmatic-tim-running-out-time-fix-glitches.

Hart InterCivic – collectively provide voting machines & software that facilitate voting for over 90% of all eligible voters in the U.S." (See Ex. 16).

H. Senator Ron Wyden (D-Oregon) said the findings [insecurity of voting systems] are "yet another damning indictment of the profiteering election vendors, who care more about the bottom line than protecting our democracy." It's also an indictment, he said, "of the notion that important cybersecurity decisions should be left entirely to county election offices, many of whom do not employ a single cybersecurity specialist."[11]

93.     The House of Representatives passed H.R. 2722 in an attempt to address these very risks on June 27, 2019:

This bill addresses election security through grant programs and requirements for voting systems and paper ballots.
The bill establishes requirements for voting systems, including that systems (1) use individual, durable, voter-verified paper ballots; (2) make a voter's marked ballot available for inspection and verification by the voter before the vote is cast; (3) ensure that individuals with disabilities are given an equivalent opportunity to vote, including with privacy and independence, in a manner that produces a voter-verified paper ballot; (4) be manufactured in the United States; and (5) meet specified cybersecurity requirements, including the prohibition of the connection of a voting system to the internet.

See H.R. 2722.

**9. Because Dominion Senior Management Has Publicly Expressed Hostility to Trump and Opposition to His Election, Dominion Is Not Entitled to Any Presumption of Fairness, Objectivity or Impartiality, and Should Instead Be Treated as a Hostile Partisan Political Actor.**

94.     Dr. Eric Coomer is listed as the co-inventor for several patents on

---

[11]  Kim Zetter, *Exclusive: Critical U.S. Election Systems Have Been Left Exposed Online Despite Official Denials*, VICE (Aug. 8, 2019) ("VICE Election Article"), *available at:* https://www.vice.com/en/article/3kxzk9/exclusive-critical-us-election-systems have-been-left-exposed-online-despite-official-denials.

ballot adjudication and voting machine-related technology, all of which were assigned to Dominion.[12]  He joined Dominion in 2010, and most recently served as Voting Systems Officer of Strategy and Director of Security for Dominion.  Dr. Coomer first joined Sequoia Voting Systems in 2005 as Chief Software Architect and became Vice President of Engineering before Dominion Voting Systems acquired Sequoia.  Dr. Coomer's patented ballot adjudication technology is built into Dominion voting machines sold throughout the United States, including those used in Arizona.  (See attached hereto Exh 6, Jo Oltmann Aff.).

95.    In 2016, Dr. Coomer admitted to the State of Illinois that Dominion Voting machines can be manipulated remotely.[13]  He has also publicly posted videos explaining how Dominion voting machines can be remotely manipulated. See Id.[14]

---

[12] *See* "Patents by Inventor Eric Coomer," *available at:* https://patents.justia.com/inventor/eric-coomer.  This page lists the following patents issued to Dr. Coomer and his co-inventors: (1) U.S. Patent No. 9,202,113, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 1, 2015); (2) U.S. Patent No. 8,913,787, Ballot Adjudication in Voting Systems Utilizing Ballot Images (issued Dec. 16, 2014);  (3) U.S. Patent No. 8,910,865, Ballot Level Security Features for Optical Scan Voting Machine Capable of Ballot Image Processing, Secure Ballot Printing, and Ballot Layout Authentication and Verification (issued Dec. 16, 2014); (4) U.S. Patent No. 8,876,002, Systems for Configuring Voting Machines, Docking Device for Voting Machines, Warehouse Support and Asset Tracking of Voting Machines (issued Nov. 4, 2014); (5) U.S. Patent No. 8,864,026, Ballot Image Processing System and Method for Voting Machines (issued Oct. 21, 2014); (6) U.S. Patent No. 8,714,450, Systems and Methods for Transactional Ballot Processing, and Ballot Auditing (issued May 6, 2014), available at: https://patents.justia.com/inventor/eric-coomer.

[13] Jose Hermosa, *Electoral Fraud: Dominion's Vice President Warned in 2016 That Vote-Counting Systems Are Manipulable*, The BL (Nov. 13, 2020), *available at*: https://thebl.com/us-news/electoral-fraud-dominions-vice-president-warned-in-2016-that-vote-counting-systems-are-manipulable.html.

[14] See, *e.g.,* "Eric Coomer Explains How to Alter Votes in the Dominion Voting System" (Nov. 24, 2020) (excerpt of presentation delivered in Chicago in 2017), *available at:* https://www.youtube.com/watch?v=UtB3tLaXLJE.

96.     Dr. Coomer has emerged as Dominion's principal defender, both in litigation alleging that Dominion rigged elections in Georgia and in the media.  An examination of his previous public statements has revealed that Dr. Coomer is highly partisan and even more anti-Trump, precisely the opposite of what would expect from the management of a company charged with fairly and impartially counting votes (which is presumably why he tried to scrub his social media history).  (See Id.)

97.     Unfortunately for Dr. Coomer, however, a number of these posts have been captured for perpetuity.  Below are quotes from some of his greatest President Trump and Trump voter hating hits to show proof of motive and opportunity. (See Id).

> If you are planning to vote for that autocratic, narcissistic, fascist ass-hat blowhard and his Christian jihadist VP pic, UNFRIEND ME NOW! No, I'm not joking. … Only an absolute F[**]KING IDIOT could ever vote for that wind-bag fuck-tard FASCIST RACIST F[**]K! … I don't give a damn if you're friend, family, or random acquaintance, pull the lever, mark an oval, touch a screen for that carnival barker … UNFRIEND ME NOW!  I have no desire whatsoever to ever interact with you. You are beyond hope, beyond reason.  You are controlled by fear, reaction and bullsh[*]t.  Get your shit together.  F[**]K YOU! Seriously, this f[**]king ass-clown stands against everything that makes this country awesome! You want in on that? You [Trump voters] deserve nothing but contempt.
> *Id.* (July 21, 2016 Facebook post).[15]

98.     In a rare moment of perhaps unintentional honesty, Dr. Coomer anticipates this Complaint and many others, by slandering those seeking to hold election riggers like Dominion to account and to prevent the United States' descent into Venezuelan levels of voting fraud and corruption out of which Dominion was born:

> Excerpts in stunning Trump-supporter logic, "I know there is a lot of voter fraud.  I don't know who is doing it, or how much is happening, but I

---

[15]   In this and other quotations from Dr. Coomer's social media, Plaintiffs have redacted certain profane terms.

know it is going on a lot."  This beautiful statement was followed by, "It happens in third world countries, this the US, we can't let it happen here." *Id.* (October 29, 2016 Facebook post); (See also Exh. 6)

1.      Dr. Coomer, who invented the technology for Dominion's voting fraud and has publicly explained how it can be used to alter votes, seems to be extremely hostile to those who would attempt to stop it and uphold the integrity of elections that underpins the legitimacy of the United States government:

> And in other news… There be some serious fuckery going on right here fueled by our Cheeto-in-Chief stoking lie after lie on the flames of [Kris] Kobach… [Linking Washington Post article discussing the Presidential Advisory Commission on Election Integrity, of which former Kansas Secretary of State Kris Kobach was a member, entitled, "The voting commission is a fraud itself. Shut it down."] *Id.* (September 14, 2017 Facebook post.] (Id.)

99.      Dr. Coomer also keeps good company, supporting and reposting ANTIFA statements slandering President Trump as a "fascist" and by extension his supporters, voters and the United States military (which he claims, without evidence, Trump will make into a "fascist tool"). *Id.* (June 2, 2020 Facebook post). Lest someone claims that these are "isolated statements" "taken out of context", Dr. Coomer has affirmed that he shares ANTIFA's taste in music and hatred of the United States of America, *id.* (May 31, 2020 Facebook post linking "F[**]k the USA" by the exploited), and the police. *Id.* (separate May 31, 2020 Facebook posts linking N.W.A. "F[**]k the Police" and a post promoting phrase "Dead Cops"). *Id.* at 4-5.

100.      Affiant and journalist Joseph Oltmann researched ANTIFA in Colorado. *Id.* at 1.  "On or about the week of September 27, 2020," he attended an Antifa meeting which appeared to be between Antifa members in Colorado Springs and Denver Colorado," where Dr. Coomer was present.  In response to a question as to what Antifa would do "if Trump wins this … election?", Dr. Coomer responded "Don't worry about the election. Trump is not going to win. I made f[**]king sure of that … Hahaha." *Id.* at 2.

101.      By putting an anti-Trump zealot like Dr. Coomer in charge of election "Security," and using his technology for what should be impartial "ballot adjudication," Dominion has given the fox the keys to the hen house ***and has forfeited any presumption of objectivity, fairness, or even propriety***.  It appears that Dominion does not care about even an appearance of impropriety, as its most important officer has his fingerprints all over a highly partisan, vindictive,  and personal vendetta against the Republican nominee both in 2016 and 2020, President Donald Trump.  Dr. Coomer's highly partisan anti-Trump rages show clear motive on the part of Dominion to rig the election in favor of Biden, and may well explain why for each of the so-called "glitches" uncovered, it is always Biden receiving the most votes on the favorable end of such a "glitch." (Id.)

102.      In sum, as set forth above, for a host of independent reasons, the Arizona election results concluding that Joe Biden received more votes that President Donald Trump must be set aside.

### COUNT I

**Defendants Violated the Elections and Electors Clauses and 42 U.S.C. § 1983.**

103.      Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

104.      The Electors Clause states that "[e]ach State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors" for President.  U.S. Const. art. II, §1, cl. 2 (emphasis added).  Likewise, the Elections Clause of the U.S. Constitution states that "[t]he Times, Places, and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by *the Legislature* thereof." U.S. Const. art. I, § 4, cl. 1 (emphasis added).

105.      The Legislature is "'the representative body which ma[kes] the laws of the people.'" *Smiley v. Holm,* 285 U.S. 355, 365 (1932).   Regulations of congressional and presidential elections, thus, "must be in accordance with the method which the state has prescribed for legislative enactments."  *Id.* at 367; *see also Ariz. State Legislature v. Ariz. Indep. Redistricting Comm'n*, 135 S. Ct. 2652, 2668 (2015).

41

106.     Defendants are not part of the Arizona Legislature and cannot exercise legislative power.  Because the United States Constitution reserves for the Arizona Legislature the power to set the time, place, and manner of holding elections for the President and Congress, county boards of elections and state executive officers have no authority to unilaterally exercise that power, much less to hold them in ways that conflict with existing legislation.

     **i.**    The VRA, 52 U.S.C. § 10307, also provides, in relevant part, that,

    **ii.**   No person acting under color of law shall fail or refuse to permit any person to vote who is entitled to vote under any provision of chapters 103 to 107 of this title or is otherwise qualified to vote, or willfully fail or refuse to tabulate, count, and report such person's vote.

   **iii.**  Federal law also requires the states to maintain uniform voting standards. Section 301 of the Help America Vote Act of 2002 [HAVA], (Pub. L. 107–252, 116 Stat. 1704, codified at 42 U.S.C. § 15481.

    **iv.**  Each voting system used in an election for Federal office shall meet the following requirements: (6) Each State shall adopt uniform and nondiscriminatory standards that define what constitutes a vote and what will be counted as a vote for each category of voting system used in the State. 42 U.S.C. §15481(a)(6).

107.     With respect to unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, Plaintiffs have identified 78,714 to 94,975 ballots out of 518,560 absentee / mail ballots.  Id.  These absentee ballots were either lost or destroyed (consistent with allegations of Trump ballot destruction) and/or were replaced with blank ballots filled out by election workers, Dominion or other third parties.

108.     Taking the average of the two types of errors together, 303,305 ballots, or

58% of the total, are defective. These errors are not only conclusive evidence of widespread fraud by the State of Arizona, but they are fully consistent with the evidence about Dominion presented in Section III below insofar as these unreturned absentee ballots represent a pool of blank ballots that could be filled in by third parties to shift the election to Joe Biden, and also present the obvious conclusion that there must be absentee ballots unlawfully ordered by third parties that were returned.

109.    There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.

110.    Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the injunctive relief requested herein is granted. Defendants have acted and, unless enjoined, will act under color of state law to violate the Elections Clause.

111.    Accordingly, the results for President in the November 3, 2020 election must be set aside, the State of Arizona should be enjoined from transmitting the certified the results thereof, and this Court should grant the other declaratory and injunctive relief requested herein.

## COUNT II

### Defendants Violated The Equal Protection Clause of the
### Fourteenth Amendment U.S. Const. Amend. XIV & 42 U.S.C.
### § 1983

112.    Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

113.    The Fourteenth Amendment of the United States Constitution provides "nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws. *See also Bush v. Gore*, 531 U.S. 98, 104 (2000) (having once granted the

43

right to vote on equal terms, the State may not, by later arbitrary and disparate treatment, value one person's vote over the value of another's). *Harper v. Va. Bd. of Elections*, 383 U.S. 663, 665 (1966) ("Once the franchise is granted to the electorate, lines may not be drawn which are inconsistent with the Equal Protection Clause of the Fourteenth Amendment."). The Court has held that to ensure equal protection, a problem inheres in the absence of specific standards to ensure its equal application. *Bush*, 531 U.S. at 106 ("The formulation of uniform rules to determine intent based on these recurring circumstances is practicable and, we conclude, necessary.").

114.     The equal enforcement of election laws is necessary to preserve our most basic and fundamental rights. The requirement of equal protection is particularly stringently enforced as to laws that affect the exercise of fundamental rights, including the right to vote.

115.     The disparate treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny than another, violates Equal Protection guarantees because "the right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise." *Reynolds*, 377 U.S. at 555. *Rice v. McAlister*, 268 Ore. 125, 128, 519 P.2d 1263, 1265 (1975); *Heitman v. Brown Grp., Inc.,* 638 S.W.2d 316, 319, 1982 Mo. App. LEXIS 3159, at *4 (Mo. Ct. App. 1982); *Prince v. Bear River Mut. Ins. Co.*, 2002 UT 68, ¶ 41, 56 P.3d 524, 536-37 (Utah 2002).

116.     In statewide and federal elections conducted in the State of Arizona, including without limitation the November 3, 2020 General Election, all candidates, political parties, and voters, including without limitation Plaintiffs, have an interest in having the election laws enforced fairly and uniformly.

117.     Defendants failed to comply with the requirements of Arizona law and the Equal Protection Clause and thereby diluted the lawful ballots of the Plaintiffs and of other Arizona voters and electors in violation of the United States Constitution guarantee

-44-

of Equal Protection. In Section II, Plaintiff experts provide testimony quantifying the number of illegal votes resulting from Defendants' statutory and constitutional violations. Finally, Section III details the additional voting fraud and manipulation enabled by the use Dominion voting machines, which had the intent and effect of favoring Biden and Democratic voters and discriminating against Trump and Republican voters.

118.    Defendants have acted and will continue to act under color of state law to violate Plaintiffs' right to be present and have actual observation and access to the electoral process as secured by the Equal Protection Clause of the United States Constitution and Arizona law.  Defendants thus failed to conduct the general election in a uniform manner as required by the Equal Protection Clause of the Fourteenth Amendment, the corollary provisions of Arizona election law.

119.    Plaintiffs seek declaratory and injunctive relief forbidding Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

120.    In addition, Plaintiffs ask this Court to order that no ballot processed by a counting board in Arizona can be included in the final vote tally unless a challenger was allowed to meaningfully observe the process and handling and counting of the ballot, or that were unlawfully switched from Trump to Biden.

121.    Clearly the dilution of lawful votes violates the Equal Protection clause; and the counting of unlawful votes violates the rights of lawful Citizens.

122.    There are also thousands of absentee ballots that Plaintiffs can show were sent to someone besides the registered voter named in the request, and thus could have been filled out by anyone and then submitted in the name of another voter specifically in violation of election law, one vote is one ballot.  That is the dilution of lawful votes, while 78,714 to 94,975 ballots out of 518,560 unreturned ballots recorded for voters who did return their ballot but were recorded as being unreturned, and their vote was taken from

-45-

them.

123.      Plaintiffs have no adequate remedy at law and will suffer serious and irreparable harm unless the declaratory and injunctive relief requested herein is granted.  Indeed, the setting aside of an election in which the people have chosen their representative is a drastic remedy that should not be undertaken lightly, but instead should be reserved for cases in which a person challenging an election has clearly established a violation of election procedures and has demonstrated that the violation has placed the result of the election in doubt. Arizona law allows elections to be contested through litigation, both as a check on the integrity of the election process and as a means of ensuring the fundamental right of citizens to vote and to have their votes counted accurately.

## COUNT III

### Fourteenth Amendment, Amend. XIV & 42 U.S.C. § 1983
### Denial of Due Process On The Right to Vote

124.      Plaintiffs refer to and incorporate by reference each of the prior paragraphs of this Complaint as though the same were repeated at length herein.

125.      The right of qualified citizens to vote in a state election involving federal candidates is recognized as a fundamental right under the Fourteenth Amendment of the United States Constitution.  *Harper,* 383 U.S. at 665.     *See also Reynolds*, 377 U.S. at 554 (The Fourteenth Amendment protects the "the right of all qualified citizens to vote, in state as well as in federal elections.").  Indeed, ever since the *Slaughter-House Cases*, 83 U.S. 36 (1873), the United States Supreme Court has held that the Privileges or Immunities Clause of the Fourteenth Amendment protects certain rights of federal citizenship from state interference, including the right of citizens to directly elect members of Congress.  *See Twining v. New Jersey*, 211 U.S. 78, 97 (1908) (*citing Ex parte Yarbrough*, 110 U.S. 651, 663-64 (1884)).  *See also Oregon v. Mitchell*, 400 U.S. 112, 148-49 (1970) (Douglas, J., concurring) (collecting cases).

126. The fundamental right to vote protected by the Fourteenth Amendment is cherished in our nation because it "is preservative of other basic civil and political rights." *Reynolds*, 377 U.S. at 562. Voters have a "right to cast a ballot in an election free from the taint of intimidation and fraud," *Burson v. Freeman*, 504 U.S. 191, 211 (1992), and "[c]onfidence in the integrity of our electoral processes is essential to the functioning of our participatory democracy." *Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (per curiam).

127. "Obviously included within the right to [vote], secured by the Constitution, is the right of qualified voters within a state to cast their ballots and have them counted" if they are validly cast. *United States v. Classic*, 313 U.S. 299, 315 (1941). "[T]he right to have the vote counted" means counted "at full value without dilution or discount." *Reynolds*, 377 U.S. at 555, n.29 (*quoting South v. Peters*, 339 U.S. 276, 279 (1950) (Douglas, J., dissenting)).

128. "Every voter in a federal . . . election, whether he votes for a candidate with little chance of winning or for one with little chance of losing, has a right under the Constitution to have his vote fairly counted, without its being distorted by fraudulently cast votes." *Anderson v. United States*, 417 U.S. 211, 227 (1974); *see also Baker v. Carr*, 369 U.S. 186, 208 (1962). Invalid or fraudulent votes "debase[]" and "dilute" the weight of each validly cast vote. *See Anderson*, 417 U.S. at 227.

129. The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. *See, e.g., Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of

eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

130.    The right to an honest [count] is a right possessed by each voting elector, and to the extent that the importance of his vote is nullified, wholly or in part, he has been injured in the free exercise of a right or privilege secured to him by the laws and Constitution of the United States." *Anderson*, 417 U.S. at 226 (*quoting Prichard v. United States*, 181 F.2d 326, 331 (6th Cir.), *aff'd due to absence of quorum*, 339 U.S. 974 (1950)).

131.    Practices that promote the casting of illegal or unreliable ballots or fail to contain basic minimum guarantees against such conduct, can violate the Fourteenth Amendment by leading to the dilution of validly cast ballots. See *Reynolds*, 377 U.S. at 555 ("[T]he right of suffrage can be denied by a debasement or dilution of the weight of a citizen's vote just as effectively as by wholly prohibiting the free exercise of the franchise.").

132.    Arizona law makes clear with regard to the electronic voting systems, that "[a]fter the close of the polls and after compliance with section 16-602 the members of the election board shall prepare a report in duplicate of the number of voters who have voted, as indicated on the poll list, and place this report in the ballot box or metal container, in which the voted ballots have been placed, which thereupon shall be sealed with a numbered seal and delivered promptly by two members of the election board of different political parties to the central counting place or other receiving station designated by the board of supervisors or officer in charge of elections, which shall not be more than fifty miles from the polling place from which the ballots are delivered. The person in charge of receiving ballots shall give a numbered receipt acknowledging receipt of such ballots to the person in charge who delivers such ballots. B. The chairman of the county committee of each political party represented on the ballot may designate a member of his party to accompany the ballots from each polling place to the central counting place.  A.R.S. § 16-608.

133.    As Plaintiffs have shown the ballots processed by Dominion Voting Systems reports to SCYTL, which is offshore, and uses an algorithm, that is secretive, and applies

a cleansing of invalid versus valid ballots, before the votes get tallied for distribution.

134.      Plaintiffs seek declaratory and injunctive relief enjoining Defendants from certifying the results of the General Election. This Court should enjoin Defendants from certifying a tally that includes any ballots that were not legally cast, or that were switched from Trump to Biden through the unlawful use of Dominion Democracy Suite software and devices.

<strong>COUNT IV</strong>

<strong>Wide-Spread Ballot Fraud</strong>

135.      Plaintiffs reallege all preceding paragraphs as if fully set forth herein.

136.      The scheme of civil fraud can be shown with the pattern of conduct that includes motive and opportunity, as exhibited by the high level official at Dominion Voting Systems, Eric Coomer, and his visceral and public rage against the current U.S. President.

137.      Opportunity appears with the secretive nature of the voting source code, and the feed of votes that make clear that an algorithm is applied, that reports in decimal points despite the law requiring one vote for one ballot.

138.      The Supreme Court of Arizona set forth the standard of fraud for elections when it that held in the State of Arizona, fraud in an election is based on ballots procured in violation to the law: "We therefore hold that HN5 a showing of **fraud** is not a necessary condition to invalidate absentee **balloting**. It is sufficient that an express non-technical statute was violated, and **ballots** cast in violation of the statute affected the election. *Miller v. Picacho Elementary Sch. Dist. No*. 33, 179 Ariz. 178, 180, 877 P.2d 277, 279, (S. Ct.1994).

> "Contrary to *Findley,* election statutes are mandatory, not "advisory," or else they would not be law at all. If a statute expressly provides that non-compliance invalidates the vote, then the vote is invalid. If the statute does not have such a provision, non-compliance may or may not invalidate the vote depending on its effect. In the context of this case, "affect the result, or at least render it uncertain," *id.* at 269, 276 P. at 844, means **ballots** procured in violation of a non-technical statute in sufficient numbers to alter the outcome of the election.

Id.

139.     This Complaint presents expert witness testimony demonstrating that several hundred thousand illegal, ineligible, duplicate or purely fictitious votes must be thrown out, in particular:

A.   Unreturned mail ballots unlawfully ordered by third parties: 219,135

B.   Returned ballots that were deemed unreturned by the state:  86,845

C.   Votes by persons that moved out of state or subsequently registered to vote in another state for the 2020 election: 5,790.

D.   "Excess votes" to historically unprecedented, and likely fraudulent turnout levels of 80% or more in over half of Maricopa and Pima County precincts: 100,724.

E.   And Plaintiffs can show Mr. Biden received a statistically significant Advantage from the use of Dominion Machines in a nationwide Study, which conservatively estimates Biden's advantage at 62,282 Votes.

140.     The right to vote includes not just the right to cast a ballot, but also the right to have it fairly counted if it is legally cast. The right to vote is infringed if a vote is cancelled or diluted by a fraudulent or illegal vote, including without limitation when a single person votes multiple times. The Supreme Court of the United States has made this clear in case after case. See, e.g., *Gray v. Sanders*, 372 U.S. 368, 380 (1963) (every vote must be "protected from the diluting effect of illegal ballots."); *Crawford v. Marion Cnty. Election Bd.*, 553 U.S. 181, 196 (2008) (plurality op. of Stevens, J.) ("There is no question about the legitimacy or importance of the State's interest in counting only the votes of eligible voters."); *accord Reynolds v. Sims*, 377 U.S. 533, 554-55 & n.29 (1964).

141.     Plaintiffs have no adequate remedy at law.  Plaintiffs contest the results of Arizona's 2020 General Election because it is fundamentally corrupted by fraud. Defendants should be enjoined from certifying an election where there were intentional violations of multiple provisions of Arizona law to elect Biden and other Democratic candidates and defeat President Trump and other Republican candidates.

## PRAYER FOR RELIEF

142.    Accordingly, Plaintiffs seek an emergency order instructing Defendants to de-certify the results of the General Election for the Office of President.

143.    In the alternative, Plaintiffs seek an emergency order prohibiting Defendants from including in any certified results from the General Election the tabulation of absentee and mailing ballots which do not comply with Arizona law.

144.    Further, Plaintiffs ask this Court to order production of all registration data, ballot applications, ballots, envelopes, etc. required to be maintained by law.  When we consider the harm of these uncounted votes, and ballots not ordered by the voters themselves, and the potential that many of these unordered ballots may in fact have been improperly voted and also prevented proper voting at the polls, the mail ballot system has clearly failed in the state of Arizona and did so on a large scale and widespread basis.  The size of the voting failures, whether accidental or intentional, are multiples larger than the margin in the state.  For these reasons, Arizona cannot reasonably rely on the results of the mail vote. Relief sought is the elimination of the mail ballots from counting in the 2020 election. Alternatively, the electors for the State of Arizona should be disqualified from counting toward the 2020 election.  Alternatively, the electors of the State of Arizona should be directed to vote for President Donald Trump.

145.    For these reasons, Plaintiffs ask this Court to enter a judgment in their favor and provide the following emergency relief:

1.  An order directing Governor Ducey and Secretary Hobbs to de-certify the election results;

2.  An order enjoining Governor Ducey from transmitting the currently certified election results the Electoral College;

3.  An immediate emergency order to seize and impound all servers, software, voting machines, tabulators, printers, portable media, logs,

- 51 -

ballot applications, ballot return envelopes, ballot images, paper ballots, and all election materials related to the  November 3, 2020 Arizona election for forensic audit and inspection by the Plaintiffs;

4. An order that no votes received or tabulated by machines that were not certified as required by federal and state law be counted;

5. A declaratory judgment declaring that Arizona's failed system of signature verification violates the Electors and Elections Clause by working a de facto abolition of the signature verification requirement;

6. A declaratory judgment declaring that currently certified election results violate the Due Process Clause, U.S. CONST. Amend. XIV;

7. A declaratory judgment declaring that mail-in and absentee ballot fraud must be remedied with a Full Manual Recount or statistically valid sampling that properly verifies the signatures on absentee ballot envelopes and that invalidates the certified results if the recount or sampling analysis shows a sufficient number of ineligible absentee ballots were counted;

8. A declaratory judgment declaring absentee ballot fraud occurred in violation of Constitutional rights, Election laws and under state law;

9. A permanent injunction prohibiting the Governor and Secretary of State from transmitting the currently certified results to the Electoral College based on the overwhelming evidence of election tampering;

10. Immediate production of 48 hours of security camera recording of all rooms used in Maricopa County for November 3, 2020 and November 4, 2020.

11. Plaintiffs further request the Court grant such other relief as is just and proper, including but not limited to, the costs of this action and their reasonable attorney fees and expenses pursuant to 42 U.S.C. 1988.

Respectfully submitted, this 1st day of December 2020.

/s Sidney Powell*                                              /s Alexander Kolodin

Sidney Powell PC                                          Kolodin Law Group PLLC
Texas Bar No. 16209700                                        AZ Bar No. 030826

2911 Turtle Creek Blvd, Suite 300              3443 N. Central Ave Ste 1009
Dallas, Texas 75219                                              Phoenix, AZ 85012

*Application for admission pro hac vice
forthcoming

Of Counsel:
Emily P. Newman (Virginia Bar No. 84265)
Julia Z. Haller (D.C. Bar No. 466921)
Brandon Johnson (D.C. Bar No. 491730)

2911 Turtle Creek Blvd. Suite 300
Dallas, Texas 75219

*Application for admission pro hac vice Forthcoming

L. Lin Wood (Georgia Bar No. 774588)
L. LIN WOOD, P.C.
P.O. Box 52584
Atlanta, GA 30305-0584
Telephone: (404) 891-1402

Howard Kleinhendler (New York Bar No. 2657120)
Howard Kleinhendler Esquire
369 Lexington Ave. 12th Floor
New York, New York 10017
(917) 793-1188
howard@kleinhendler.com

**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Tyler Bowyer, et al., | No. CV-20-02321-PHX-DJH |
| Plaintiffs, | **ORDER** |
| v. | |
| Doug Ducey, et al., | |
| Defendants. | |

Plaintiffs bring their Complaint seeking injunctive relief from this Court, specifically, to "set aside the results of the 2020 General Election," because they claim the election process and results were "so riddled with fraud, illegality and statistical impossibility . . . that Arizona voters, courts and legislators cannot rely on or certify" its results. (Doc. 1 at 2). By any measure, the relief Plaintiffs seek is extraordinary. If granted, millions of Arizonans who exercised their individual right to vote in the 2020 General Election would be utterly disenfranchised. Such a request should then be accompanied by clear and conclusive facts to support the alleged "egregious range of conduct in Maricopa County and other Arizona counties . . . at the direction of Arizona state election officials." (*Id.*) Yet the Complaint's allegations are sorely wanting of relevant or reliable evidence, and Plaintiffs' invocation of this Court's limited jurisdiction is severely strained. Therefore, for the reasons stated herein, the Complaint shall be dismissed.

## I.    Background

In Arizona, more than 3.4 million voters participated in the November 3, 2020,

# Exhibit 2

General Election.  Thereafter, pursuant to A.R.S. § 16-602, several counties performed a hand count of sample ballots to test the tabulation equipment, and either no discrepancies were found or, if there were, they were "within the acceptable margin."[1]  Arizona law also requires the secretary of state, in the governor's presence, to certify the statewide canvas on the fourth Monday after a general election.  A.R.S. § 16-648.  On November 30, 2020, Secretary of State Katie Hobbs, in the presence of Governor Doug Ducey, certified the statewide canvas.  (Doc. 40 at 4).  The Canvas shows that former Vice President Joseph Biden prevailed over President Donald Trump by more than ten thousand votes.[2]  On that same day, Governor Ducey signed the Certificate of Ascertainment for Vice President Biden's presidential electors.  (Doc. 40 at 4).  The Certificate was then transmitted to the United States Archivist pursuant to the Electoral Count Act.  (*Id.*); s*ee also* 3 U.S.C. § 6.

In their Complaint and the accompanying Motion for Temporary Restraining Order ("TRO") filed on December 2, Plaintiffs "contest" the election and ask this Court to compel the Governor to "de-certify" these results. (Docs. 1 ¶ 145; 2 at 10).  The Complaint also requests that this Court grant a permanent injunction "enjoining Secretary Hobbs and Governor Ducey from transmitting the currently certified election results to the Electoral College," declare the election results unconstitutional, and seize all voting machines, equipment, software, and other election-related records and materials, including all ballots cast.[3]  (Doc. 1 at 51–52).  The Complaint claims to show "multifaceted schemes and artifices implemented by Defendants and their collaborators" to defraud the election.  (*Id.* at ¶ 3).  And these schemes allegedly resulted in "the unlawful counting, or fabrication, of hundreds of thousands of illegal, ineligible, duplicate or purely fictitious ballots."  (*Id.*)

---

[1] Ariz. Sec'y of State, *Summary of Hand Count Audits–2020 General Election* (Nov. 17, 2020), https://azsos.gov/election/2020-general-election-hand-count-results.

[2] Ariz.   Sec'y   of   State,   State   of   Arizona   Official   Canvass, https://azsos.gov/sites/default/files/2020_General_State_Canvass.pdf.

[3] Under 3 U.S.C. § 5, if a state enacts and applies procedures to decide election controversies before election day, and a decision regarding a contested election is made at least six days before the electors' meetings, then the decision is conclusive and will apply in counting the electoral votes.  That deadline, referred to as the "safe harbor" deadline, was December 8, 2020, as the Electoral College will meet on December 14, 2020.  *See* 3 U.S.C. § 7.

1    Of the fourteen named Plaintiffs, three are registered voters and GOP Chairs for
2  various Arizona counties.  (*Id.* at ¶¶ 29–31).  The remaining eleven are Republican
3  nominees for Arizona's presidential electors.  (*Id.* at ¶ 28).  One of the eleven, Dr. Kelli
4  Ward, filed suit in state-court over allegations of fraud in this election.  *See Ward v.*
5  *Jackson*, Case No. CV2020-015285, slip. op. (Ariz. Super. Ct. Dec. 4, 2020) (finding  no
6  evidence of alleged fraud and dismissing claims of election misconduct); (Doc. 55-1).  In
7  that case, on December 8, 2020, the Arizona Supreme Court affirmed the Maricopa County
8  Superior Court's findings that there was no evidence of fraud or misconduct in Arizona's
9  election.  (*Ward v. Jackson*, CV2020-015285 (Ariz. 2020); (Doc. 81-1).

10    Plaintiffs' Complaint contains four counts, three of which assert 42 U.S.C. § 1983
11  claims for violations of the Constitution's Elections and Electors Clauses, as well as the
12  Fourteenth Amendment's Due Process and Equal Protection guarantees.  (Doc. 1 ¶¶ 103–
13  34). The final count, which does not specify a cause of action, is for "Wide-Spread Ballot
14  Fraud." (*Id.* at ¶¶ 135–41).

15    On December 3, the day after Plaintiffs filed their Complaint, the Court received a
16  Motion to Intervene from the Arizona Democratic Party, which was subsequently denied.[4]
17  (Docs. 26 and 69).  The Court also received a Motion to Intervene from the Maricopa
18  County Board of Supervisors and Maricopa County Recorder Adrian Fontes, which was
19  granted.  (Docs. 27 and 32).  The Court held a status conference on the same day, in which
20  it scheduled a December 8 hearing on the TRO.  (Doc. 28).  By subsequent Order (Doc.
21  43), the Court converted that hearing to oral argument on the Motions to Dismiss filed on
22  December 4.  (Docs. 36, 38, and 40).  Plaintiffs have filed their Response to the Motions
23  (Doc. 44), and Defendants have filed their Replies.  (Docs. 53, 54, and 55).  On December
24  8, 2020, the Court held oral argument on the Motions to Dismiss and took this matter under
25  advisement.  Being fully briefed on the matter, the Court now issues its ruling.
26  …
27
28  ───────────────────
[4] The Arizona Democratic Party sought intervention under theories of permissive joinder.
While the Court did not believe the Motion was inappropriate, the Court did not find their
presence necessary to this lawsuit and therefore denied the Motion to Intervene.

## II.    Analysis

Given the import of the overarching subject—a United States Presidential Election—to the citizens of Arizona, and to the named Plaintiffs, the Court is compelled to make clear why it finds it inappropriate to reach the merits of Plaintiffs' Complaint and why it must grant the Motions to Dismiss this matter in its entirety.   The Court will endeavor to lay bare the independent reasons for its conclusions, including those related to Article III standing, abstention, laches, mootness, and the federal pleading standards, which govern its review.

### A.    Article III Standing

"To ensure that the Federal Judiciary respects the proper—and properly limited— role of the courts in a democratic society, a plaintiff may not invoke federal-court jurisdiction unless he can show a personal stake in the outcome of the controversy." *Gill v. Whitford*, 138 S. Ct. 1916, 1929 (2018) (internal citations omitted).   Article III provides that federal courts may only exercise judicial power in the context of "cases" and "controversies."   U.S. Const. art. III, § 2, cl. 1; *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 559 (1992).   For there to be a case or controversy, the plaintiff must have standing to sue. *Spokeo, Inc. v. Robins*, 136 S. Ct. 1540, 1547 (2016) ("*Spokeo II*").   Whether a plaintiff has standing presents a "threshold question in every federal case [because it determines] the power of the court to entertain the suit."   *Warth v. Seldin*, 422 U.S. 490, 498 (1975). "No principle is more fundamental to the judiciary's proper role in our system of government than the constitutional limitation of federal-court jurisdiction to actual cases or controversies."   *DaimlerChrysler Corp. v. Cuno,* 547 U.S. 332, 341 (2006).   A suit brought by a plaintiff without Article III standing is not a "case or controversy," and an Article III federal court therefore lacks subject matter jurisdiction.   *Steel Co. v. Citizens for a Better Environment*, 523 U.S. 83, 101 (1998).

"[A] plaintiff seeking relief in federal court must first demonstrate . . . a personal stake in the outcome," *Baker v. Carr*, 369 U.S. 186, 204 (1962), distinct from a "generally available grievance about government," *Lance v. Coffman*, 549 U.S. 437, 439 (2007) (per

- 4 -

curiam).  "That threshold requirement ensures that we act as judges, and do not engage in policymaking properly left to elected representatives."  *Gill*, 138 S. Ct. at 1923.  To establish standing, a plaintiff has the burden of clearly demonstrating that she has: "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo II*, 136 S. Ct. at 1547 (*quoting Warth*, 422 U.S. at 518); *accord Kokkonen v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994) (noting the party asserting jurisdiction bears the burden of establishing subject matter jurisdiction on a Rule 12(b)(1) motion to dismiss).

To establish an injury in fact, "a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo,* 136 S. Ct. at 1548 (*quoting Lujan,* 504 U.S. at 560).  "When we have used the adjective 'concrete, we have meant to convey the usual meaning of the term—'real,' and not 'abstract.'"  *Id.*  The plaintiff must establish a "particularized" injury, which means that "the injury must affect the plaintiff in a personal and individual way."  *Raines v. Byrd*, 521 U.S. 811, 819 (1997).  Moreover, "[a]lthough imminence is concededly a somewhat elastic concept, it cannot be stretched beyond its purpose, which is to ensure that the alleged injury is not too speculative for Article III purposes—that the injury is certainly impending."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013).  Where a plaintiff has not established the elements of standing, the case must be dismissed pursuant to Federal Rule of Civil Procedure 12(b)(1).

Rule 12(b)(1) authorizes a court to dismiss claims over which it lacks subject-matter jurisdiction.  A Rule 12(b)(1) challenge may be either facial or factual.  *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004).  In a facial attack, the court may dismiss a complaint when the allegations of and documents attached to the complaint are insufficient to confer subject-matter jurisdiction.  *See Savage v. Glendale Union High Sch. Dist. No. 205*, 343 F.3d 1036, 1039 n.2 (9th Cir. 2003).  In this context, all allegations of material fact are taken as true and construed in the light most favorable to the nonmoving party.  *Fed'n of African Am. Contractors v. City of Oakland*, 96 F.3d 1204, 1207 (9th Cir.

- 5 -

1996).  In contrast, when a court evaluates a factual challenge to jurisdiction, a court is "free to weigh the evidence and satisfy itself as to the existence of its power to hear the case."  *Safe Air for Everyone*, 373 F.3d at 1039 ("In resolving a factual attack on jurisdiction, the district court may review evidence beyond the complaint without converting the motion to dismiss into a motion for summary judgment.").

### 1.      Elections and Electors Clause – Count One

Plaintiffs allege in Count One that Defendants violated the Elections and Electors Clauses and 28 U.S.C. § 1983 by, among other things, losing or destroying absentee ballots, and/or replacing those ballots with "blank ballots filled out by election workers, Dominion or other third parties" sending thousands of absentee ballots to someone besides the registered voter that "could have been filled out by anyone."  (Doc. 1 at 41).  Defendants argue that Plaintiffs do not have standing to assert such a claim.  (Doc. 40 at 8–9).

The Elections Clause of the United States Constitution states: "The Times, Places and Manner of holding Elections for Senators and Representatives, shall be prescribed in each State by the Legislature thereof[.]"  U.S. Const. art. I, § 4, cl. 1.  The Elections Clause authorizes the state governments to regulate federal elections held in the state, while Congress retains "exclusive control" to alter a state's regulations.  *Colegrove v. Green*, 328 U.S. 549, 554 (1946).  A separate provision, the "Electors Clause" of the Constitution, states: "Each State shall appoint, in such Manner as the Legislature thereof may direct, a Number of Electors . . . ."  U.S. Const. art. II, § 1, cl. 2.[5]

Plaintiffs' Complaint alleges that Defendants violated the Elections Clause. However, the Complaint does not allege grounds for standing to assert this claim, nor does it distinguish between the status of the groups of Plaintiffs.  At oral argument, Plaintiffs'

---

[5] While the Electors Clause and Elections Clause are separate Constitutional provisions, they share "considerable similarity."  *Ariz. State Leg. v. Ariz. Indep. Redistricting Comm'n*, 576 U.S. 787, 839, (2015) (Roberts, C.J., dissenting).  These provisions are therefore often considered together.  *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 348–52 (3d Cir. 2020) (analyzing standing for Elections Clause and Electors Clause under the same test); *Wood v. Raffensperger*, 2020 WL 6817513, at *1 (N.D. Ga. Nov. 20, 2020) (same); *U.S. Term Limits, Inc. v. Thornton*, 514 U.S. 779, 804–05 (1995) (holding that state's "duty" under Elections Clause "parallels the duty" described by Electors Clause).  Plaintiffs do not meaningfully distinguish between the two clauses in their Complaint or briefing.

counsel stated that eleven of the Plaintiffs were Republican Party nominees to be electors, and the other three were county GOP Chairs.  As an initial matter, Plaintiffs' briefing does not contain any arguments that the GOP Chairs have standing to assert this claim and the Court will dismiss the claim as to the GOP Chairs outright.

Plaintiffs argue that the Plaintiff Electors should be considered "candidates," and thus that they have standing under the Electors and Elections Clause pursuant to an Eighth Circuit case, *Carson v. Simon*, 978 F.3d 1051 (8th Cir. 2020).  (Doc. 44 at 5).  That case, which is based on the operation of Minnesota state election law, allowed electors to bring claims under the Elections Clause because electors were treated as candidates for office under Minnesota law and thus would be injured by the governor's failure to seat them if chosen as the state's electors.  *See Carson*, 978 F.3d at 1057.

Plaintiff Electors likewise assert that under Arizona law they should also be considered "candidates."  (Doc. 44 at 5–6) (citing A.R.S. § 16-344).  However, the Electors are not candidates for office as the term is generally understood.  Arizona law makes clear that the duty of an Elector is to fulfill a ministerial function, which is extremely limited in scope and duration, and that they have no discretion to deviate at all from the duties imposed by the statute.  *See* A.R.S. § 16-212(C) ("After the secretary of state issues the statewide canvass containing the results of a presidential election, the presidential electors of this state ***shall cast their electoral college votes for the candidate for president and the candidate for vice president who jointly received the highest number of votes*** in this state as prescribed in the canvass.") (emphasis added).  Arizona voters do not show up to vote for any single Electors listed next to the presidential candidates' names; they vote for their preferred presidential candidate.  By specifying that the electors "shall be enclosed in a bracketed list" next to "the surname of the presidential candidate and vice-presidential candidate," A.R.S. § 16-507(B) clarifies and distinguishes the Electors' ministerial status from that of the presidential candidate running for office, the latter who unquestionably suffers the discrete injury required for standing.[6]  Notably, the Republican candidate whose

---

[6] A.R.S. § 16-507(B) in its entirety reads: "Presidential electors, which, shall be enclosed in a bracketed list and next to the bracketed list shall be printed in bold type the surname

name was on the ballot is not a plaintiff in this case.

Other circuit courts to reach the issue have cited the *Carson* decision with disapproval, noting that there was no precedent for expanding standing in the way that it did.[7] *See Bognet v. Sec'y of Commonwealth of Pa.*, 980 F.3d 336, 351 n.6 (3d Cir. 2020) ("Our conclusion departs from the recent decision of an Eighth Circuit panel which, over a dissent, concluded that candidates for the position of presidential elector had standing under *Bond* [*v. United States*, 564 U.S. 211 (2011)] to challenge a Minnesota state-court consent decree that effectively extended the receipt deadline for mailed ballots. . . . The *Carson* court appears to have cited language from *Bond* without considering the context— specifically, the Tenth Amendment and the reserved police powers—in which the U.S. Supreme Court employed that language. There is no precedent for expanding *Bond* beyond this context, and the *Carson* court cited none."). Indeed, as numerous other courts have held, where, as here, the injury alleged by plaintiffs is that defendants failed to follow the Elections Clause, the Supreme Court has stated that the "injury is precisely the kind of undifferentiated, generalized grievance about the conduct of government that [courts] have refused to countenance." *Lance*, 549 U.S. at 442.

Elector Plaintiffs have not established they can personally bring suit, and therefore, they do not have standing to bring Count One.[8]  Therefore, the Court will dismiss Count

---

of the presidential candidate and vice-presidential candidate who is seeking election jointly with the presidential candidate shall be listed directly below the name of the presidential candidate.  The indicator for the selection of the presidential and vice-presidential candidates shall be directly next to the surname of the presidential candidate, and one mark directly next to a presidential candidate's surname shall be counted as a vote for each elector in the bracketed list next to the presidential and vice-presidential candidates."

[7] *See also Carson,* 78 F.3d at 1063 (Kelly, J., dissenting) ("I am not convinced the Electors have Article III standing to assert claims under the Electors Clause. Although Minnesota law at times refers to them as 'candidates,' *see, e.g.*, Minn. Stat. § 204B.03 (2020), the Electors are not candidates for public office as that term is commonly understood. Whether they ultimately assume the office of elector depends entirely on the outcome of the state popular vote for president. *Id.* § 208.04 subdiv. 1 ('[A] vote cast for the party candidates for president and vice president shall be deemed a vote for that party's electors.'). They are not presented to and chosen by the voting public for their office, but instead automatically assume that office based on the public's selection of entirely different individuals.").

[8] The Court notes that Count One of the Complaint makes passing references to the "VRA and HAVA," (the Voting Rights Act and the Help America Vote Act of 2002) but does not bring any claims under these statutes.  (Doc. 1 ¶ 106).

- 8 -

1   One.

2          **2.      Vote Dilution – Count Two**

3          In Count Two, Plaintiffs allege Equal Protection violations based on Defendants'

4   failure to comply with Arizona law by permitting "illegal votes," allowing "voting fraud

5   and manipulation," and in preventing "actual observation and access to the elector

6   process," which allegedly resulted in "the dilution of lawful votes . . . and the counting of

7   unlawful votes." (Doc. 1 at 45).  Plaintiffs ask the Court to order that "no ballot processed

8   by a counting board in Arizona can be included in the final vote tally unless a challenger

9   [i]s allowed to meaningfully observe the process." (Doc 1 ¶ 120).  Absent from the

10  Complaint is an allegation that Plaintiffs (or any registered Arizona voter for that matter)

11  were deprived of their right to vote.  Instead, they bring baseless claims of "disparate

12  treatment of Arizona voters, in subjecting one class of voters to greater burdens or scrutiny

13  than another." (Doc. 1 ¶ 115).  They do not allege what "class" of voters were treated

14  disparately.  Nor do the Elector Plaintiffs cite to any authority that they, as "elector

15  delegates," are a class of protected voters.  Defendants contend that Plaintiffs do not have

16  standing to assert these claims and point out that these allegations are nothing more than

17  generalized grievances that any one of the 3.4 million Arizonans who voted could make if

18  they were so allowed.  The Court agrees.

19         Here, Plaintiffs have not alleged a concrete harm that would allow the Court to find

20  Article III Standing for their vote dilution claim.  As courts have routinely explained, vote

21  dilution is a very specific claim that involves votes being weighed differently and cannot

22  be used generally to allege voter fraud.   "Contrary to the Voter Plaintiffs'

23  conceptualization, vote dilution under the Equal Protection Clause is concerned with votes

24  being weighed differently." *Bognet*, 980 F.3d at 355; *see also Rucho v. Common Cause*, –

25  —— U.S. ——, 139 S. Ct. 2484, 2501 (2019) ("[V]ote dilution in the one-person, one-vote

26  cases refers to the idea that each vote must carry equal weight.").  "This conceptualization

27  of vote dilution—state actors counting ballots in violation of state election law—is not a

28  concrete harm under the Equal Protection Clause of the Fourteenth Amendment.  Violation

of state election laws by state officials or other unidentified third parties is not always amenable to a federal constitutional claim." *Bognet*, 980 F.3d at 355; *see also Shipley v. Chicago Bd. of Election Comm'rs*, 947 F.3d 1056, 1062 (7th Cir. 2020) ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution."); *Powell v. Power*, 436 F.2d 84, 88 (2d Cir. 1970) (rejecting Equal Protection claim where allegations of state's erroneous counting of votes cast by voters unqualified to participate).

Additionally, Plaintiffs cannot sustain their Equal Protection Clause claim on a vote dilution theory. *See Bognet*, 980 F.3d at 355 (rejecting Equal Protection theory and explaining "[t]his conceptualization of vote dilution—state actors counting ballots in violation of state election law—is not a concrete harm under the Equal Protection Clause of the Fourteenth Amendment"); *see also Shipley*, 947 F.3d at 1062 ("A deliberate violation of state election laws by state election officials does not transgress against the Constitution") (internal citations omitted); *Am. Civil Rights Union v. Martinez-River*a, 166 F. Supp. 3d 779, 789 (W.D. Tex. 2015) (holding that allegations of "vote dilution" as a result of alleged voting process irregulates "[are] speculative and, as such, are more akin to a generalized grievance about the government than an injury in fact."); *Powell*, 436 F.2d at 88 (rejecting Equal Protection Clause claim arising from state's erroneous counting of votes cast by voters unqualified to participate in closed primary); *Snowden v. Hughes*, 321 U.S. 1, 11 (1944) ("It was not intended by the Fourteenth Amendment . . . that all matters formerly within the exclusive cognizance of the states should become matters of national concern.").

Setting aside that Plaintiffs' claims regarding the election are not viable vote dilution claims, Plaintiffs also have not requested relief that is redressable in a tailored way as is required. *See Gill*, 138 S. Ct. at 1934 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury."); *see also Lewis v. Casey*, 518 U.S. 343, 357 (1996) ("The remedy must of course be limited to the inadequacy that produced the injury in fact that the plaintiff has established."). Therefore, even if Plaintiffs could somehow establish that

1    their vote dilution claim was more than a generalized grievance to the point of asserting an

2    injury, Plaintiffs have not established that the Court can redress this grievance.  To give

3    Plaintiffs the relief they desire would disenfranchise the nearly 3.4 million Arizonans that

4    voted in the 2020 General Election.  Under Plaintiffs' theory of dilution, this would

5    transform all of the alleged diluted votes from being "diluted" to being destroyed.  As

6    Plaintiffs raise "only a generally available grievance about government—claiming only

7    harm to his and every citizen's interest in proper application of the Constitution and laws,

8    and seeking relief that no more directly and tangibly benefits him than it does the public at

9    large," the Court finds that Plaintiffs' Count Two "does not state an Article III case or

10   controversy."  *See Lance*, 549 U.S. 437 at 439.  Therefore, Plaintiffs do not have standing

11   to bring suit in this forum.[9]

12   ## B.    Abstention

13        Defendants also argue the Court should abstain from reaching Plaintiffs' claims

14   based on their similarities with ongoing state court cases.  Yesterday, the Arizona Supreme

15   Court ruled on one such case—filed by Dr. Kelli Ward—seeking to "set aside the 2020

16   General Election results."  *See Ward*, CV 2020-015285 (Ariz. 2020); (Doc. 81-1).  That

17   case was filed pursuant to A.R.S. § 16-672 and was also filed after Governor Ducey

18   certified the election results on November 30, 2020. (Doc. 58-1 at 17).  The *Ward* plaintiffs

19   alleged an insufficient opportunity to observe election officials, an overcounting of mail-

20   in ballots by not adequately comparing signatures on the ballot envelopes, and errors in the

21   ballot duplication process.  (*Id.* at 17–21).  After an evidentiary hearing, the Maricopa

22   County Superior Court issued a ruling on December 4, 2020, finding that there was no

23   misconduct, fraud, or effect on the outcome of the election.[10]  (*Id.*)  This ruling was

24   _____

25   [9] Having established that the Court does not have jurisdiction over Plaintiffs' Counts One
     through Three, the Court will decline to exercise supplemental jurisdiction over Count
26   Four, which pleads no federal cause of action and is entirely based on alleged fraud under
     Arizona law.

27   [10] Judge Randall H. Warner of the Maricopa County Superior Court addressed Ward's
     allegations of election misconduct.  First, Ward argued that there was an insufficient
28   opportunity to observe the actions of election officials. The State Court dismissed that
     claim as untimely, holding that "[t]he observation procedures for the November general
     election were materially the same as for the August primary election, and any objection to

- 11 -

1  unanimously affirmed by an *en banc* panel of the Arizona Supreme Court on expedited

2  review.[11]

3  Here, Plaintiffs' Complaint similarly relies upon A.R.S. § 16-672 and its provisions

4  related to bringing suit for alleged election misconduct, including illegal votes and

5  erroneous counting.  (Doc. 1 at ¶ 15).  A.R.S. § 16-672 also provides that an elections

6  contest brought under this statute should be filed in the superior court of the county in

7  which the person contesting resides or in the superior court of Maricopa county.  A.R.S. §

8  16-672(B).  Plaintiffs aver that their claims seek federal action under federal statutes, and

9  therefore, their claims are distinguishable from the claims being litigated in the state court.

10  The Court disagrees.

11  Generally, a federal court has a duty to exercise the jurisdiction conferred by

12  Congress.  However, under certain circumstances, it is prudent for a federal court to abstain

13  from hearing a matter.  "Indeed, we have held that federal courts may decline to exercise

14  its jurisdiction, in otherwise 'exceptional circumstances,' where denying a federal forum

15  would clearly serve an important countervailing interest."  *Quackenbush v. Allstate Ins.*

16  

---

17  them should have been brought at a time when any legal deficiencies could have been

18  cured," and citing *Lubin v. Thomas*, 144 P.3d 510, 511 (Ariz. 2006) ("In the context of election matters, the laches doctrine seeks to prevent dilatory conduct and will bar a claim if a party's unreasonable delay prejudices the opposing party or the administration of justice.").  Second, Ward alleged that "election officials overcounted mail-in ballots by not being sufficiently skeptical in their comparison of signatures on the mail-in envelope/affidavits with signatures on file."  The state court allowed Ward to examine a sampling of mail-in ballots, and the court held that "[t]he evidence does not show that these affidavits are fraudulent, or that someone other than the voter signed them. There is no evidence that the manner in which signatures were reviewed was designed to benefit one candidate or another, or that there was any misconduct, impropriety, or violation of Arizona law with respect to the review of mail-in ballots."  Lastly, Ward alleged errors with duplication of ballots.  The state court also allowed Ward to examine a sampling of duplicate ballots and held that '[t]he duplication process prescribed by the Legislature necessarily requires manual action and human judgment, which entail a risk of human error. Despite that, the duplication process for the presidential election was 99.45% accurate. And there is no evidence that the inaccuracies were intentional or part of a fraudulent scheme. They were mistakes. And given both the small number of duplicate ballots and the low error rate, the evidence does not show any impact on the outcome."  The state court concluded by holding that "[t]he Court finds no misconduct, no fraud, and no effect on the outcome of the election."  *Ward*, CV 2020-015285 (Ariz. Super. Ct. Dec. 4, 2020); (Doc. 58-1).

28  [11] "The Court concludes, unanimously, that the trial judge did not abuse his discretion in denying the request to continue the hearing and permit additional inspection of the ballots." *Ward*, CV 2020-015285, at *7 (Ariz. 2020); (Doc. 81-1).

*Co.*, 517 U.S. 706, 716 (1996) (citing *County of Allegheny v. Frank Mashuda Co.*, 360 U.S. 185, 189 (1959)).  Abstention may be "warranted by considerations of proper constitutional adjudication, regard for federal-state relations, or wise judicial administration."  *Id.*  *Colorado River* abstention permits a federal court to abstain from exercising jurisdiction over a matter in deference to a state court suit regarding similar claims and allegations.  *Colorado River Water Conservation District v. United States*, 424 U.S. 800, 813, 817 (1976).

The Ninth Circuit has enumerated an eight-part test for whether *Colorado River* abstention is warranted, stressing that the factors are "not a mechanical checklist," with some factors that "may not have any applicability to a case."  *Seneca Ins. Co., Inc. v. Strange Land, Inc.*, 862 F.3d 835, 841–42 (9th Cir. 2017).  The factors are: (1) which court first assumed jurisdiction over any property at stake; (2) the inconvenience of the federal forum; (3) the desire to avoid piecemeal litigation; (4) the order in which the forums obtained jurisdiction; (5) whether federal law or state law provides the rule of decision on the merits; (6) whether the state court proceedings can adequately protect the rights of the federal litigants; (7) the desire to avoid forum shopping; and (8) whether the state court proceedings will resolve all issues before the federal court.  *Id.*

Factors two through seven all support abstaining from this case.[12]  To begin, this federal forum is less convenient than the state forum, considering the state election law violations alleged, the claims are brought against state actors, and the interplay of state election law.  Moreover, the present suit reflects the very essence of "piecemeal litigation," with many of the same parties and attorneys litigating related matters in both forums.  As to the primacy of cases, this case was the last filed case.  All of the state court litigation filed related to the election preceded this action.  As to the nature of the claims, while Plaintiffs bring their claims under federal laws, the crux of their arguments, and the statutes upon which they rely, involve Arizona election law and the election procedures carried out at the county and state level by state officials.  The state courts are adequately equipped to

---

[12] The Court finds that the first factor is not relevant to the facts alleged herein.

protect the rights of the named Plaintiffs, especially considering that Plaintiff Ward already pursued her grievances there.  Moreover, as Congress has conferred concurrent jurisdiction on state courts to adjudicate Section 1983 claims, there is no concern that the state is unable to adjudicate Plaintiffs' Section 1983 claims.  *Felder v. Casey*, 487 U.S. 131, 139 (1988).  Lastly, abstention would alleviate the necessity to consider whether this matter was filed in this Court as a form of forum shopping, especially considering that a number of other related state court lawsuits have already been disposed of.  The eighth factor is the only factor that weighs against abstention, as it does not appear that Plaintiffs' allegations of widespread fraud in relation to the tabulation systems and software were before the state court.  However, as discussed *infra*, the Court finds that claim lacks Rule 9(b) particularity and plausibility.

Moreover, when considering abstention, "proper constitutional adjudication, regard for federal-state relations, or wise judicial administration," also inform this Court.  *Quackenbush*, 517 U.S. at 716.  If the Court were to reach the merits of Plaintiffs' claims, it would be entirely possible today for it to reach a different legal determination, or the same conclusion but with a different analysis, than the Arizona Supreme Court reached in *Ward v. Jackson*.  The Court cannot think of a more troubling affront to "federal-state relations" than this.  *See Quackenbush*, 517 U.S. at 716.  Therefore, the Court finds that abstention of these parallel issues is appropriate and indeed necessary.

## C.    Eleventh Amendment

Defendants also argue that the Eleventh Amendment bars Plaintiffs' demands for relief because they, as state officials who have not consented to being sued, are immune from suit.  Further, they argue that no exception applies, that the relief Plaintiffs seek is not prospective, and that the claims are barred.

The Eleventh Amendment to the Constitution provides:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI.  Such immunity applies when a citizen brings a claim against their own state.  *See Hans v. Louisiana*, 134 U.S. 1, 19 (1890).  The immunity extends to "suit[s] against state officials when the state is the real, substantial party in interest." *Pennhurst State Sch. & Hosp. v. Halderman*, 465 U.S. 89, 100 (1984).  "This jurisdictional bar applies regardless of the nature of the relief sought." *Id.*  "When the suit is brought only against state officials, a question arises as to whether that suit is a suit against the State itself." *Id.* at 101.  "The general rule is that a suit is against the sovereign . . . if the effect of the judgment would be to restrain the Government from acting, or to compel it to act." *Dugan v. Rank*, 372 U.S. 609, 620 (1963).

There are three recognized exceptions to the above: (1) Congress has abrogated the immunity within a federal statute; (2) the State has waived immunity and allowed individuals to sue it pursuant to specific state statutes; and (3) in "claims seeking *prospective* injunctive relief against state officials to remedy a state's *ongoing* violation of *federal* law." *Ariz. Students' Ass'n v. Ariz. Bd. of Regents*, 824 F.3d 858, 865 (9th Cir. 2016) (citing *Ex parte Young*, 209 U.S. 123 (1908)) (emphasis added).

None of these exceptions are present here.  As for Plaintiffs' 42 U.S.C. § 1983 claims, Congress did not abrogate the states' immunity from suit in the enacting language of Section 1983, and therefore, the Eleventh Amendment bars those claims.  *See Will v. Michigan Dep't of State Police*, 491 U.S. 58, 66 (1989) (holding that Section 1983 "does not provide a federal forum for litigants who seek a remedy against a State for alleged deprivations of civil liberties").  Plaintiffs provided no argument or authority that the state has explicitly waived its immunity for elections challenges.  Therefore, the second exception does not apply.  As for the remaining claims, the Court must determine whether Plaintiffs are seeking prospective relief to cure an ongoing violation of federal law.

"In determining whether the doctrine of *Ex parte Young* avoids an Eleventh Amendment bar to suit, a court need only conduct a straightforward inquiry into whether [the] complaint alleges an ongoing violation of federal law and seeks relief properly characterized as prospective." *Verizon Md., Inc. v. Pub. Serv. Comm'n*, 535 U.S. 635, 645

1    (2002) (internal citations omitted).  However, where the claims are state law claims,

2    masked as federal law claims, *Ex parte Young* is inapplicable and the Eleventh Amendment

3    clearly bars the suit.  *See Massey v. Coon*, 865 F.2d 264 (9th Cir. 1989) (affirming dismissal

4    where "on its face the complaint states a claim under the due process and equal protection

5    clauses of the Constitution, [but] these constitutional claims are entirely based on the

6    failure of defendants to conform to state law"); *see also Pennhurst*, 465 U.S. at 90 ("[W]hen

7    a plaintiff alleges that a state official has violated state law" and "when a federal court

8    instructs state officials on how to conform their conduct to state law, this conflicts directly

9    with the principles of federalism that underlie the Eleventh Amendment.").  This is true

10    whether the relief requested is "prospective or retroactive" in nature.  *Pennhurst*, 465 U.S.

11    at 106.

12        Here, Plaintiffs face a number of difficulties in their attempt to pierce Defendants'

13    sovereign immunity.  Defendants argue that all of Plaintiffs' allegations are actually state

14    law allegations masked under federal law.  Defendants point to numerous instances in

15    Plaintiffs' Complaint where Arizona state election law is relied on, including their catch-

16    all fraud claims, which are entirely based on state law.  The Eleventh Amendment clearly

17    bars such claims.  *See Pennhurst*, 465 U.S. at 106 ("On the contrary, it is difficult to think

18    of a greater intrusion on state sovereignty than when a federal court instructs state officials

19    on how to conform their conduct to state law.").

20        However, even assuming that Plaintiffs established that their claims are indeed

21    independent federal claims, it is unclear what *ongoing* violation of federal law is being

22    asserted.  Plaintiffs allege Due Process and Equal Protection claims, along with a catch-all

23    fraud claim, that arise from Defendants' alleged failure to follow Arizona state election

24    laws.  (Doc. 1 at ¶¶ 106–120).  These numerous alleged violations—related to alleged

25    issues with signature verification, ballot duplication, and poll observation—concern past

26    conduct.[13]   The relief requested—compelling the Governor to decertify the election—

---

[13] These include objections regarding poll watchers' ability to observe ballot counting,
issues related to the manner and process by which Arizona election officials matched
signatures on absentee ballots (Doc. 1 at ¶¶ 46–48); issues related to the process and role
assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

1   similarly seeks to alter past conduct.  Plaintiffs have not identified an ongoing violation to

2   enjoin.   In short, "Plaintiffs are seeking to undo what has already occurred, as their

3   requested relief reflects."  *See King v. Whitmer*, 2020 WL 7134198, at *5 (E.D. Mich. Dec.

4   7, 2020).

5          The Eleventh Amendment bars the injunctive relief sought.

6          **D.    Laches**

7          Defendants also argue that the doctrine of laches bars Plaintiffs' claims.  Laches

8   will bar a claim when the party asserting it shows the plaintiff unreasonably delayed in

9   filing the action and the delay caused prejudice to the defendant or the administration of

10  justice.  *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 951–52 (9th Cir. 2001) (noting that

11  laches requires a "defendant [] prove both an unreasonable delay by the plaintiff and

12  prejudice to itself").  Laches can bar untimely claims for relief in election cases, even when

13  the claims are framed as constitutional challenges.   *Soules v. Kauaians for Nukolii*

14  *Campaign Comm.*, 849 F.2d 1176, 1181 (9th Cir. 1988); *U.S. v. Clintwood Elkhorn Min.*

15  *Co.*, 553 U.S. 1, 9 (2008) ("[A] 'constitutional claim can become time-barred just as any

16  other claim can.'") (*quoting Block v. North Dakota ex rel. Board of Univ. and School*

17  *Lands*, 461 U.S. 273, 292 (1983)).

18         Plaintiffs filed their Complaint and request for TRO seeking to "de-certify" the

19  election results on December 2, 2020, nearly a month after the General Election on

20  November 3, 2020.  Plaintiffs conclusively argue that they waited this long because they

21  "could not have known the basis of their claim, or presented evidence substantiating their

22  claim, until after the election."  (Doc. 44 at 9)  They further state that, because "Arizona

23  election officials and other third parties did not announce or publicize their misconduct,

24  and in fact prevented Republican poll watchers from observing the ballot counting and

25  handling, it took Plaintiffs additional time post-election to gather the fact and expert

26  witness testimony presented in the Complaint."  (*Id.*)  During oral argument, Plaintiffs'

27  counsel repeatedly stated that the alleged fraud related to the Dominion voting machines

28  ──────────────
    "irregularities" with the voting machines (*Id.* at ¶¶ 50–52); and certification of the
    Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

1   was not known until election night, when their experts noted a "blip" in their reporting data

2   that showed an increase in votes for Joe Biden around 8:00 p.m.  Plaintiffs also argue that

3   A.R.S. §16-673 supports the timeliness of their Complaint because it requires an elector to

4   file a challenge to the election in state court within five days of certification of the election.

5          Plaintiffs' Complaint includes a hodge-podge of alleged misconduct by Arizona

6   elections officials, occurring on various dates over the past weeks, months, and even years.

7   In addition to the objections regarding poll watchers' inability to observe ballot counting

8   and handling, Plaintiffs also object to the manner and process by which Arizona election

9   officials matched signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role

10  assigned to poll referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49);

11  to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52);

12  and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53).

13         The affidavits or declarations upon which Plaintiffs rely clearly shows that the basis

14  for each of these claims was either known well before Election Day or soon thereafter, and

15  thus cannot be excused by a lack of knowledge nor an inability to substantiate their claims

16  through December 2.  For example, Plaintiffs' Complaint cites to documents showing that

17  Plaintiffs were in possession of information about suspected irregularities with the

18  Dominion voting machines as early as 2018.  (*Id.* at ¶¶ 21, 69, 71–73) (referencing

19  "publicly available evidence (including judicial and administrative proceedings)" that

20  discuss concerns with security flaws in Dominion voting machines dating back to 2018);

21  (Doc. 1-10 at 19, Ex. 20, Declaration of Mark Paul Law dated November 24, 2020

22  (describing his concerns over Maricopa County Dominion voting machine security and

23  observations while poll watching on October 25, 2020 and November 1, 2020); *id.* at 30,

24  Ex. 22, Declaration of Gregory Wodynski dated November 23, 2020 (describing his

25  concerns over Maricopa County Dominion voting machine security and his perception that

26  "Bruce," a Dominion employee, could manually manipulate voter data files while poll

27  watching on October 24, 2020 and November 1, 2020).

28         Plaintiffs also include documents showing that the facts underlying their allegations

of ballot counting and verification misconduct occurred weeks before Election Day. Canvassing in Arizona began in October, and the poll watcher declarations and affidavits attached to the Complaint object to the signature verification and ballot process during this time.  (*See* Doc. 1-3 at 7, Ex. 5) (containing unsigned Declaration dated October 25, 2020 from poll watcher objecting to "NO EFFECTIVE oversight" in signature verification rooms); *id.* at 9, Ex. 5A (document listing poll watcher objections made on 10/7/20, 10/23/20, 10/24/20, 10/29/20); (Doc. 1-10 at 25, Ex. 21) (containing a Declaration of poll watcher Judith Burns dated November 16, 2020 and noting her objections in observing the signature verification and ballot processing on October 17, 2020 and October 21, 2020). In a statement from Ms. Linda Brickman, the First Vice-Chair of the Maricopa County Republican Committee, she represents that she had ongoing concerns regarding the signature verification for early and mail-in ballots during her time as an elections worker "from 10/19/20 to 11/11/20" (Doc. 1-10 at 38, Ex. 23) and had objections to the Logic and Accuracy Certification of the Dominion voting systems that occurred on November 18, 2020.  (*Id.* at 35).  Indeed, at least one Plaintiff has already raised some of these complaints in state court.[14]  *Ward*, CV2020-015285 (Super. Ct. of Ariz. Dec. 4, 2020) (dismissing the Petition with prejudice); (Doc. 58-1 at 14, Ex. B).  Dr. Ward clearly knew the basis of her claim before December 2, 2020 but offers no reasonable explanation for the delay in bringing this suit in federal court.  When contesting an election, any delay is prejudicial, but waiting until a month after Election Day and two days after certification of the election is inexcusable.  *See Kelly v. Penn.*, 2020 WL 7018314, at *1 (Pa. Nov. 28, 2020) ("Petitioners failed to act with due diligence in presenting the instant claim" when they waited until November 21 to sue to invalidate Pennsylvania's election); *Kistner v. Simon*, No. A20-1486, slip op. at 3–4 (Minn. Dec. 4, 2020); *see also, e.g., Ariz. Libertarian Party*

---

[14] As she does here, Ms. Ward's state court action claimed that poll watchers were given insufficient opportunity to observe the actions of election officials.  Notably, the state court judge found this claim barred by the doctrine of laches, as Ms. Ward had failed to assert it during a time when it could have been corrected. (Doc. 1-10 at 19 ("The observation procedures for the November general election were materially the same as for the August primary election, and any objection to them should have been brought at a time when any legal deficiencies could have been cured.").

- 19 -

1   *v. Reagan*, 189 F. Supp. 3d 920, 922–23 (D. Ariz. 2016).

2      The Court does not find that the Arizona state election challenge deadline excuses

3   delay on Plaintiffs' part in these circumstances.  *See* A.R.S. §16-673.  As noted above, the

4   facts underlying the suspected irregularities complained of were either known to Plaintiffs

5   prior to Election Day or soon thereafter.  Although Arizona electors may have a deadline

6   by which to file election contests in Arizona state court, Plaintiffs here opted to file their

7   federal constitutional challenges in federal court.  The exhibits to the Complaint confirm

8   that the events complained of occurred on or before Election Day.  Accordingly, the Court

9   rejects Plaintiffs' self-serving statement that they did not know the basis for their claims

10  before December 2, 2020.  The documents they submit with their Complaint plainly shows

11  the contrary is true, and the delay—which has resulted in a rush by this Court and

12  Defendants to resolve these issues before the Electoral College meeting deadline of

13  December 14, 2020—is unreasonable.

14     The second part of the laches test—prejudice—is also unquestionably met.  First,

15  the prejudice to the Defendants and the nearly 3.4 million Arizonans who voted in the 2020

16  General Election would be extreme, and entirely unprecedented, if Plaintiff were allowed

17  to have their claims heard at this late date.  *SW Voter Registration Educ. Project v. Shelley*,

18  344 F.3d 914, 919 (9th Cir. 2003) ("Interference with impending elections is extraordinary,

19  and interference with an election after voting has begun is unprecedented.").  As an Eastern

20  District of Michigan Court stated in a nearly identical case, "[the prejudice] is especially

21  so considering that Plaintiffs' claims for relief are not merely last-minute—they are after

22  the fact.  While Plaintiffs delayed, the ballots were cast; the votes were counted; and the

23  results were certified.  The rationale for interposing the doctrine of laches is now at its

24  peak."  *King*, 2020 WL 7134198, at *7.

25     Second, the challenges that Plaintiffs assert quite simply could have been made

26  weeks ago, when the Court would have had more time to reflect and resolve the issues.

27  "Unreasonable delay can prejudice the administration of justice by compelling the court to

28  steamroll through . . . delicate legal issues in order to meet election deadlines."  *Arizona*

- 20 -

1   *Libertarian Party*, 189 F. Supp. 3d at 923 (quotation marks and citations omitted).

2   Plaintiffs offer no reasonable explanation why their claims were brought in federal court

3   at this late date. Their delay and the resulting prejudice bars their claims by laches.

4         **E.      Mootness**

5         Defendants also argue that this case is moot. (Docs. 38 at 5; 40 at 22). The Court

6   agrees. "Mootness is a jurisdictional issue, and 'federal courts have no jurisdiction to hear

7   a case that is moot, that is, where no actual or live controversy exists.'" *Foster v. Carson*,

8   347 F.3d 742, 745 (9th Cir. 2003) (quoting *Cook Inlet Treaty Tribes v. Shalala*, 166 F.3d

9   986, 989 (9th Cir. 1999)). In addition, a case is moot when a party cannot obtain relief for

10  its claim. *Id.*; *see also Ruvalcaba v. City of L.A.*, 167 F.3d 514, 521 (9th Cir. 1999).

11        Plaintiffs request an injunction that (a) enjoins Governor Ducey from transmitting

12  the certified results, (b) orders Defendants to "de-certify" the election results, (c) nullifies

13  votes tabulated by uncertified machines, (d) declares that illegal ballot fraud occurred in

14  violation of the Electors and Elections Clauses and the Fourteenth Amendment's Due

15  Process and Equal Protections Clauses, (e) mandates a manual recount or statistical

16  sampling of all mail-in and absentee ballots, and (f) allows Plaintiffs to seize and inspect

17  voting hardware and software as well as security camera recordings "of all rooms used in

18  Maricopa County" from November 3 to 4. (Doc. 1 at ¶ 145).

19        Obviously, the Court cannot enjoin the transmission of the certified results because

20  they have already been transmitted. (Doc. 40 at 4). Plaintiffs' counsel orally argued that

21  Defendants had the power to de-certify the election under 3 U.S.C. § 6. Nothing in that

22  statute authorizes this Court to de-certify the results. The manner provided to contest

23  elections under Arizona law requires election contest claims to be brought, "in the superior

24  court of the county in which the person contesting resides or in the superior court of

25  Maricopa County." A.R.S. § 16-672. Therefore, if de-certification were possible, it would

26  only be possible through an action brought in Arizona superior court. In other words, this

27  Court has no power to de-certify the results. But even assuming the Court were able to

28  grant the extraordinary relief requested, ordering Governor Ducey to de-certify the

1    election, such relief would necessarily run afoul of 3 U.S.C. § 6 by ignoring Arizona law.

2    In this instance, the Court cannot allow Plaintiffs to circumvent both federal and Arizona

3    law.

4         Because this Court cannot de-certify the results, it would be meaningless to grant

5    Plaintiffs any of the remaining relief they seek.  *See Wood v. Raffensperger*, 2020 WL

6    7094866, at *6 (11th Cir. Dec. 5, 2020) ("[I]t is not possible for us to delay certification

7    nor meaningful to order a new recount when the results are already final and certified.");

8    *King*, 2020 WL 7134198, at *5 n.3 ("[T]he evidence Plaintiffs seek to gather by inspecting

9    voting machines and software and security camera footage only would be useful if an

10   avenue remained open for them to challenge the election results.").  Plaintiffs' claims are

11   moot.

12        **F.      Failure to State a Claim**

13        "A motion to dismiss a complaint or claim 'grounded in fraud' under Rule 9(b)[15]

14   for failure to plead with particularity is the functional equivalent of a motion to dismiss

15   under Rule 12(b)(6) for failure to state a claim."  *Vess v. Ciba-Geigy Corp. USA*, 317 F.3d

16   1097, 1107 (9th Cir. 2003).  In a Rule 12(b)(6) context, courts must consider all well-

17   pleaded factual allegations as true and interpret them in the light most favorable to the

18   plaintiff.  *Schlegal v. Wells Fargo Bank, NA,* 720 F.3d 1204, 1207 (9th Cir. 2013).

19   Dismissal is proper when there is either (1) a lack of a cognizable legal theory or (2)

20   insufficient facts to support a cognizable legal claim.  *Conservation Force v. Salazar*, 646

21   F.3d 1240, 1242 (9th Cir. 2011), *cert. denied, Blasquez v. Salazar*, 565 U.S. 1261 (2012).

22        When pleading allegations concerning fraudulent conduct, Rule 9(b) requires

23   something more than Rule 8: particularity.  *Ashcroft v. Iqbal*, 556 U.S. 662, 686 (2009);

---

[15] Although Plaintiffs strenuously argue that they can bring their Arizona election law-based claims in federal court because of the presence of federal allegations, they also boldly assert in their Reply that they need not follow the heightened pleading standard of Federal Rule of Civil Procedure 9(b) in pleading their fraud claims with particularity, because the federal rules are somehow abrogated by "controlling Arizona Supreme Court precedent.[15]" (Doc. 44 at 23).  Plaintiffs cannot have it both ways.  Plaintiffs have not provided any authority that a state court decision can alter the pleading requirements in federal court established by United States Supreme Court precedent and the Federal Rules of Civil Procedure.

*see also* Fed. R. Civ. P. 9(b) ("In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "This particularity requirement demands a higher degree of notice than that required for other claims. The claim must identify who, what, where, when, and how." *U.S. ex rel. Costner v. United States*, 317 F.3d 883, 888 (8th Cir. 2003).

Moreover, "claims of fraud or mistake . . . must, in addition to pleading with particularity, also plead plausible allegations. That is, the pleading must state enough facts to raise a reasonable expectation that discovery will reveal evidence of the misconduct alleged." *Cafasso, U.S. ex rel. v. Gen. Dynamics C4 Sys., Inc*., 637 F.3d 1047, 1055 (9th Cir. 2011) (internal citations omitted). Indeed, "Rule 9(b) serves not only to give notice to defendants of the specific fraudulent conduct against which they must defend, but also 'to deter the filing of complaints as a pretext for the discovery of unknown wrongs, to protect [defendants] from the harm that comes from being subject to fraud charges, and to prohibit plaintiffs from unilaterally imposing upon the court, the parties and society enormous social and economic costs absent some factual basis.'" *Bly-Magee v. California*, 236 F.3d 1014, 1018 (9th Cir. 2001) (citing *In re Stac Elec. Sec. Litig*., 89 F.3d 1399, 1405 (9th Cir. 1996)).

Establishing the plausibility of a complaint's allegations is a two-step process that is "context-specific" and "requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. 679. First, a court must "identif[y] pleadings that, because they are no more than conclusions, are not entitled to the assumption of truth." *Id.* Then, assuming the truth only of well-pleaded factual allegations, a court must "determine whether they plausibly give rise to an entitlement to relief." *Id.*; *see also Eclectic Props. E., LLC v. Marcus & Millichap Co.*, 751 F.3d 990, 996 (9th Cir. 2014) (identifying the two-step process for evaluating pleadings). Although a plaintiff's specific factual allegations may be consistent with a plaintiff's claim, a district court must assess whether there are other "more likely explanations" for a defendant's conduct such that a plaintiff's claims cannot cross the line "'from conceivable to plausible.'" *Iqbal*, 556 U.S. at 680

- 23 -

1    (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  This standard represents

2    a balance between Rule 8's roots in relatively liberal notice pleading and the need to

3    prevent "a plaintiff with a largely groundless claim" from "'tak[ing] up the time of a

4    number of other people, with the right to do so representing an *in terrorem* increment of

5    settlement value.'"  *Twombly*, 550 U.S. at 557–58 (quoting *Dura Pharmaceuticals, Inc. v.*

6    *Broudo*, 544 U.S. 336, 347 (2005)).

7            Advancing several different theories, Plaintiffs allege that Arizona's Secretary of

8    State and Governor conspired with various domestic and international actors to manipulate

9    Arizona's 2020 General Election results allowing Joseph Biden to defeat Donald Trump in

10   the presidential race.  The allegations they put forth to support their claims of fraud fail in

11   their particularity and plausibility.  Plaintiffs append over three hundred pages of

12   attachments, which are only impressive for their volume.  The various affidavits and expert

13   reports are largely based on anonymous witnesses, hearsay, and irrelevant analysis of

14   unrelated elections.  Because the Complaint is grounded in these fraud allegations, the

15   Complaint shall be dismissed.  *Vess*, 317 F.3d at 1107 ("When an entire complaint, or an

16   entire claim within a complaint, is grounded in fraud and its allegations fail to satisfy the

17   heightened pleadings requirements of Rule 9(b), a district court may dismiss the complaint

18   or claim.").

19          Plaintiffs first "describe specific violations of Arizona law" to support their fraud

20   claims.[16]  In doing so, they attach declarations from poll watchers that observed election

21   officials during the November General Election.  (Doc. 1 ¶¶ 46–53).  As Intervenor-

22   Defendant Maricopa County points out, these are the only declarants offered by Plaintiffs

23   with first-hand observation of the election administration.  (Doc. 36 at 4).  But these four

24   declarants do not allege fraud at all.  (*See* Doc. 1-10 at 18–24).  Instead, they raise

25   objections to the manner and process by which Arizona election officials matched

26   signatures on absentee ballots (Doc. 1 ¶¶ 46–48); to the process and role assigned to poll

27   _____

28   [16] Plaintiffs' often scattershot pleadings allege that "Defendants failed to administer the
     November 3, 2020 election in compliance with the manner prescribed by the ***Georgia***
     ***legislature***."  (Doc 2 at 6) (emphasis added).  Plaintiffs also nonsensically include
     references to Wisconsin state statutes.  (Doc. 1 at 33).

- 24 -

referees in settling unresolved disputes between adjudicators (*Id.* at ¶ 49); to "irregularities" with the voting machines on Election Day and before (*Id.* at ¶¶ 50–52); and to the certification of the Dominion voting system on November 18, 2020 (*Id.* at ¶ 53). These objections to the manner in which Arizona officials administered the election cannot serve to overturn the results of the 2020 presidential election in Arizona because they fail to present evidence that supports the underlying fraud claim. At most, these are the type of "garden variety election irregularities" federal courts are "not equipped nor empowered to supervise . . . ." *Griffin v. Burns*, 570 F.2d 1065, 1076, 1077 (1st Cir. 1978) ("If every election irregularity or contested vote involved a federal violation, the court would be thrust into the details of virtually every election, tinkering with the state's election machinery, reviewing petitioners, registration cards, vote tallies, and certificates of election for all manner of error and insufficiency under state and federal law.").

Plaintiffs next argue that they have expert witnesses who can attest to widespread voter fraud in Arizona. As an initial matter, none of Plaintiffs' witnesses identify Defendants as committing the alleged fraud, or state what their participation in the alleged fraudulent scheme was. Instead, they allege that, absentee ballots "*could have* been filled out by anyone and then submitted in the name of another voter," "*could be* filled in by third parties to shift the election to Joe Biden," or that ballots were destroyed or replaced "with blank ballots filled out by election workers, Dominion or other third parties." (Doc. 1 ¶¶ 54–58) (emphasis added). These innuendoes fail to meet Rule 9(b) standards. But perhaps more concerning to the Court is that the "expert reports" reach implausible conclusions, often because they are derived from wholly unreliable sources.

Plaintiffs' expert Mr. William Briggs ("Briggs"), for example, concludes that "troublesome" errors by Arizona election officials "involving unreturned mail-in ballots []" are indicative of voter fraud" and that the election should consequently be overturned. (Doc. 1 at ¶ 54). Briggs relies on data provided by an unknown person named "Matt Braynard," a person who may or may not have tweeted a "Residency Analysis of ABS/EV Voters" on his Twitter account on November 20, 2020 (Doc. 1-2 at 14, Ex. 2); (*Id.* at 52,

Ex. 3).  Apart from a screenshot of Mr. Braynard's tweets that day, Plaintiffs offer nothing further about Mr. Braynard's identity, qualifications, or methodologies used in conducting his telephone "survey."  But according to the Briggs' report, Mr. Braynard conducted his survey of unknown size and to unknown persons in Georgia, Michigan, Wisconsin, Arizona, and Pennsylvania regarding absentee ballots, and his "findings" were conveyed to Mr. Briggs.  (*Id.*)  In concluding that there were "clearly a large number of troublesome ballots in each state," Mr. Briggs assumed Mr. Braynard's "survery [sic] respondents [were] representative and the data [was] accurate." (*Id.*)  This cavalier approach to establishing that hundreds of thousands of Arizona votes were somehow cast in error is itself troublesome.  The sheer unreliability of the information underlying Mr. Briggs' "analysis" of Mr. Braynard's "data" cannot plausibly serve as a basis to overturn a presidential election, much less support plausible fraud claims against these Defendants.

The Complaint is equally void of plausible allegations that Dominion voting machines were actually hacked or compromised in Arizona during the 2020 General Election.  Plaintiffs are clearly concerned about the vulnerabilities of voting machines used in some counties across Arizona and in other states.  They cite sources that attest to knowledge of "well-known" vulnerabilities, have included letters from concerned citizens, Arizona elected officials, and United States senators.  Plaintiffs even attach an affidavit of an anonymous witness with connections to the late Venezuelan dictator Hugo Chavez claiming to be privy as to how officials in Venezuela rigged their elections with the help of a voting systems company whose software "DNA" is now used in voting machines in the United States.  (Doc. 1-1, Ex. 1).  These concerns and stated vulnerabilities, however, do not sufficiently allege that any voting machine used in Arizona was in fact hacked or compromised in the 2020 General Election.  Rather, what is present is a lengthy collection of phrases beginning with the words "could have, possibly, might," and "may have." (Doc. 1 ¶¶ 8, 53, 55, 57, 60, 66, 77, 88, 91, 108, 109, 122).  To lend support to this theory, Plaintiffs offer expert Russell Ramsland, Jr., who asserts there was "an improbable, and *possibly impossible* spike in processed votes" in Maricopa and Pima Counties at 8:46 p.m.

on November 3, 2020.  (Doc. 1 ¶ 60); (Doc. 1-9, Ex. 17) (emphasis added).  He suggests that this spike "could easily be explained" by presuming that Dominion "pre-load[ed] batches of blank ballots in files such as Write-Ins or other adjudication-type files then casting them almost all for Biden using the Override Procedure . . . ." (Doc. 1-9 at 9, Ex. 17).  This scenario is conceivable.  However, Defendant Hobbs points to a much more likely plausible explanation: because Arizona begins processing early ballots before the election, the spike represented a normal accounting of the early ballot totals from Maricopa and Pima Counties, which were reported shortly after in-person voting closed.  (Doc. 40 at 17–18).  Thus, the Court finds that while this "spike" *could* be explained by an illicit hacking of voting machinery in Arizona, the spike is "not only compatible with, but indeed was more likely explained by, lawful, unchoreographed" reporting of early ballot tabulation in those counties.  *See Iqbal*, 556 U.S. at 680.  Plaintiffs have not moved the needle for their fraud theory from conceivable to plausible, which they must do to state a claim under Federal pleading standards.  *Id.*

Because Plaintiffs have failed to plead their fraud claims with particularity and because the Complaint is grounded in these claims, it must be dismissed.[17]

### G.    Motion for TRO and Preliminary Injunction

There are multiple independent grounds upon which to dismiss Plaintiffs' Complaint.  Accordingly, it is not necessary to reach the merits of Plaintiffs' requests for a temporary restraining order and preliminary injunction and the Court will therefore only briefly addresses those Motions here.

"The standard for issuing a temporary restraining order is identical to that for issuing a preliminary injunction." *Taylor-Failor v. Cty of Hawaii*, 90 F. Supp. 3d 1095, 1098 (D. Haw. 2015).  Under normal circumstances, both are extraordinary and drastic remedies,

---

[17] Throughout their pleadings, Plaintiffs allege that there were "spikes" of votes for Joe Biden that occurred in Arizona, which also occurred in other states that certified the election for Joe Biden, including Georgia, Wisconsin, Michigan, and Pennsylvania. Regardless of whether these "spikes" shifting the vote majorities from President Trump to Vice President Biden occurred in other states, Plaintiffs have presented nothing to support the claim that these same "spikes" occurred in Arizona, where Biden never trailed Trump in the vote tally.

and "should not be granted unless the movant, by a clear showing, carries the burden of persuasion.'" *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)); *see also Winter v. Natural Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008) ("A preliminary injunction is an extraordinary remedy never awarded as of right.") (citation omitted). A plaintiff seeking a temporary restraining order or preliminary injunction must show that (1) he or she is likely to succeed on the merits, (2) is likely to suffer irreparable harm without an injunction, (3) the balance of equities tips in his or her favor, and (4) an injunction is in the public interest. *Winter*, 555 U.S. at 20.

Plaintiffs simply cannot establish they have a likelihood of success on their claims. Plaintiffs face serious jurisdictional impediments in bringing their claims to federal court at the eleventh hour. These insurmountable legal hurdles are exacerbated by insufficiently plead allegations of fraud, rendered implausible by the multiple inadmissible affidavits, declarations, and expert reports upon which their Complaint relies.

Furthermore, granting Plaintiffs the injunctive relief they seek would greatly harm the public interest. As stated by Defendant Hobbs, "the requested relief would cause enormous harm to Arizonans, supplanting the will of nearly 3.4 million voters reflected in the certified election results and potentially imperiling Arizona's participation in the Electoral College. It would be more difficult to envision a case in which the balance of hardships would tip more strongly against a plaintiff." (Doc. 40 at 24). The Court agrees. The significant weight of these two *Winters* factors requires that the Court deny Plaintiffs' requests for injunctive relief.[18]

III.   **Conclusion**

Not only have Plaintiffs failed to provide the Court with factual support for their extraordinary claims, but they have wholly failed to establish that they have standing for the Court to consider them. Allegations that find favor in the public sphere of gossip and innuendo cannot be a substitute for earnest pleadings and procedure in federal court. They

---

[18] The Court will vacate the hearing on Plaintiffs' TRO and Request for Preliminary Injunction scheduled for December 10, 2020.

1    most certainly cannot be the basis for upending Arizona's 2020 General Election.  The
2    Court is left with no alternative but to dismiss this matter in its entirety.

3            Accordingly,

4            **IT IS HEREBY ORDERED** that Defendants' Governor Doug Ducey, Secretary
5    of State Katie Hobbs, and Intervenor Defendants Maricopa County Board of Supervisors
6    and Adrian Fontes' Motions to Dismiss the Complaint (Docs. 36, 38, and 40) are
7    **GRANTED** for the reasons stated herein.

8            **IT IS FURTHER ORDERED** that all remaining pending motions (Docs. 14, 62,
9    65 and 66) are **denied as moot,** and the hearing on Plaintiffs' TRO and Preliminary
10   Injunction set for December 10, 2020 is **vacated**.

11           **IT IS FINALLY ORDERED** that this matter is dismissed, and the Clerk of Court
12   is kindly directed to terminate this action.

13           Dated this 9th day of December, 2020.

14

15

16   _____
     Honorable Diane J. Humetewa
17   United States District Judge

18

19

20

21

22

23

24

25

26

27

28

**Declaration of** ███████████

Pursuant to 28 U.S.C Section 1746, I, ████████████, make the following declaration.

1. I am over the age of 21 years and I am under no legal disability, which would prevent me from giving this declaration.

2. I have been a private contractor with experience gathering and analyzing foreign intelligence and acted as a LOCALIZER during the deployment of projects and operations both OCONUS and CONUS. I am a trained Cryptolinguist, hold a completed degree in Molecular and Cellular Physiology and have FORMAL training in other sciences such as Computational Linguistics, Game Theory, Algorithmic Aspects of Machine Learning, Predictive Analytics among others.

3. I have operational experience in sources and methods of implementing operations during elections both CONUS and OCONUS

4. I am an amateur network tracer and cryptographer and have over two decades of mathematical modeling and pattern analysis.

5. In my position from 1999-2014 I was responsible for delegating implementation via other contractors sub-contracting with US or 9 EYES agencies identifying connectivity, networking and subcontractors that would manage the micro operations.

6. My information is my personal knowledge and ability to detect relationships between the companies and validate that with the cryptographic knowledge I know and attest to as well as evidence of these relationships.

7. In addition, I am WELL versed due to my assignments during my time as a private contractor of how elections OCONUS (for countries I have had an assignment at) and CONUS (well versed in HAVA ACT) and more.

8. On or about October 2017 I had reached out to the US Senate Majority Leader with an affidavit claiming that our elections in 2017 may be null and void due to lack of EAC certifications. In fact Sen. Wyden sent a letter to Jack Cobb on 31 OCT 2017 advising discreetly pointing out the importance of being CERTIFIED EAC had issued a certificate to

# Exhibit 3

Pro V & V and that expired on Feb 24, 2017.  No other certification has been located.



9.  Section 231(b) of the Help America Vote Act (HAVA) of 2002 (42 U.S.C. §15371(b)) requires that the EAC provide for the accreditation and revocation of accreditation of independent, non-federal laboratories qualified to test voting systems to Federal standards. Generally, the EAC considers for accreditation those laboratories evaluated and recommended by the National Institute of Standards and Technology (NIST) pursuant to HAVA Section 231(b)(1).  However, consistent with HAVA Section 231(b)(2)(B), the Commission may also vote to accredit laboratories outside of those recommended by NIST upon publication of an explanation of the reason for any such accreditation.

Case 1:21-cv-00317-DCLC-CHS  Document 72-1  Filed 04/19/22  Page 84 of 133  PageID #:
Case 2:20-cv-01771-PP  Document 103  Filed 04/18/22  Page 21 of 47  Document 5-13
2849



**United States Department of Commerce**
**National Institute of Standards and Technology**

## Certificate of Accreditation to ISO/IEC 17025:2017

**NVLAP LAB CODE: 200978-0**

**Pro V&V**

Huntsville, AL

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services,*
*listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.*
*This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality*
*management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-03-26 through 2021-03-31
*Effective Dates*



*For the National Voluntary Laboratory Accreditation Program*

10.

11. VSTL's are VERY important because equipment vulnerabilities allow for deployment of algorithms and scripts to intercept, alter and adjust voting tallies.

12. There are only TWO accredited VSTLs (VOTING SYSTEM TEST LABORATORIES). In order to meet its statutory requirements under HAVA §15371(b), the EAC has developed the EAC's Voting System Test Laboratory Accreditation Program. The procedural requirements of the program are established in the proposed information collection, the EAC **Voting System Test Laboratory Accreditation Program Manual**. Although participation in the program is voluntary, adherence to the program's procedural requirements is mandatory for participants. The procedural requirements of this Manual will supersede any prior laboratory accreditation requirements issued by the EAC. This manual shall be read in conjunction with the EAC's **Voting System Testing and Certification Program Manual** (OMB 3265-0019).

Case 1:21-cv-00317-DCLG-CHS Document 79-1 Filed 04/18/22 Page 85 of 133 PageID #:
Case 2:20-cv-01771-PP Document 79-1 Filed 04/18/22 Page 84 of 84 Document 9-13
2850



# MICHIGAN

| | |
|---|---|
| *State Participation:* | **Requires Testing by an Independent Testing Authority.** MI requires that voting systems are certified by an independent testing authority accredited by NASED and the board of state canvassers. |
| *Applicable Statute(s):* | "An electronic voting system shall not be used in an election unless it is approved by the board of state canvassers … and unless it meets 1 of the following conditions: (a) Is certified by an independent testing authority accredited by the national association of state election directors and by the board of state canvassers. (b) In the absence of an accredited independent testing authority, is certified by the manufacturer of the voting system as meeting or exceeding the performance and test standards referenced in subdivision (a) in a manner prescribed by the board of state canvassers." MICH. COMP. LAWS ANN § 168.795a (2009). |
| *Applicable Regulation(s):* | MI does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State accepts requests from persons/corporations wishing to have their voting system examined. The requestor must pay the Secretary of State an application fee of $1,500.00, file a report listing all of the states in which the voting system has been approved and any reports that these states have made regarding the performance of the voting system. The Board of State Canvassers conducts a field test involving Michigan electors and election officials in simulated election day conditions. The Board of State Canvassers shall approve the voting system if it meets all of the state requirements. MICH. COMP. LAWS ANN § 168.795a (2009). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.michigan.gov/sos/0,1607,7-127-1633_8716_45458---,00.html |

13.

Case 1:21-cv-02317-DCL-C-CHS Document 78-1 Filed 04/18/22 Page 86 of 133 PageID #:
Case 2:20-cv-01771-PP Document 151-3 Filed 11/04/21 Page 41 of 47 Document 9-13
2851

 **WISCONSIN**

**State Participation:**    **Requires Testing by a Federally Accredited Laboratory.** WI requires that its voting systems receive approval from an independent testing authority accredited by NASED verifying that the voting systems meet all of the recommended FEC standards.

**Applicable Statute(s):**    "No ballot, voting device, automatic tabulating equipment or relating equipment and materials to be used in an electronic voting system may be utilized in this state unless it is approved by the board [of election commissioners]." WIS. STAT.ANN. § 5.91 (West 2009).

**Applicable Regulation(s):**    "An application for approval of an electronic voting system shall be accompanied by all of the following … [r]eports from an independent testing authority accredited by the national association of state election directors (NASED) demonstrating that the voting system conforms to all the standards recommended by the federal elections commission." WIS. ADMIN. CODE GAB § 7.01 (2009).

**State Certification Process:**    The Board of Election Commissioners accepts applications for the approval of electronic voting systems. Once the application is completed, the vendor must set up the voting system for three mock elections using; (1) offices, (2) referenda questions and (3) candidates. A panel of local election officials can assist the Board in the review of the voting system. The Board conducts the test using a mock election for the partisan primary, general election, and nonpartisan election. The Board may also require that the voting system be used in an actual election as a condition of the approval. WIS. ADMIN. CODE GAB §§ 7.01, 7.02 (2009).

**Fielded Voting Systems:**    *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].*
http://elections.state.wi.us/section.asp?linkid=643&locid=47

14.

Case 1:21-cv-00317-DCLC-CHS Document 73-1 Filed 04/18/22 Page 87 of 133 PageID #:
Case 2:20-cv-01771-PP Document 102-3 Filed 04/16/21 Page 31 of 34 Document 9-13
2852



# GEORGIA

**State Participation:**    **Requires Federal Certification.** GA requires that its voting systems are tested to EAC standards by EAC accredited labs and certified by the EAC.

**Applicable Statute(s):**    "Any person or organization owning, manufacturing, or selling, or being interested in the manufacture or sale of, any voting machine may request the Secretary of State to examine the machine. Any ten or more electors of this state may, at any time, request the Secretary of State to reexamine any voting machine previously examined and approved by him or her. Before any such examination or reexamination, the person, persons, or organization requesting such examination or reexamination shall pay to the Secretary of State the reasonable expenses of such examination; provided, however, that in the case of a request by ten or more electors the examination fee shall be $ 250.00. The Secretary of State may, at any time, in his or her discretion, reexamine any voting machine." GA CODE ANN. § 21-2-324 (2008).

**Applicable Regulation(s):**    "Prior to submitting a voting system for certification by the State of Georgia, the proposed voting system's hardware, firmware, and software must have been issued Qualification Certificates from the EAC. These EAC Qualification Certificates must indicate that the proposed voting system has successfully completed the EAC Qualification testing administered by EAC approved ITAs. If for any reason, this level of testing is not available, the Qualification tests shall be conducted by an agency designated by the Secretary of State. In either event, the Qualification tests shall comply with the specifications of the *Voting Systems Standards* published by the EAC." GA. COMP. R. & RES. 590-8-1-.01 (2009).

**State Certification Process:**    After the voting system has passed EAC Qualification testing, the vendor of the voting system submits a letter to the Office of the Secretary of State requesting certification for the voting system along with a technical data package to the certification agent. An evaluation proposal is created by the certification agent after a preliminary view of the Technical Data Package and sent to the vendor. Any additional EAC ITA testing identified in the evaluation proposal is arranged by the vendor and the certification agent will perform all other tests identified in the evaluation proposal. The certification agent submits a report of their findings to the Secretary of State. Based on these findings the Secretary of State will make a final determination on whether to certify the voting system. GA. COMP. R. & RES. 590-8-1-.01 (2009).

**Fielded Voting Systems:**    *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].*
http://www.sos.georgia.gov/Elections/

15.



# PENNSYVANIA

| | |
|---|---|
| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** PA requires that its voting systems are approved by a federally recognized independent testing laboratory as meeting federal voting system standards. |
| *Applicable Statute(s):* | "Any person or corporation owning, manufacturing or selling, or being interested in the manufacture or sale of, any electronic voting system, may request the Secretary of the Commonwealth to examine such system if the voting system has been examined and approved by a federally recognized independent testing authority and if it meets any voting system performance and test standards established by the Federal Government." 25 PA. CONS. STAT. ANN. Code § 3031.5 (West 2008). |
| *Applicable Regulation(s):* | PA does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State examines voting systems, upon request, once the voting systems have received approval by a federally recognized independent testing authority. The person(s) requesting the examination of the voting system are responsible for the cost of the examination. After the examination, the Secretary of State issues a report stating whether or not the voting systems are safe and compliant with state and federal requirements. If the voting systems are deemed safe and compliant by the Secretary of State then the systems may be adopted and approved for use in elections by each county through a majority vote of its qualified electors. 25 PA. CONS. STAT. ANN. Code §§ 3031.5, 3031.2 (West 2008). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].*<br>http://www.votespa.com/HowtoVote/tabid/74/language/en-US/Default.aspx |

16.

Case 1:21-cv-00317-DCLC-CHS Document 72-1 Filed 04/18/22 Page 89 of 133 PageID #:
Case 2:20-cv-01771-PP Document 163-3 Filed 04/16/22 Page 47 of 47 Document 9-13
2854



**ARIZONA**

| | |
|---|---|
| *State Participation:* | **Requires Testing by a Federally Accredited Laboratory.** AZ requires that its voting systems are HAVA compliant and approved by a laboratory that is accredited pursuant to HAVA. |
| *Applicable Statute(s):* | "On completion of acquisition of machines or devices that comply with HAVA, machines or devices used at any election for federal, state or county offices may only be certified for use in this state and may only be used in this state if they comply with HAVA and if those machines or devices have been tested and approved by a laboratory that is accredited pursuant to HAVA." ARIZ. REV. STAT. § 16-442(B) (2008). |
| *Applicable Regulation(s):* | AZ does not have a regulation regarding the federal certification process. |
| *State Certification Process:* | The Secretary of State appoints a committee of three people that test different voting systems. This committee is required to submit their recommendations to the Secretary of State who then makes the final decision on which voting system(s) to adopt. ARIZ. REV. STAT. § 16-442(A) and (C) (2008). |
| *Fielded Voting Systems:* | *[After the EAC completes and issues the 2008 Election Administration and Voting Survey, information about fielded voting systems will be added to this document. In the meantime, readers may find information on the voting systems at the following website (if available)].* http://www.azsos.gov/election/equipment/default.htm |

State Participation in EAC Voting System Certification Program                                      9

17.

18. **Pro V& V** and **SLI Gaming** both lack evidence of EAC Accreditation as per the Voting System Testing and Certification Manual.

19. **Pro V& V** is owned and Operated by Jack Cobb. Real name is Ryan Jackson Cobb. The company ProV&V was founded and run by Jack Cobb who formerly worked under the entity of Wyle Laboratories which is an AEROSPACE DEFENSE CONTRACTING ENTITY. The address information on the EAC, NIST and other entities for Pro V & V are different than that of what is on ProV&V website. The EAC and NIST (ISO CERT) issuers all have another address.



20. VSTLs are the most important component of the election machines as they examine the use of COTS (Commercial Off–The-Shelf)

21. "Wyle became involved with the testing of electronic voting systems in the early 1990's and has tested over 150 separate voting systems. Wyle was the first company to obtain accreditation by the National Association of State Election Directors (NASED). Wyle is accredited by the Election Assistance Commission (EAC) as a Voting System Testing Laboratory (VSTL). Our scope of accreditation as a VSTL encompasses all aspects of the hardware and software of a voting machine. Wyle also received NVLAP accreditation to ISO/IEC 17025:2005 from NIST." Testimony of Jack Cobb 2009

22. COTS are preferred by many because they have been tried and tested in the open market and are most economic and readily available. COTS are also the SOURCE of vulnerability therefore VSTLs are VERY important. COTS components by voting system machine manufacturers can be used as a "Black Box" and changes to their specs and hardware make up change continuously. Some changes can be simple upgrades to make them more efficient in operation, cost efficient for production, end of life (EOL) and even complete reworks to meet new standards. They key issue in this is that MOST of the COTS used by Election Machine Vendors like Dominion, ES&S, Hart Intercivic, Smartmatic and others is that such manufacturing for COTS have been outsourced to China which if implemented in our Election Machines make us vulnerable to BLACK BOX antics and backdoors due to hardware changes that can go undetected. This is why VSTL's are VERY important.

23. The proprietary voting system software is done so and created with cost efficiency in mind and therefore relies on 3rd party software that is AVAILABLE and HOUSED on the HARDWARE. This is a vulnerability. Exporting system reporting using software like Crystal Reports, or PDF software allows for vulnerabilities with their constant updates.

24. As per the COTS hardware components that are fixed, and origin may be cloaked under proprietary information a major vulnerability exists since once again third-party support software is dynamic and requires FREQUENT updates. The hardware components of the computer components, and election machines that are COTS may have slight updates that can be overlooked as they may be like those designed that support the other third -party software. COTS origin is important and the US Intelligence Community report in 2018 verifies that.

25. The Trump Administration made it clear that there is an absence of a major U.S. alternative to foreign suppliers of networking equipment. This highlights the growing dominance of

Chinese manufacturers like Huawei that are the world's LARGEST supplier of telecom and other equipment that endangers national security.

26. China, is not the only nation involved in COTS provided to election machines or the networking but so is Germany via a LAOS founded Chinese linked cloud service company that works with SCYTL named Akamai Technologies that have offices in China and are linked to the server that Dominion Software.

28 046 Madrid

**Asian offices**

**Akamai Technologies – India**
111, Brigade Court
Koramangala Industrial Area
Bangalore 560 095, India

Telephone:     91-80-575-99222
Fax:           91-80-575-99209
Regional Manager: Stuart Spiteri

**Akamai Technologies – China**
Suite 1560, 15th Floor
NCI Tower
12A Jianguomenwai Avenue
Chaoyang District,
Beijing 100022
China

Telephone:     86-10-8523-3097
Fax:           86-10-8523-3001
Regional Manager: Stuart Spiteri

**Akamai Japan K.K.**
The Executive Centre Japan K.K.
15F Tokyo Ginko Kyokai building
1-3-1 Marunouchi, Chiyoda-ku, Tokyo 100-0005

Telephone:     81-3-3216-7200 (Centre)
               81-3-3216-7300 (Akamai direct)
Fax:           81-3-3216-7390 (Centre)
Regional Manager: Stuart Spiteri

**Akamai Technologies – Singapore**
Akamai, Regus Centre, 36-01 UOB Plaza 1
80 Raffles Place
Singapore 048624
Driving directions

Telephone:     +65 6248 4614
Fax:           +65 6248-4501
Regional Manager: Stuart Spiteri

**Akamai Technologies – Australia and New Zealand**
201 Sussex St
Tower 2, Level 20
Sydney, NSW 2000, Australia
info@au.akamai.com

Telephone:     61 2 9006 1325
Fax:           61 2 9475 0343
Regional Manager: Stuart Spiteri



*ptt.gov resolves to 4.30.228.74. According to our data this IP address belongs to Level 3 Communications and is located in Alexandria, Virginia, United States. Please have a look at the information provided below for further details.*

| 🇺🇸 4.30.228.74 | |
| --- | --- |
| ISP/Organization | Level 3 Communications |
| Location | Alexandria 22304, Virginia (VA), 🇺🇸 United States (US) |
| Latitude | 38.8115 / 38°48'41" N |
| Longitude | -77.1285 / 77°7'42" W |
| Timezone | America/New_York |
| Local Time | Thu, 12 Jul 2018 19:27:40 -0400 |

27.

28. L3 Level Communications is federal contractor that is partially owned by foreign lobbyist George Soros. An article that AP ran in 2010 – spoke out about the controversy of this that has been removed. (LINK) "As for the company's other political connections, it also appears that none other than George Soros, the billionaire funder of the country's liberal political infrastructure, owns 11,300 shares of OSI Systems Inc., the company that owns Rapiscan. Not surprisingly, OSI's stock has appreciated considerably over the course of the year. Soros certainly is a savvy investor." Washington Examiner re-write.



29.



30.

31. **L-3 Communication** Systems-East designs, develops, produces and integrates communication systems and support equipment for space, air, ground, and naval applications, including C4I systems and products; integrated Navy communication systems; integrated space communications and RF payloads; recording systems; secure communications, and information security systems. In addition, their site claims that MARCOM is an integrated communications system and The Marcom® is the foundation of the Navy's newest digital integrated voice / data switching system for affordable command and control equipment supporting communications and radio room automation. The MarCom® uses the latest **COTS** digital technology and open systems standards to offer the command and control user a low cost, user friendly, solution to the complex voice, video and data communications needs of present and future joint / allied missions. Built in reliability, rugged construction, and fail-safe circuits ensure your call and messages will go through. Evidently a HUGE vulnerability.

32. Michigan's government site is thumped off Akamai Technologies servers which are housed on **TELIA AB** a foreign server located in Germany.

33. Scytl, who is contracted with AP that receives the results tallied BY Scytl on behalf of Dominion – During the elections the AP reporting site had a disclaimer.

AP – powered by SCYTL.



34. "Scytl was selected by the Federal Voting Assistance Program of the U.S. Department of Defense to provide a secure online ballot delivery and onscreen marking systems under a program to support overseas military and civilian voters for the 2010 election cycle and beyond. Scytl was awarded 9 of the 20 States that agreed to participate in the program (New York, Washington, Missouri, Nebraska, Kansas, New Mexico, South Carolina, Mississippi and Indiana), making it the provider with the highest number of participating States." PDF

35. According to DOMINION : 1.4.1Software and Firmware The software and firmware employed by Dominion D-Suite 5.5-Aconsists of 2 types, custom and commercial off the shelf (COTS). COTS applications were verified to be pristine or were subjected to source code review for analysis of any modifications and verification of meeting the pertinent standards.

36. The concern is the HARDWARE and the NON – ACCREDITED VSTLs as by their own admittance use COTS.

37. The purpose of VSTL's being accredited and their importance in ensuring that there is no foreign interference/ bad actors accessing the tally data via backdoors in equipment software. The core software used by ALL SCYTL related Election Machine/Software manufacturers ensures "anonymity" .

38. Algorithms within the area of this "shuffling" to maintain anonymity allows for setting values to achieve a desired goal under the guise of "encryption" in the trap-door.

39. The actual use of trapdoor commitments in Bayer-Groth proofs demonstrate the implications for the verifiability factor. This means that no one can SEE what is going on during the process of the "shuffling" therefore even if you deploy an algorithms or manual scripts to fractionalize or distribute pooled votes to achieve the outcome you wish – you cannot prove they are doing it! See STUDY : "The use of trapdoor commitments in Bayer-Groth proofs and the implications for the verifiability of the Scytl-SwissPost Internet voting system"

40. **Key Terms**

41. **UNIVERSAL VERIFIABILITY**: Votes cast are the votes counted and integrity of the vote is verifiable (the vote was tallied for the candidate selected) . **SCYTL FAILS UNIVERSAL VERIFIABILITY** because no mathematical proofs can determine if any votes have been manipulated.

42. **INDIVIDUAL VERIFIABILITY**: Voter cannot verify if their ballot got correctly counted. Like, if they cast a vote for ABC they want to verify it was ABC. That notion clearly discounts the need for anonymity in the first place.

Case 1:21-cv-00317-DCLG-CHS Document 158-13 Filed 04/18/23 Page 98 of 133 PageID #:
Case 3:20-cv-01771-SPP Document 158-13 Filed 04/18/23 Page 16 of 23 Document 9-13
2863

43. To understand what I observed during the 2020 I will walk you through the process of one ballot cast by a voter.

44. STEP 1 |Config Data |  All non e-voting data is sent to Scytl (offshore) for configuration of data. All e-voting is sent to CONFIGURATION OF DATA then back to the e-voting machine and then to the next phase called CLEANSING. **CONCERNS**: Here we see an "OR PROOF" as coined by mathematicians – an "or proof" is that votes that have been pre-tallied parked in the system and the algorithm then goes back to set the outcome it is set for and seeks to make adjustments if there is a partial pivot present causing it to fail demanding manual changes such as block allocation and narrowing of parameters or self-adjusts to ensure the predetermined outcome is achieved.

45.  STEP 2|CLEANSING | The Process is when all the votes come in from the software run by Dominion and get "cleansed" and put into 2 categories: invalid votes and valid votes.

46. STEP 3|Shuffling /Mixing | This step is the most nefarious and exactly where the issues arise and carry over into the decryption phase. Simply put, the software takes all the votes, literally mixes them a and then re-encrypts them.  This is where if ONE had the commitment key- TRAPDOOR KEY – one would be able to see the parameters of the algorithm deployed as the votes go into this mixing phase, and how algorithm redistributes the votes.

47. This published PAPER FROM University College London depicts how this shuffle works.  In essence, when this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes when mixed.

48.

# Background - ElGamal encryption

- Setup:          Group $\mathcal{G}$ of prime order q with generator g
- Public key:     $pk = y = g^x$
- Encryption:     $\mathcal{E}_{pk}(m; r) = (g^r, y^r m)$
- Decryption:     $\mathcal{D}_x(u, v) = vu^{-x}$
- Homomorphic:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(M; R) = \mathcal{E}_{pk}(mM; r + R)$$

- Re-rencryption:

$$\mathcal{E}_{pk}(m; r) \times \mathcal{E}_{pk}(1; R) = \mathcal{E}_{pk}(m; r + R)$$

▲UCL

49. When this mixing/shuffling occurs, then one doesn't have the ability to know that vote coming out on the other end is actually their vote; therefore, ZERO integrity of the votes.

50. When the votes are sent to Scytl via Dominion Software EMS (Election Management System) the Trap Door is accessed by Scytl or TRAP DOOR keys (Commitment Parameters).

51. 

52. The encrypted data is shifted into Scytl's platform in the form of ciphertexts – this means it is encrypted and a key based on commitments is needed to read the data. The ballot data can only be read if the person has a key that is set on commitments.

53. A false sense of security is provided to both parties that votes are not being "REPLACED" during the mixing phase. Basically, Scytl re-encrypts the ballot data that comes in from Dominion (or any other voting software company) as ciphertexts. Scytl is supposed to prove that votes A, B, C are indeed X, Y, Z under their new re-encryption when sending back the votes that are tallied coding them respectively. This is done by Scytl and the Election Software company that agrees to certain

Case 1:21-cv-00317-DCC- THSP Document 89-13 Filed 04/18/22   Page 100 of 133   PageID
Case 2:20-cv-01771-PP   Document 013 Exhibit 13 Page 10 of 22   Document 9-13
#: 2865

"Generators" and therefore together build "commitments."

```
public CommitmentParams(final ZpSubgroup group, final int n) {
    group = group;
    h = GroupTools.getRandomElement(group);
    commitmentlength = n;
    g = GroupTools.getVectorRandomElement(group,
this.commitmentlength);
    }

// from getRandomElement(group)
Exponent randomExponent = ExponentTools.getRandomExponent(group.getQ());
return group.getGenerator().exponentiate(randomExponent);
```

54. Scytl and Dominion have an agreement – only the two would know the parameters. This means that access is able to occur through backdoors in hardware if the parameters of the commitments are known in order to alter the range of the algorithm deployed to satisfy the outcome sought in the case of algorithm failure.

55. Trapdoor is a cryptotech term that describes a state of a program that knows the commitment parameters and therefore is able change the value of the commitments however it likes. In other words, Scytl or anyone that knows the commitment parameters can take all the votes and give them to any one they want. If they have a total of 1000 votes an algorithm can distribute them among all races as it deems necessary to achieve the goals it wants. (Case Study: Estonia)

Case 1:21-cv-00317-DCLC-CHS Document 58-1 Filed 04/18/22 Page 101 of 133 PageID
Case 2:20-cv-01771-PP Document 9-13 Filed 12/03/20 Page 19 of 37 Document 9-13
#: 2866



$$\text{Commitment}_{CRYPT} = CM_c$$

Saytl sets    commitment - simple math

$$CM_c(\vec{\alpha}; r) = H^r \prod_{i=1}^{n} = 1 \cdot G_i^{\alpha_i}$$

$$CM_c(\vec{\alpha}; r) = H^{r + \sum_{i=1}^{n} (\alpha_i - z_i) e_i} \prod_{i=1}^{n} H^{z_i e_i}$$

$$CM_c(\vec{\alpha}; r) = CM_c(\vec{z}; r')$$

$$r' = r + \sum_{i=1}^{n} e_i (a_i - z_i).$$

56.

57. Within the trapdoor this is how the algorithm behaves to move the goal posts in elections without being detected by this proof . During the mixing phase this is the algorithm you would use to

Case 1:21-cv-00317-DCLC-CHS Document 59-21 Filed 04/18/22 Page 102 of 133 PageID
Case 2:20-cv-01771-PP Document 103 Filed 10/20/21 Page 20 of 27 Document 9-13 PageID
#: 2867

"reallocate" votes via an algorithm to achieve the goal set.

58. STEP 4|Decryption would be the decryption phase and temporary parking of vote tallies before reporting. In this final phase before public release the tallies are released from encrypted format into plain text. As previously explained, those that know the trapdoor can easily change any votes that the randomness is applied and used to generate the tally vote ciphertext. Thus in this case, Scytl who is the mixer can collude with their vote company clients or an agency (-------) to change votes and get away with it. This is because the receiver doesn't have the decryption key so they rely solely on Scytl to be **honest** or free from any foreign actors within their backdoor or the Election Company (like Dominion) that can have access to the key.

59. In fact, a study from the University of Bristol made claim that interference can be seen when there is a GREAT DELAY in reporting and finalizing numbers University of Bristol : How not to Prove Yourself: Pitfalls of the Fiat-Shamir Heuristic and Applications to Helios

60. "Zero-knowledge proofs of knowledge allow a prover to convince a verifier that she holds information satisfying some desirable properties without revealing anything else." David Bernhard, Olivier Pereira,and Bogdan Warinschi.

Case 1:21-cv-00317-DCLC-CHS Document 58-1 Filed 04/18/22 Page 103 of 133 PageID
Case 2:20-cv-01771-PP Document 88-13 Filed 04/18/22 Page 21 of 37 Document 9-13
#: 2868

61. Hence, you can't prove anyone manipulated anything. The TRAP DOOR KEY HOLDERS can offer you enough to verify to you what you need to see without revealing anything and once again indicating the inability to detect manipulation. **ZERO PROOF of INTEGRITY OF THE VOTE.**

62. Therefore, if decryption is challenged, the administrator or software company that knows the trap door key can provide you proof that would be able to pass verification (blind). This was proven to be factually true in the case study by The University of Melbourne in March. White Hat Hackers purposely altered votes by knowing the parameters set in the commitments and there was no way to prove they did it – or any way to prove they didn't.

63. IT'S THE PERFECT THREE CARD MONTY. That's just how perfect it is. They fake a proof of ciphertexts with KNOWN "RANDOMNESS" .This rolls back to the integrity of the VOTE.  The vote is not safe using these machines not only because of the method used for ballot "cleansing" to maintain anonymity but the EXPOSURE to foreign interference and possible domestic bad actors.

64. In many circumstances, manipulation of the algorithm is NOT possible in an undetectable fashion. This is because it is one point heavy. Observing the elections in 2020 confirm the deployment of an algorithm due to the BEHAVIOR which is indicative of an algorithm in play that had no pivoting parameters applied.

65. The behavior of the algorithm is that one point (B)  is the greatest point within the allocated set. It is the greatest number within the A B points given. Point A would be the smallest. Any points outside the A B points are not necessarily factored in yet can still be applied.

66. The points outside the parameters can be utilized to a certain to degree such as in block allocation.

67. The algorithm geographically changed the parameters of the algorithm to force blue votes and ostracize red.

68. Post block allocation of votes the two points of the algorithm were narrowed ensuring a BIDEN win hence the observation of NO Trump Votes and some BIDEN votes for a period of time.

Case 1:21-cv-02317-DCLC-CHS Document 56-13 Filed 04/18/22 Page 104 of 133 PageID
Case 2:20-cv-01771-PP Document 102-13 Filed 04/16/21 Page 22 of 27 Document 9-13
#: 2869



# ARIZONA
## "FIXING" THE VOTE

BIDEN INJECTION

**Nov. 3rd**
**8:06:40 pm**
**+143,100 votes**
**(Maricopa & Pima)**

NUMBER OF VOTES PROCESSED & THE TIME AT WHICH THEY PROCESSED

ELECTION DAY          NOV 4 - 10

NOV 3 - NOV 10          *DATA SOURCED FROM NEW YORK TIMES

| SUMMARY | - Mathematical evidence of the seeding "injection" of votes at the beginning<br>- A spike means that a large number of votes were injected into the totals<br>- A normal vote pattern would look like a natural progression – smooth without extreme jumps |
| --- | --- |

69.

Case 1:21-cv-00317-DCLC-CHS   Document 58-13   Filed 04/18/22   Page 105 of 133   PageID
Case 2:20-cv-01771-PP   Document 9-13   Filed 12/03/20   Page 23 of 27   Document 9-13
#: 2870

70. Gaussian Elimination without pivoting explains how the algorithm would behave and the election results and data from Michigan confirm FAILURE of algorithm.



71. The "Digital Fix" observed with an increased spike in VOTES for Joe Biden can be determined as evidence of a pivot. Normally it would be assumed that the algorithm had a Complete Pivot. Wilkinson's demonstrated the guarantee as :

$$\frac{\|U\|_\infty}{\|A\|_\infty} \leq n^{\frac{1}{2}\log(n)}$$

72.

73. Such a conjecture allows the growth factor the ability to be upper bound by values closer to n. Therefore, complete pivoting can't be observed because there would be too many floating points. Nor can partial as the partial pivoting would overwhelm after the "injection" of votes. Therefore, external factors were used which is evident from the "DIGITAL FIX"

74. Observing the elections, after a review of Michigan's data a spike of 54,199 votes to Biden. Because it is pushing and pulling and keeping a short distance between the 2 candidates; but then a spike, which is how an algorithm presents; - and this spike means there was a pause and an insert was made, where they insert an algorithm. Block spikes in votes for JOE BIDEN were NOT paper

Case 1:21-cv-00317-DCLC-CHS Document 58-13 Filed 04/18/22 Page 106 of 133 PageID
Case 2:20-cv-01771-PP Document 80-13 Filed 12/08/21 Page 24 of 27 Document 9-13
#: 2871

ballots being fed or THUMB DRIVES. The algorithm block adjusted itself and the PEOPLE were creating the evidence to BACK UP the block allocation.

75. I have witnessed the same behavior of the election software in countries outside of the United States and within the United States. In -------, the elections conducted behaved in the same manner by allocating BLOCK votes to the candidate "chosen" to win.

76. Observing the data of the contested states (and others) the algorithm deployed is identical to that which was deployed in 2012 providing Barack Hussein Obama a block allocation to win the 2012 Presidential Elections.

77. The algorithm looks to have been set to give Joe Biden a 52% win even with an initial 50K+ vote block allocation was provided initially as tallying began (as in case of Arizona too). In the am of November 4, 2020 the algorithm stopped working, therefore another "block allocation" to remedy the failure of the algorithm. This was done manually as ALL the SYSTEMS shut down NATIONWIDE to avoid detection.





78.

79. In Georgia during the 2016 Presidential Elections a failed attempt to deploy the scripts to block allocate votes from a centralized location where the "trap-door" key lay an attempt by someone using

the DHS servers was detected by the state of GA. The GA leadership assumed that it was "Russians" but later they found out that the IP address was that of DHS.

80. In the state of Wisconsin, we observed a considerable BLOCK vote allocation by the algorithm at the SAME TIME it happened across the nation. All systems shut down at around the same time.



81.

82. In Wisconsin there are also irregularities in respect to BALLOT requests. (names AND address Hidden for privacy)

| F | G | H | V | W | X | Y | AB | AC | AD | AG | AH | AI | AJ | AK | AL |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | |
| Active | Registered | Regular | Brown County | | 10/23/2020 | Voted in Person | Regular | Official | Active | Returned | Voted In Person | 10/23/2020 | 10/23/2020 | | |
| Active | Registered | Military | Brown County | 11/01/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/01/2020 | | | |
| Active | Registered | Regular | Brown County | 11/01/2020 | Online | | | Official | Active | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Email | Regular | | Official | Active | Returned | Mail | 10/31/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Voted in Person | Regular | | Official | Active | Returned | Voted In Person | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Received in Person | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Email | Hospitaliz | | Official | Active | Returned | Appointed Agent | 11/02/2020 | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | 11/02/2020 | 11/02/2020 | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Mail | Regular | | Official | Active | Returned | Appointed Agent | | 11/02/2020 | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/02/2020 | | | |
| Active | Registered | Military | Brown County | 11/02/2020 | Online | Military | | Official | Active | Not Returned | Online | 11/02/2020 | | | |
| Active | Registered | Regular | Brown County | 11/02/2020 | Online | | | | | | | | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | FPCA | Military | | Official | Active | Not Returned | Mail | 11/02/2020 | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | FPCA | Military | | Official | Active | Returned | Email | 11/02/2020 | 11/03/2020 | | |
| Active | Registered | Regular | Brown County | 11/03/2020 | Voted in Person | Regular | | Official | Inactive | Voter Spoiled | Voted In Person | 11/03/2020 | | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | Certification insufficient | Federal Absent | Active | Returned, to be Rejected | Mail | 11/03/2020 | 11/03/2020 | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Mail | Military | | Official | Active | Not Returned | Mail | 11/03/2020 | 11/03/2020 | | |
| Active | Registered | Military | Brown County | 11/03/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/03/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online | | | | | | | | | | |

83.

| | | | | | |
|---|---|---|---|---|---|
| Active | Registered | Regular | Brown County | 11/03/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/04/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/05/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |
| Active | Registered | Regular | Brown County | 11/06/2020 | Online |

84.

85. I can personally attest that in 2013 discussions by the Obama / Biden administration were being had with various agencies in the deployment of such election software to be deployed in ----- in 2013.

86. On or about April 2013 a one year plan was set to fund and usher elections in -----.

87. Joe Biden was designated by Barack Hussein Obama to ensure the ----- accepted assistance.

88. John Owen Brennan and James (Jim) Clapper were responsible for the ushering of the intelligence surrounding the elections in -----.

89. Under the guise of Crisis support the US Federal Tax Payers funded the deployment of the election software and machines in ------ signing on with Scytl.



**The White House**
Office of the Press Secretary

For Immediate Release                                                    April 21, 2014

SHARE THIS:
TWITTER
FACEBOOK
EMAIL

# FACT SHEET: U.S. Crisis Support Package for Ukraine

President Obama and Vice President Biden have made U.S. support for Ukraine an urgent priority as the Ukrainian government works to establish security and stability, pursue democratic elections and constitutional reform, revive its economy, and ensure government institutions are transparent and accountable to the Ukrainian people. Ukraine embarks on this reform path in the face of severe challenges to its sovereignty and territorial integrity, which we are working to address together with Ukraine and our partners in the international community. The United States is committed to ensuring that Ukrainians alone are able to determine their country's future without intimidation or coercion from outside forces. To support Ukraine, we are today announcing a new package of assistance totaling $50 million to help Ukraine pursue political and economic reform and strengthen the partnership between the United States and Ukraine.

90.

91. Right before the ----- elections it was alleged that CyberBerkut a pro-Russia group infiltrated --- central election computers and **deleted key files**. These actions supposedly rendered the vote-tallying system inoperable.

92. In fact, the KEY FILES were the Commitment keys to allow Scytl to tally the votes rather than the election machines. The group had disclosed emails and other documents proving that their election was rigged and that they tried to avoid a fixed election.

93. The elections were held on May 25, 2014 but in the early AM hours the election results were BLOCKED and the final tally was DELAYED flipping the election in favor of -----.

94. The claim was that there was a DDoS attack by Russians when in actual fact it was a mitigation of the algorithm to inject block votes as we observed was done for Joe Biden because the KEYS were unable to be deployed. In the case of -----, the trap-door key was "altered"/deleted/ rendered ineffective. In the case of the US elections, representatives of Dominion/ ES&S/ Smartmatic/ Hart Intercivic would have to manually deploy them since if the entry points into the systems seemed to have failed.

95. The vote tallying of all states NATIONWIDE stalled and hung for days – as in the case of Alaska that has about 300K registered voters but was stuck at 56% reporting for almost a week.

96. This "hanging" indicates a failed deployment of the scripts to block allocate remotely from one location as observed in ------ on May 26, 2014.

97. This would justify the presence of the election machine software representatives making physical appearances in the states where the election results are currently being contested.

98. A Dominion Executive appeared at the polling center in Detroit after midnight.

99. Considering that the hardware of the machines has NOT been examined in Michigan since 2017 by Pro V& V according to Michigan's own reporting. COTS are an avenue that hackers and bad actors seek to penetrate in order to control operations. Their software updates are the reason vulnerabilities to foreign interference in all operations exist.

100. The importance of VSTLs in underrated to protect up from foreign interference by way of open access via COTS software. Pro V& V who's EAC certification EXPIRED on 24 FEB 2017 was contracted with the state of WISCONSIN.

101. In the United States each state is tasked to conduct and IV& V (Independent Verification and Validation) to provide assurance of the integrity of the votes.

102. If the "accredited" non-federal entities have NOT received EAC accreditation this is a failure of the states to uphold their own states standards that are federally regulated.

103. In addition, if the entities had NIST certificates they are NOT sufficing according the HAVA ACT 2002 as the role of NIST is clear.

104. Curiously, both companies PRO V&V and SLI GAMING received NIST certifications OUTSIDE the 24 month scope.

105.     PRO V& V received a NIST certification on 26MAR2020 for ONE YEAR. Normally the NIST certification is good for two years to align with that of EAC certification that is good for two years.



106.

107.     The last PRO V& V EAC accreditation certificate (Item 8) of this declaration expired in February 2017 which means that the IV & V conducted by Michigan claiming that they were accredited is false.

108.     The significance of VSTLs being accredited and examining the HARDWARE is key. COTS software updates are the avenues of entry.

109.     As per DOMINION'S own petition, the modems they use are COTS therefore failure to have an accredited VSTL examine the hardware for points of entry by their software is key.

| | | | |
|---|---|---|---|
| *Compact Flash Cards | ***SanDisk Ultra:<br>SDCFHS-004G<br>SDCFHS-008G<br>RiData:<br>CFC-14A<br>RDF8G-233XMCB2-1<br>RDF16G-233XMCB2-1<br>RDF32G-233XMCB2-1<br>SanDisk Extreme:<br>SDCFX-016G<br>SDCFX-032G<br>SanDisk:<br>SDFAA-008G | | Memory device for<br>ICP and ICE<br>tabulators. |
| *Modems | Verizon USB Modem<br>Pantech UMW190NCD<br><br>USB Modem MultiTech<br>MT9234MU<br><br>CellGo Cellular Modem<br>E-Device 3GPUSUS<br><br>AT&T USB Modem<br>MultiTech GSM MTD-<br>H5<br>Fax Modem US<br>Robotics 56K V.92. | | Analog and wireless<br>modems for<br>transmitting<br>unofficial election<br>night results. |

110.

111. For example and update of Verizon USB Modem Pantech undergoes multiple software updates a year for it's hardware. That is most likely the point of entry into the systems.

112. During the 2014 elections in ---- it was the modems that gave access to the systems where the commitment keys were deleted.

113. SLI Gaming is the other VSTL "accredited" by the EAC BUT there is no record of their accreditation. In fact, SLI was NIST ISO Certified 27 days before the election which means that PA IV&V was conducted without NIST cert for SLI being valid.

**United States Department of Commerce**
**National Institute of Standards and Technology**

# NVLAP®

## Certificate of Accreditation to ISO/IEC 17025:2017

**NVLAP LAB CODE: 200733-0**

**SLI Compliance**
Wheat Ridge, CO

*is accredited by the National Voluntary Laboratory Accreditation Program for specific services,
listed on the Scope of Accreditation, for:*

**Voting System Testing**

*This laboratory is accredited in accordance with the recognized International Standard ISO/IEC 17025:2017.
This accreditation demonstrates technical competence for a defined scope and the operation of a laboratory quality
management system (refer to joint ISO-ILAC-IAF Communique dated January 2009).*

2020-10-07 through 2020-12-31
*Effective Dates*

*For the National Voluntary Laboratory Accreditation Program*

114.

115.    In fact SLI was NIST ISO Certified for less than 90 days.

116.    I can personally attest that high-level officials of the Obama/Biden administration and large
private contracting firms met with a software company called GEMS which is ultimately the
software ALL election machines run now running under the flag of DOMINION.

117.    GEMS was manifested from SOE software purchased by SCYTL developers and US Federally
Funded persons to develop it.

118.    The only way GEMS can be deployed across ALL machines is IF all counties across the nation
are housed under the same server networks.

119.    GEMS was tasked in 2009 to a contractor in Tampa, Fl.

120.    GEMS was also fine-tuned in Latvia, Belarus, Serbia and Spain to be localized for EU
deployment as observed during the Swissport election debacle.

121.    John McCain's campaign assisted in FUNDING the development of GEMS web monitoring via
WEB Services with 3EDC and Dynology.

Case 1:21-cv-00317-DCLC-CHS   Document 38-1   Filed 04/18/22   Page 113 of 133   PageID
Case 2:20-cv-01771-PP   Document 130-13   Filed 01/18/23   Page 31 of 47   Document 9-13
#: 2878

**SCHEDULE B–P**
**ITEMIZED DISBURSEMENTS**

Use separate schedule(s)
for each category of the
Detailed Summary Page

| FOR LINE NUMBER: (check only one) | PAGE 7358 / 8595 |
|---|---|

☒ 23 ☐ 24 ☐ 25 ☐ 26 ☐ 27a
☐ 27b ☐ 28a ☐ 28b ☐ 28c ☐ 29

Any information copied from such Reports and Statements may not be sold or used by any person for the purpose of soliciting contributions or for commercial purposes, other than using the name and address of any political committee to solicit contributions from such committee.

NAME OF COMMITTEE (In Full)
**JOHN MCCAIN 2008, INC.**

---

Full Name (Last, First, Middle Initial)
**A. 3EDC LLC**

Mailing Address 211 NORTH UNION ST STE 200

| City | State | Zip Code |
|---|---|---|
| ALEXANDRIA | VA | 22314 |

Purpose of Disbursement
WEB SERVICE

Candidate Name

Category/Type

Office Sought: ☐ House ☐ Senate ☐ President
State: ☐ District:
Disbursement For: 2008 ☒ Primary ☐ General ☐ Other (specify) ▼

Date of Disbursement
M M / D D / Y Y Y Y Y Y
03 / 17 / 2008

Transaction ID : SB23.10515

Amount of Each Disbursement this Period
399916.09

---

Full Name (Last, First, Middle Initial)
**B. A FARE EXTRAORDINAIRE**

Mailing Address 2035 MARSHALL

| City | State | Zip Code |
|---|---|---|
| HOUSTON | TX | 77098 |

Purpose of Disbursement
FACILITY RENTAL/CATERING

Candidate Name

Category/Type

Office Sought: ☐ House ☐ Senate ☐ President
State: ☐ District:
Disbursement For: 2008 ☒ Primary ☐ General ☐ Other (specify) ▼

Date of Disbursement
M M / D D / Y Y Y Y Y Y
03 / 17 / 2008

Transaction ID : SB23.10049

Amount of Each Disbursement this Period
23697.69

---

Full Name (Last, First, Middle Initial)
**C. ADMINISTAFF**

Mailing Address PO BOX 203332

| City | State | Zip Code |
|---|---|---|
| HOUSTON | TX | 77216 |

Purpose of Disbursement
INSURANCE

Candidate Name

Category/Type

Office Sought: ☐ House ☐ Senate ☐ President
State: ☐ District:
Disbursement For: 2008 ☒ Primary ☐ General ☐ Other (specify) ▼

Date of Disbursement
M M / D D / Y Y Y Y Y Y
03 / 05 / 2008

Transaction ID : SB23.10117

Amount of Each Disbursement this Period
483.68

---

Subtotal Of Receipts This Page (optional)..................................... ► 424097.46

Total This Period (last page this line number only))............................ ►

122.

123.

124.   AKAMAI Technologies services SCYTL.

125.   AKAMAI Technologies Houses ALL foreign government sites. (Please see White Paper by
       Akamai.)

126.   AKAMAI Technologies houses ALL .gov state sites. (ref Item 123 Wisconsin.gov Example)



127.

128.   Wisconsin has EDGE GATEWAY port which is AKAMAI TECHNOLOGIES based out of
       GERMANY.

129.   Using AKAMAI Technologies is allowing .gov sites to obfuscate and mask their systems by way
       of HURRICANE ELECTRIC (he.net) Kicking it to anonymous (AKAMAI Technologies) offshore
       servers.



130.

131.   AKAMAI Technologies has locations around the world.

132.   AKAMAI Technologies has locations in China (ref item 22)

133.   AKAMAI Technologies has locations in Iran as of 2019.

134.   AKAMAI Technologies merged with UNICOM (CHINESE TELECOMM) in 2018.

135.   AKAMAI Technologies house all state .gov information in GERMANY via TELIA AB.

Case 1:21-cv-00317-DCLC-CHS   Document 132-13   Filed 04/18/22   Page 115 of 133   PageID
Case 2:20-cv-01761-PP   Document 9-13   Filed 03/05/21   Page 95 of 97   Document 9-13
#: 2880

136.    In my professional opinion, this affidavit presents unambiguous evidence:

137.    That there was Foreign interference, complicit behavior by the previous administrations from 1999 up until today to hinder the voice of the people and US persons knowingly and willingly colluding with foreign powers to steer our 2020 elections that can be named in a classified setting.

138.    Foreign interference is present in the 2020 election in various means namely,

139.    Foreign nationals assisted in the creation of GEMS (Dominion Software Foundation)

140.    Akamai Technologies merged with a Chinese company that makes the COTS components of the election machines providing access to our electronic voting machines.

141.    Foreign investments and interests in the creation of the GEMS software.

142.    US persons holding an office and private individuals knowingly and willingly oversaw fail safes to secure our elections.

143.    The EAC failed to abide by standards set in HAVA ACT 2002.

144.    The IG of the EAC failed to address complaints since their appointment regarding vote integrity

145.    Christy McCormick of the EAC failed to ensure that EAC conducted their duties as set forth by HAVA ACT 2002

146.    Both Patricia Layfield (IG of EAC) and Christy McCormick (Chairwoman of EAC) were appointed by Barack Hussein Obama and have maintained their positions since then.

147.    The EAC failed to have a quorum for over a calendar year leading to the inability to meet the standards of the EAC.

148.    AKAMAI Technologies and Hurricane Electric raise serious concerns for NATSEC due to their ties with foreign hostile nations.

149.    For all the reasons above a complete failure of duty to provide safe and just elections are observed.

150.    For the people of the United States to have confidence in their elections our cybersecurity standards should not be in the hands of foreign nations.

151.    Those responsible within the Intelligence Community directly and indirectly by way of procurement of services should be held accountable for assisting in the development, implementation and promotion of GEMS.

152.    GEMS ------- General Hayden.

153.    In my opinion and from the data and events I have observed -------------------- with the assistance of SHADOWNET under the guise of L3-Communications which is MPRI. This is also confirmed by us.army.mil making the statement that shadownet has been deployed to 30 states which all

happen to be using Dominion Machines.

FAIRFAX, Va. -The Virginia National Guard's Bowling Green-based 91st Cyber Brigade completed the nationwide rollout of its ShadowNet enterprise solution July 19, 2019, with the integration of the 125th Cyber Protection Battalion into the solution's virtual private network. ShadowNet is a custom-built private cloud-based out of the brigade's data center in Fairfax, Virginia, that uses VPN connectivity to provide its aligned units with 24-hour, seven-days-a-week remote access to critical cyber training at both the collective and individual levels. The brigade successfully integrated its three other cyber protection battalions - the 123rd, 124th, and 126th Cyber Protection Battalions - into the ShadowNet platform last January.

"I'm extremely proud to announce that the Soldiers of the 91st Cyber Brigade have completed the construction and rollout of ShadowNet, a world-class enterprise solution designed to propel operational innovation in the field of cyber training," said Col. Adam C. Volant, commander of the 91st Cyber Brigade. "ShadowNet will allow us to leverage the expertise of cyber professionals across our four cyber protection battalions to build Soldier-centric programs and collective training environments that deliver breakthroughs in exercise complexity and cost efficiency. Its robust

OCTOBER 26, 2020
U.S. Army STAND-TO! | Army Readiness Training

SEPTEMBER 12, 2019
September 2017 Nominative Sergeants Major Assignments

SEPTEMBER 12, 2019
DA ANNOUNCES ROTATIONAL DEPLOYMENTS

154.     Based on my research of voter data – it appears that there are approximately 23,000 residents of a Department of Corrections Prison with requests for absentee ballot in Wisconsin. We are currently reviewing and verifying the data and will supplement.

| | | | | | | |
|---|---|---|---|---|---|---|
| 23230 | 23230 | Gutierrez | Mary | Jane | | (262)994-9050 |
| 23231 | 23231 | Hansen | Luann | M | | (262)994-9050 |
| 23232 | 23232 | Neberman | John | C | | (262)994-9050 |
| 23233 | 23233 | Reynolds | Devi | J | | (262)994-9050 |
| 23234 | 23234 | Rieckhoff | Kathryn | Susan | | (262)994-9050 |
| 23235 | 23235 | Edwards | Mark | Landon | | (262)994-9050 |
| 23236 | 23236 | Pfeiffer | Joseph | Patrick | | (262)994-9050 |
| 23237 | 23237 | Hines | Dianna | K | | (262)994-9050 |
| 23238 | 23238 | Beachem | Janice | F | | (262)994-9050 |
| 23239 | 23239 | Blackstone | Thomas | Wayne | | (262)994-9050 |
| 23240 | 23240 | Braun | Patricia | Ann | | (262)994-9050 |
| 23241 | 23241 | Smith | Raymond | L | | (262)994-9050 |
| 23242 | 23242 | Meyer | Steven | R | | (262)994-9050 |
| 23243 | 23243 | Vincent | Herbert | | | (262)994-9050 |
| 23244 | 23244 | Guajardo | Juan | P | | (262)994-9050 |
| 23245 | 23245 | Wallace | Kirk | R | | (262)994-9050 |
| 23246 | 23246 | Kaplan | Bernard | L | | (262)994-9050 |
| 23247 | 23247 | Bahrs | Michelle | M | | (262)994-9050 |
| 23248 | 23248 | Shattuck | Elizabeth | L | | (262)994-9050 |
| 23249 | 23249 | Munoz | Rosalio | S | JR | (262)994-9050 |
| 23250 | 23250 | Strunk | Amy | C | | (262)994-9050 |
| 23251 | 23251 | Schendel | Michael | P | JR | (262)994-9050 |
| 23252 | 23252 | Mack | Kimberly | N | | (262)994-9050 |
| 23253 | 23253 | Spikes | Debra | A | | (262)994-9050 |
| 23254 | 23254 | Busarow | Suzanne | M | | (262)994-9050 |
| 23255 | 23255 | Oliver | Timmy | | | (262)994-9050 |
| 23256 | 23256 | Wember | Jimmy | Dean | | (262)994-9050 |
| 23257 | 23257 | Kosterman | Michael | Richard | | (262)994-9050 |
| 23258 | 23258 | Szaradowski | Paul | M | | (262)994-9050 |
| 23259 | 23259 | Oliver | Dale | | | (262)994-9050 |
| 23260 | 23260 | Derango | Nancy | | | (262)994-9050 |
| 23261 | 23261 | Smith | Arthur | J | | (262)994-9050 | SMITH24.3059@YAHOO |
| 23262 | 23262 | Brown | Michael | Edward | | (262)994-9050 |

155.

Case 1:21-cv-00217-DCN-CHS Document 59-13 Filed 04/18/22 Page 118 of 133 PageID
Case 2:20-cv-01711-PP Filed 10/08/21 Page 96 of 97 Document 9-13
#: 2883

I declare under penalty of perjury that the forgoing is true and correct to the best of my knowledge. Executed this November 29th, 2020.

Case 1:21-cv-00317-DCLC-CHS Document 132-13 Filed 04/18/22 Page 119 of 133 PageID
#: 2884
Case 2:20-cv-01771-PP Document 68 Exhibit 13 Page 37 of 37 Document 9-13



## LATEST NEWS

**Legal Updates** | **Setting the Record Straight: Facts & Rumors** |
Return to Latest News

December 17, 2020

# DOMINION DEMANDS RETRACTION OF SIDNEY POWELL'S DEFAMATORY FALSEHOODS

DENVER, Colorado — Yesterday, legal representatives for Dominion Voting Systems issued a letter to Sidney Powell regarding her baseless and false accusations about the company over the past two months. In spreading false conspiracy theories, undermining confidence in the election process, and putting election officials in harm's way, Powell acted with malice in her defamatory accusations about Dominion. The letter demands a retraction of her most serious falsehoods.

"As I have testified under oath, Dominion has recently been thrust into the national spotlight as part of a dangerous and reckless disinformation campaign aimed at sowing doubt and confusion over the 2020 presidential election. The people making these baseless claims surely know they are lies, and these lies have consequences," said John Poulos, CEO of Dominion Voting Systems. "With this letter, we are asking Ms. Powell to publicly retract her false accusations and set the record straight."



Privacy - Terms

Exhibit 4

In its demand letter, Dominion outlines the ways in which Powell has actively misrepresented and manufactured evidence to support her defamatory falsehoods against the company and its role in the 2020 election. Her conduct and statements during her press conference, media tour, and online are part of a fundraising scheme to gain business and notoriety. In more than one instance, the letter claims, she intentionally disregarded the reliable evidence conclusively debunking her claims, instead working to undermine the election results and evidence confirmed by both Democratic and Republican state officials.

**Dominion voting machines have one main function: accurately and reliably tabulating votes from verified voters using a durable paper ballot/record controlled and secured by local elections officials.**

Dominion welcomes transparency and a full investigation of the relevant facts in a court of law.

Excerpts from the letter are below:

*"Dominion values freedom of speech and respects the right of all Americans—of all political persuasions—to exercise their First Amendment rights and to disagree with each other.  But while you are entitled to your own opinions, Ms. Powell, you are not entitled to your own facts.  Defamatory falsehoods are actionable in court and the U.S. Supreme Court has made clear that 'there is no constitutional value in false statements of fact.'  Gertz v. Welch, Inc., 418 U.S. 323, 340 (1974)."*

*"Although the indisputable facts all point to the conclusion that this was a free and fair election, you launched a media circus and fundraising campaign that undermined confidence in American democracy and peddled false, inherently improbable, and defamatory claims about Dominion participating in an international conspiracy to rig the election, deeply damaging Dominion's hard-earned reputation and business in the process."*

**Read Demand Letter to Sidney Powell (PDF)**

Return to Latest News

Privacy - Terms



## PRODUCTS

EMS ENGINE
Democracy Suite®

IN-PERSON AND ACCESSIBLE VOTING
ImageCast® X

CENTRAL TABULATION
ImageCast® Central

COMBINATION VOTING AND TABULATION
ImageCast® Precinct
ImageCast® Evolution

Optional Solutions

Founded in 2003, Dominion Voting
Systems is a leading industry
supplier of election technology
across the U.S., Canada and
globally.

## ABOUT

Dominion Difference
Dominion Secure
Careers
Latest News

## INFO

Customer Support

1-866-654-VOTE (8683)

Contact Us

U.S.: Denver, CO
CANADA: Toronto, ON

Accessibility          Privacy          Terms of          Site
Statement              Policy           Use               Map

Copyright © 2021 Dominion Voting Systems Corp.
All Rights Reserved.

Privacy - Terms



POLITICS

# Sidney Powell's Key Election Witness Is A Pro-Trump Podcaster Once Sued For Fraud: Report

Terpsichore Maras-Lindeman has been accused by North Dakota's attorney general of assuming false identities to "deceive people."

**By Mary Papenfuss**

12/25/2020 09:08pm EST | **Updated** December 26, 2020

# Exhibit 5







01:19

Michigan AG Seeks Sanctions Against Sidney Powell

ADVERTISEMENT

But podcaster Terpsichore Maras-Lindeman of North Dakota, who confirmed to the Post that she is the informant Powell has referred to, served less than a year in the Navy in the 1990s and there is no indication that she ever worked in intelligence or as an intelligence contractor.

Her affidavit submitted in Powell's lawsuit is a slight rewording of one of her blog posts written more than a year before the election, according to the Post.

A 2018 civil fraud case against Maras-Lindeman by the North Dakota Attorney General's Office accused her of falsely claiming to be a physician, a Purple Heart recipient and a Navy intelligence veteran;

 

her resume in a "persistent" effort to "deceive others," according to the Post. A judge earlier this year ordered Maras-Lindeman to pay [$25,000 in fines and attorney fees](#) after she spent donations solicited for veterans' wreaths and homeless shelters on herself. She [denied the accusations](#) and is appealing the ruling to the state Supreme Court.

The news comes after reports that Trump is considering naming Powell as a special counsel to investigate election fraud. (There have been no credible reports of fraud in the 2020 election.) Trump floated the idea early this month in a heated meeting with top aides, who blasted the idea, [according to media reports](#) confirmed by Powell.

ADVERTISEMENT

Ad removed. Details

Powell complained Thursday that officials close to the president are now prohibiting her from communicating with him.

"I've been blocked from speaking to or communicating with the president since I left the Oval Office on Friday night, by apparently everyone around him," Powell [said in an interview](#). She hasn't spoken with the president since then.

She claimed Trump offered her a special counsel post but she hasn't been able to present the paperwork to make it official. The job has so far "not come to pass because it seems it was blocked after Friday night, or undone, or I'm not sure what you'd call it," Powell said.

https://www.huffpost.com/entry/sidney-powell-terpsichore-maras-lindeman-trump-election-fraud-special-counsel_n_5fe67309c5b6acb53457f8b4          3/11

 

but "there was a discussion about me being a special White House counsel."

ADVERTISEMENT

Trump apparently hasn't dismissed the idea, according to a tweet Wednesday, saying he disagrees with "anyone that thinks a strong, fast, and fair Special Counsel is not needed IMMEDIATELY" to investigate election results.

> After seeing the massive Voter Fraud in the 2020 Presidential Election, I disagree with anyone that thinks a strong, fast, and fair Special Counsel is not needed, IMMEDIATELY. This was the most corrupt election in the history of our Country, and it must be closely examined!
> — Donald J. Trump (@realDonaldTrump) December 23, 2020

Trump's campaign last month distanced itself from Powell after she passionately promoted a bizarre conspiracy theory that Americans working with Venezuela, China, Serbia, Canada, Venezuela, Cuba, the CIA, billionaire philanthropist George Soros and the Clinton Foundation (among others) plotted to rig the presidential election against Trump by tampering with voting machines.

But Trump has kept in touch with her, and invited her to the meeting when he discussed naming her as special counsel.

Trump's former national security adviser Michael Flynn, who was recently pardoned by the president after pleading guilty of lying to the FBI, accompanied Powell to the meeting and urged the president to declare martial law and remain as president to "rerun" the election, The Associated Press reported. Flynn has denied he called

recent interview.



Aaron Rupar ✓
@atrupar

Here's Michael Flynn on Newsmax saying that Trump
could order "military capabilities" to swing states and
"rerun an election in each of those states."

"People out there talk about martial law like it's
something that we've never done. Martial law has been
instituted 64 times."

6:33 PM · Dec 17, 2020                                    ⓘ

♡ 12.3K        💬 8.1K        ⬆ Share this Tweet

Tweet your reply

Powell has promoted another secret witness, identified in court
filings as "Spyder," as a military intelligence expert. The Post
reported earlier this month that the witness is a tech consultant who
worked mostly as an Army mechanic and never in military
intelligence.



insist, with no evidence, that the vote was rigged.

Ad removed. <u>Details</u>



**Mary Papenfuss**
Trends Reporter, HuffPost

Do you have information you want to share with HuffPost? <u>Here's how.</u>

<u>Suggest a correction</u>

POLITICS AND GOVERNMENT     POLITICS     ELECTIONS



# Popular in the Community

Ad removed. Details

**U.S. Issues First Passport With Gender Neutral 'X'...**

**FDA Advisers Back Pfizer's COVID-19 Vacci...**

AdChoices ▷                          Sponsored

## You May Like



**Fun photos at the right time**
alt shot news · Ad

**We All Had A Crush On Her, This Is Her Now**
BridesBlush · Ad

**25 Movies Considered To Be Flawless**
upbeat news · Ad

**Always Keep A Bread Clip With You When Traveling**
Sogoodly · Ad

**12 Female Fashion Trends That Men Can't Stand**
Investing.com magazine · Ad

**Relatable Tweets About The Things Kids Today Will Never Understand**

HuffPost

**Kristen Stewart Talks About The 'Spooky' Scene She Filmed in 'Spencer'**

HuffPost

**Wife Goes To Bathroom, Waitress Tells Husband This**

WorldLifeStyle · Ad

**Chevy Chase Gets Candid About Bill Murray**

freshedits.com · Ad

**27 Of The Funniest Waiters and Servers Ever**

TravelerDreams · Ad

**She's Hands Down The Richest Female Singer Ever**

Sportinal · Ad

**I Can't Believe She Did THIS On Live TV...**

YourSportSpot · Ad

**'Not Looking Good': Democrats Float Cutting Sick Leave To Appease Joe Manchin**

HuffPost

**What To Buy Now If You Want To Get In The Holiday Spirit Early**

HuffPost

**30 Tweets About The Funny Names Kids Give Things**

HuffPost



**'Squid Game' Creator Shades LeBron James After Star's Criticism**

**Braves Pitcher Somehow Strikes Out 2 Hitters While Playing On A Broken Leg**

**Huma Abedin Says In New Book That U.S. Senator Sexually Assaulted Her**

**'I'm A Footballer And I Am Gay': Soccer Star Comes Out In Emotional Video**

## MORE IN POLITICS

**The Texas Abortion Ban Handed Abusers A Whole New Tool To Control Their Victims With**

Case 1:21-cv-00317-DCLC-CHS   Document 78-1   Filed 04/18/22   Page 131 of 133   PageID #: 2896



**Conservative Pundit Points Out Where Real Blame For GOP's 'Descent Into Madness' Lies**

**Trump Jr. Gets A Reality Check After Comparing U.S. To Communist Czechoslovakia**

**Democratic Lawmaker Tells 'Cheap Mistress' Trump What Republicans Say Behind His Back**

Ad  | Shopping Buzz

NEWS                              POLITICS

ENTERTAINMENT                     LIFE

COMMUNITIES                        HUFFPOST PERSONAL

VIDEO                             NEWSLETTERS

HUFFPOST                          ABOUT US

ADVERTISE                        CONTACT US

Case 1:21-cv-00317-DCLC-CHS    Document 78-1    Filed 04/18/22    Page 132 of 133    PageID #: 2897



CAREERS                                             ARCHIVE

USER AGREEMENT                                      COMMENT POLICY

HUFFPOST PRESS ROOM                                 PRIVACY POLICY

DMCA POLICY                                         CONSENT PREFERENCES

DO NOT SELL MY PERSONAL INFORMATION ▷

Part of HuffPost Politics. ©2021 BuzzFeed, Inc. All rights reserved.

The Huffington Post